**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
PATTI'S PITAS, LLC and QUEEN CITY :
TOURS, individually and on behalf of all :
others similarly situated, :
                                :
               Plaintiffs, :         CIVIL ACTION NO.
                                :
v. :         _____
                                :
                                :
WELLS FARGO MERCHANT SERVICES, LLC, :   **Jury Trial Demanded**
                                :
              Defendant. :
------------------------------------------------------------x

## CLASS ACTION COMPLAINT

      COME NOW Plaintiffs Patti's Pitas, LLC and Queen City Tours, individually and on

behalf of the class of persons and entities preliminarily defined below, and complain and allege

as follows, based on personal knowledge, investigation of counsel, and information and belief.

## INTRODUCTION

      1.     This action challenges the assessment and seizure of unauthorized and excessive

fees for merchant payment processing services by Defendant.

      2.     In today's business world, the vast majority of merchants must accept payment

for goods and services via credit and debit cards to stay competitive in the marketplace.

Plaintiffs are small businesses that could not survive without accepting debit and credit cards.  In

order to accept this method of payment, the merchant must utilize a payment processing service.

      3.     Merchants rely on the companies that provide this critical service to do so at a fair

price and in accordance with fair and appropriate terms.  Indeed, for many businesses, fees for

card processing services are likely to be the third highest expense following labor and product

costs.  Even for a very small business, these fees can easily exceed $100 per month.

4.      The card processing system can be a difficult one to understand, with many involved parties.   For instance, in addition to the merchant who receives payment and the customer who provides such payment, the processing of a card transaction involves several other parties:

(a).    <u>The Card Issuer</u> –   the company that issued the credit or debit card to the customer, which is typically a bank such as Chase, Bank of America, or Defendant's corporate affiliate Wells Fargo Bank, and which charges a fee whenever a customer uses one its cards for a transaction.   These companies charge fees that are usually calculated as a percentage of a transaction plus a per-transaction fee (e.g., 1.65% + $0.20/transaction).   This fee varies based on the type of card used.   For example, the card issuing companies will charge a higher fee for transactions involving a rewards credit card than a card with no rewards program.   These fees are generally known as "interchange rates."

(b).    <u>The Card Network</u> – the card networks (i.e., Visa, MasterCard, Discover, American Express) also charge per transaction fees.   By way of example, Visa assesses a fee known as the "APF" ("Acquirer Processing Fee"), and MasterCard charges a fee known as the "NABU" ("Network Access Brand Usage") fee.   The card networks also charge various additional fees depending on the type of transaction.   These fees are generally known as "assessments."

(c).    <u>The Payment Processor</u> – this is the entity that actually processes the payment through the card network and ensures that whenever a customer pays for an item or service with a credit or debit card, the customer's account is debited and the merchant's account is credited.   First Data Merchant Services Corporation, which co-owns Defendant with Wells Fargo Bank, N.A., serves as payment processor for all of Defendant's customers.   In this way,

more of the revenues and profits from customer transactions stay with Defendant and its owners than is often the case.

(d).   The Member Bank – only banks such as Wells Fargo Bank may be members of card networks.   These member banks "sponsor" payment processors so they may process transactions through the card networks.   Unsurprisingly, Defendant works with Wells Fargo Bank as its member bank, thus once again allowing more of the revenue earned from customers to stay under the Wells Fargo corporate umbrella, and increasing profits.

(e).   The Merchant Acquirer – this is the company that markets the payment processor's services to merchants.   Merchant acquirers essentially act as a "middle man" between merchants and payment processors.   They enroll merchants in payment processing services and usually provide customer support to the merchant.   Merchant acquirers usually work with independent agents or companies, sometimes known as Independent Sales Organizations (ISOs) or Member Service Providers (MSPs), who sign up merchants.   The merchant acquirer then pays the ISO/MSP based on a percentage of the processing fees obtained from "their" merchants.   Defendant is a merchant acquirer but also signs up merchants directly, and so qualifies as an ISO/MSP as well.   Once again, because customer revenues are shared among Defendant, Wells Fargo Bank, and First Data, an inordinate amount of revenue and profit is kept "in house."

5.   Ordinarily, a merchant that desires to accept credit and debit cards as a form of payment reaches agreement with an ISO/MSP and/or merchant acquirer to obtain such services. The parties agree on the fees that the merchant will be charged, which commonly consist of two parts:

(a).   <u>"Pass Through" Costs</u> – these charges consist of fees imposed by card issuers and the assessments imposed by card networks.   These are set costs incurred by the member bank that apply universally at any given time, regardless of the type or amount of the transaction or the identity of the merchant.   These costs are set, unavoidable, and are "passed through" to the merchant.

(b).   <u>Payment Processing Fees</u> – these are the fees which the merchant is charged by the payment processor and/or merchant acquirer for payment processing services.

6.   The number of involved parties and moving pieces can make it difficult for merchants to understand whether their card processing companies are only charging them agreed-upon fees.

7.   Unfortunately, Defendant takes advantage of this confusion, inducing small, "mom and pop" merchants like Plaintiffs to execute standardized "Merchant Processing Applications" with the promise of straightforward, transparent pricing.

8.   Defendant's 63-page, fine print "Program Guide" is where Defendant lists most contractual terms.[1]   Merchants are asked to sign a "Confirmation Page" to suggest they have read and understood the Program Guide, even though such an effort would take an expert attorney weeks of toil.   The Program Guide is a massive document that could never be read in its entirety – and certainly not understood – by a busy merchant.

9.   Through the Program Guide, Defendant seeks to backtrack from the agreed-upon fees and rates that have actually been reviewed and approved by the merchant and immunize itself from liability.   As such, several provisions of the Program Guide are illusory, lack mutuality, violate public policy, are unduly exculpatory, and are unconscionable.   Nevertheless,

---

[1] The Merchant Processing Application and Program Guide are collectively referred to herein as the contract or "the Agreement."

not even Defendant's self-serving Program Guide has a clause to explain or excuse many of Defendant's improper fee practices.

10.     After merchants sign the contracts and the parties begin to do business, Defendant implements mark-ups by inflating "pass through" costs, increasing agreed-upon fees, and imposing new junk fees.  Even though Defendant knew full well that it would take such actions – because it does so for nearly all merchant customers, and has for several years – it does not include any disclosure or discussion of such fees in its procedure for signing up new customers.

11.     Defendant usually gets away with its scheme by using techniques to prevent customers from noticing and taking action, such as: by seizing the charged amounts from merchant bank accounts before merchants receive billing statements itemizing such charges; by using deceptive language in monthly statements to lead merchants to believe increases are being mandated by card networks, as opposed to being imposed merely to pad Defendant's bottom line; by assessing charges on subsequent monthly statements, even though all information needed is already in Defendant's automated system; and by burying contractual provisions which make a mockery of customers' rights in the relationship.  Even if customers learn they are being ripped off, they are still not able to escape because Defendant imposes massive early termination fees.

12.     To the extent Defendant argues that the excessive fees and charges are authorized by the Program Guide, it will be shown that such terms are inapplicable or unenforceable.  New York law applies to all customers, because Defendant has imposed this requirement in the Program Guide.   New York law does not allow certain of Defendant's more egregious contractual provisions to be enforced.

13.     It is important to note that Plaintiffs do not seek the return of monies that were

charged because of actual increased expenses incurred by Defendant. The challenged mark-ups are assessed for the sole purpose of raising additional revenue at the merchant's expense. Such additional revenue goes straight to the bottom line as more profit.

14. For several years, Defendant has perpetrated this overbilling scheme. This case challenges the nature and amount of the payment processing fees that Defendant imposes and seeks relief via reimbursement for all such improper amounts.

## THE WELLS FARGO CULTURE

15. Over the past two years, numerous dramatic revelations about Wells Fargo's business practices have come to light. Scrutiny from regulators, the press, and the legal system has forced Wells Fargo to reimburse hundreds of millions of dollars to customers and to change its practices. Wells Fargo's improper business practices also infected Wells Fargo Merchant Services.

16. Although known by Defendant at all times (and certainly since 2015), the improper practices that had infected Wells Fargo Merchant Services did not receive public notice until April of 2017 when media reports surfaced and Defendant had acknowledged numerous problems at Merchant Services.

17. For example, the *Wall Street Journal* reported the following items on April 5, 2017:

(a). For two years Defendant knew of policy violations at Merchant Services;

(b). Wells Fargo restructured Merchant Services in the Fall of 2016 to reduce incentives for aggressive tactics;

(c). Defendant fired at least two dozen employees based on their improper practices, such as misrepresenting merchant sales volume to increase

commission income;

(d).     Customer complaints also related to improper "sales practices and fees"; and

(e).     Defendant has offered refunds and financial assistance to a few victims of its practices that were publicized in the media.

18.     The *Wall Street Journal* provided three examples of improper "sales practices and fees," including: an Arizona technology company that was charged much higher fees than promised; a North Carolina wellness coach that was stuck paying for unneeded payment processing equipment; and California food truck owners who paid fees for 18 months even though their business was not even operating.

19.     Plaintiffs and the members of the proposed class have been victimized by similar practices.

## PARTIES

20.     Plaintiff Patti's Pitas, LLC ("Patti's Pitas") is a Pennsylvania limited liability company that operated a restaurant from January 2017 to May of 2017.  The restaurant did not succeed and was shuttered in May.  During its several months of operations, Patti's Pitas was pounded by excessive fees by Defendant.

21.     Plaintiff Queen City Tours is a tour operator headquartered in Charlotte, North Carolina, which focuses on African-American themed tours of Charlotte.  Juan Whipple is the owner and operator of the business which he started after completing his military service.  The business operates as a DBA and is not a corporation or a limited liability company.

22.     Defendant Wells Fargo Merchant Services, LLC ("Merchant Services") is a Delaware limited liability company that is co-owned by Wells Fargo Bank, N.A. and First Data

Merchant Services Corporation, which is a wholly-owned subsidiary of First Data Corporation. First Data is the country's largest payment processor. Defendant was formed in 1993 and has been incredibly successful for its two partners. The current ownership percentages of the two partners appear to be 60 percent for Wells Fargo and 40 percent for First Data.

23. Defendant does not issue its own financial reports, but its finances can be gleaned from the reports submitted to the Securities and Exchange Commission by First Data. In 2015, Defendant showed $514,125,000 in profits. In 2016, Defendant earned $523,387,000. Defendant also pays each partner over $100,000,000 each year for other "additional services" they purportedly provide. These amounts are not included as profits of Defendant. In total, the partners netted $766,630,000 from Merchant Services in 2016.

24. The profitability of Merchant Services has steadily climbed in recent years, even as competition has increased in the merchant services industry.

## JURISDICTION AND VENUE

25. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d)(2) because there are more than 100 potential class members and the aggregate amount in controversy exceeds $5 million exclusive of interest, fees, and costs, and at least one class member is a citizen of a state other than New York.

26. Oddly, Defendant is not registered to do business in New York. This Court still has personal jurisdiction over Defendant, however, because it has engaged in a continuous and systematic course of doing business in New York by offering and providing payment processing services to thousands of New York citizens and companies.

27. Venue lies within this judicial because Merchant Services mandates that suits against it be filed in Suffolk County, which falls entirely within this district of the Court.

## COMMON FACTUAL ALLEGATIONS

**A.    Defendant Induces Merchants to Do Business with Pricing Promises.**

28.    Merchant Services is notorious in the payment processing industry for inducing merchants to sign up for its services through misleading statements about its fees and promises that it does not intend to keep.  Hundreds of complaints against Defendant can readily be found by simply searching on any number of small business-oriented websites.  Contrary to the impression that its sales people convey, Defendant's fees are often some of the highest that can be found in the payment industry.

29.    Merchant Services provides prospective merchant customers with a form Merchant Processing Application ("Application").  The Application also references the Program Guide, which has a total of 63 pages of text (no text on page 64) and includes voluminous legalese that could not possibly be read in its entirety or understood by merchant customers. Both the Application and the Program Guide have been revised periodically but the relevant provisions cited or quoted herein have remained substantially the same.

30.    The Application identifies the fees and charges to which the merchant will be subject if it enrolls in Defendant's services.  The Application provides that merchants will be subject to two general types of charges.

31.    The first is the pricing method.  Under "discount rate" pricing, merchants agree to pay a specified amount for each type of card transaction with such amount being calculated as a percentage of a transaction plus a per-authorization fee.  Another option is "interchange plus" where customers pay the actual rates of the card networks plus a specified mark-up for Defendant.

32.    In addition to the pricing method, the Application also specifically identifies the second type of charges, other periodic fees to which the merchant will be subject.

33.     The Application thus informs the merchant in relatively clear terms what it would be charged if it agrees to enroll with Defendant.  This transparency is very important because Defendant's contract typically extends for a mandatory term of three years.  Wells Fargo sales representatives – who have previously been highly motivated by commission income – are notorious for telling potential customers they can cancel at any time without penalty.  If a merchant desires to end its relationship with Defendant prior to the expiration of this term, however, it often must pay an early termination fee of several hundred dollars.

**B.      Defendant Buries Absurd Provisions in the Fine Print of the Program Guide that Purport to Allow It to Charge Whatever It Wants Without Fear of Legal Action.**

34.     The Application itself does not indicate that the agreed-upon fees and rates will increase (nor would increases be expected since technology and competition have actually driven down costs for payment processing) or that new, undisclosed fees and rates will be charged.

35.     Instead of conspicuously setting forth such critical provisions in the Application, Defendant buried them in the separate, fine print Program Guide – a boilerplate, non-negotiable document.

36.     Several terms set forth in the Program Guide represent a unilateral effort by Merchant Services to (a) covertly backtrack from the rates and fees prominently set forth in the Application and (b) immunize itself from liability for improper practices.

37.     For example, the Program Guide purports to allow Defendant "to increase our fees or add new fees for Services for any other reason at any time, by notifying you thirty (30) days prior to the effective date of any such change or addition."  *Id.* at § 5.6.  Boiled down to its core, this provision purports to give Merchant Services unlimited discretion to charge whatever it wants even if such fees and rates are vastly different and higher than those that are clearly set forth in the Application.

38.     By way of additional examples, the Program Guide purports to (a) limit the total amount of Defendant's liability to twelve months of fees (*id.* at § 7.4), (b) reduce all applicable statutes of limitation to one year from the date the claim accrued, regardless of when it was discovered (*id.* at § 24.4), and (c) waive the merchants' right to a trial by jury (*id.* at § 24.3).

39.     Defendant uses these provisions, as well as a hefty early termination fee, as tools to discourage aggrieved merchants from terminating their relationships with Defendant or pursuing legal action for overcharges.

40.     Several of the provisions highlighted above, and others, violate public policy, lack mutuality, are illusory, unduly exculpatory, and unconscionable, and are otherwise void and unenforceable pursuant to New York law.

### D.     Defendant Raises Fees and Imposes New Categories of Fees Not Reflected in the Application.

41.     After Defendant begins providing payment processing services, almost immediately it begins increasing charges and cramming merchants with fees that are inconsistent with the agreed-upon charges that are set forth in the Application.

42.     Indeed, Defendant increases agreed-upon rates, including but not limited to rates that are supposed to be strictly "pass through" rates, and also increases agreed-upon fees and adds new categories of fees that were not referenced in the Application.

43.     Defendant knows that if it disclosed these substantial fees in its Applications, merchants would be much less likely to leave their then-current processor.  Instead, Defendant crams merchants with these unanticipated fees after the relationship has commenced and merchants are "locked in" to long term deals that are only terminable upon payment of hefty penalties.

44.     Defendant describes these fees in a very misleading fashion so as to preclude merchants from realizing the fees are improper or Defendant, as opposed to the card networks, are responsible.

45.     Defendant seizes these additional amounts from merchant bank accounts before merchants even know they are gone.  Even if merchants could effectively decipher Defendant's monthly statements, by the time merchants receive such statements, Defendant has already debited the identified amounts from merchant bank accounts.

## INDIVIDUAL FACTUAL ALLEGATIONS

46.     Plaintiffs are former payment processing customers of Defendant.  In each case, Wells Fargo Bank utilized an existing banking relationship to push Defendant's payment processing service on Plaintiffs.

47.     Plaintiff Queen City Tours and its owner had banked with Wells Fargo for several years.  When Queen City needed expanded credit card processing capabilities in October of 2015, it inquired with Wells Fargo and was assured that Defendant would provide great service and at competitive rates.

48.     Plaintiff Patti's Pitas and its owner had also banked with Wells Fargo for years. When Patti's was opening for business in January of 2017, its owner was visited on-site by one of Defendant's sales people.

49.     In each case, Plaintiffs signed up for Defendant's service after Defendant made promises that turned out to be untrue.  For example, in both cases, Plaintiffs were not informed that they would be stuck in the contract for three years, or they would have to pay a $500 early termination fee.

50.     Even more upsetting, the fee structure that was promised by Defendant was not honored.

51.     For example, Queen City negotiated a contract with no monthly minimum charge. This was an important provision for Queen City because the tour business is seasonal and, in some months of the year, there would be no transaction activity.  Queen City's contract stated: "Monthly Minimum Processing Fee(9)       $0.00 per month."  The contract further stated at footnote (9): "If the total discount fee for Visa, MasterCard, Discover Network Card and American Express transactions in a given month is less than the Monthly Minimum Processing Fee, then in addition to the total discount fee Client will be charged an amount equal to the Monthly Minimum Processing Fee minus the total discount fee."

52.     Defendant's Program Guide also deals with the Monthly Minimum Processing Fee.  For example, in Section 41.3 it states: "A Monthly Minimum Processing Fee will be calculated beginning thirty (30) days after the date Client's Application is approved. (Refer to pricing disclosures.)."  Defendant may contend that this provision allows the company to add such fees to unsuspecting merchants but, as described below, such an interpretation would violate other clear provisions of the contract, and the specific terms of the "Pricing Terms" schedule of the Application.

53.     Queen City's contract also provided for a "Monthly Service Fee."  This fee was not further described in the fee schedule, nor in the Program Guide.  Since, by its plain terms, it would not apply in a month when no services were rendered, Queen City was willing to accept such a fee.

54.     Ultimately, in each month when Queen City had no transaction activity, Defendant assessed a minimum fee.   Such fee began at $35 and, after complaints from Queen City, was reduced to $20.

55.     Another example of an improper fee assessed by Defendant is the "Statement Billing Fee."  Plaintiff's contract stated: "Statement Billing Fee (Paper Statement) (7)     $10.00 per month."  At footnote (7) the contract clarified: "The monthly Statement Billing Fee can be waived if Client elects to access the monthly statement online instead of receiving a paper copy by mail."  Queen City promptly requested electronic statements and did receive electronic statements.

56.     On numerous occasions thereafter, however, Queen City was assessed the Statement Billing Fee in the amount of $10.

57.     Defendant's contract also made clear that Queen City would not be charged the "Non-validation PCI Compliance Fee" because it stated in the applicable footnote 8: "These fees apply to Level 4 Clients who utilize a gateway or value added reseller (VAR)."  Even if Queen City qualifies as a "Level 4 Client" it did not "utilize a gateway or value added reseller."  Indeed, Queen City does not allow payments through its website, and did not use any gateway or VAR. It was thus exempt from the "Non-validation PCI Compliance Fee."

58.     Nevertheless, Defendant repeatedly assessed Queen City with a monthly fee of $25 for "Non-Validation PCI Compliance."

59.     These and numerous other improper fees were assessed against Queen City in each month from October 2015 through 2016.  Queen City's owner complained bitterly many times, wasting dozens of hours on the phone with Defendant.  Eventually Queen City ceased using Defendant's services altogether, and switched to a competitive service that offered better service and more transparent pricing.  Since Defendant stated that $500 would be owed to terminate the account, Queen City resigned itself to paying the improper monthly minimum fee of $20 until the purported term of the contact ended.

60.     After additional problems with Defendant arose, Queen City's owner complained to federal authorities.  It was only after the Consumer Financial Protection Bureau of the Federal Reserve notified Defendant about Queen City's complaint that Defendant agreed to refund a few fees and close the account without the $500 early termination fee.

61.     Defendant's treatment of Patti's Pitas was even more outrageous.  It too was the victim of the improper "PCI" charge described above.  Perhaps because the restaurant handled more transaction activity than Queen City, however, it was hit with exponentially more fees, often hundreds of dollars in fees each month, many of which were not provided for in the fee schedule or Program Guide.

62.     One additional category of fees warrants special mention.  In the February 2017 statement, and each subsequent statement, Defendant assessed dozens of fees purportedly for transactions made during the prior month.  Even though Defendant had all needed transaction information to impose any proper fees in the month in which the transactions occurred, it uses this "bill-back" methodology to confound and confuse merchants.  In this way, it is very difficult for merchants to determine how much they are actually being charged for Defendant's services.  In any given month, Patti's Pitas was charged 30 or more "bill-back" fees often totaling over $100.

63.     Defendant's "bill-back" scheme is never described to customers and is not authorized in the rate schedule or Program Guide.  Moreover, this scheme is unusual in the industry and is not even used by First Data for its non-Wells Fargo accounts.  This outlier program is designed to deceive customers and keep them silent as to improper fees.

64.     Although confusing and non-transparent, the "bill-back" scheme would not cost customers more over the long term if Defendant did not use the program to also hide mark-ups

and fees that go directly to its bottom line.  The various assessments included in the "bill-back" charges all appear to customers to be mandated by the card networks because they are categorized as "Interchange Charges."  They include many amounts that are not passed through to the card networks, however, but rather improperly increase Defendant's profits.  Both Patti's Pitas and Queen City were victimized by this practice.

65.     Patti's Pitas stopped using Defendant's services when the restaurant closed.  The fees continued, however, until Plaintiff's owner complained.  He was initially told that the contract was for three years and he could not quit.  Fortunately, by the time the business closed, Wells Fargo's improper sales practices had already come to light so, when the owner of Patti's Pitas informed Defendant that he had not been told about a three-year term, Defendant closed the account without a termination fee.  Most of Defendant's customers are not so fortunate, rather they are put to a Hobson's Choice – pay the early termination fee (usually $500) or accept the overbilling for three years.

66.     The improper fees and charges described herein are illustrative only and are not intended to provide a full listing of the hundreds of improper fees paid by Plaintiffs.

67.     As a consequence of Defendant's overbilling policies and practices, Plaintiffs and the members of the proposed class have been wrongfully forced to pay unauthorized fees and charges.  Defendant has improperly deprived Plaintiffs and those similarly situated of significant funds, causing ascertainable monetary losses and damages.

## CLASS ALLEGATIONS

68.     Plaintiffs bring this action on behalf of themselves and all others similarly situated.

69.     The Class is preliminarily defined as:

> All United States customers of Wells Fargo Merchant Services, LLC that paid a fee not authorized in their Merchant Processing Application.

70.     Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate and as the Court may otherwise allow.

71.     Excluded from the Class are Defendant, its parents, subsidiaries, affiliates, officers, and directors, any entity in which Defendant has a controlling interest, all customers who make a timely election to be excluded, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

72.     The time period for the Class is the number of years immediately preceding the date on which the initial Complaint was filed as allowed by the applicable statute of limitations, going forward into the future until such time as Defendant remedies the conduct complained of herein.  If New York law is deemed to apply, then the relevant period is likely to begin August 4, 2011 and extend through Defendant's change in conduct or the conclusion of the case.

73.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can meet all the applicable requirements of Federal Rule of Civil Procedure 23 and can prove the elements of its claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

74.     **Numerosity.**  The members of the Class are so numerous that individual joinder of all the members is impracticable.  There are hundreds of thousands of merchants that have been damaged by Defendant's wrongful conduct as alleged herein.  The precise number of Class members and their addresses is presently unknown to Plaintiffs, but can readily be ascertained from Defendant's books and records.  Class members may be notified of the pendency of this

action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, and/or published notice.

75.   **Commonality and Predominance.**   Numerous common questions of law and fact exist as to the claims of Plaintiffs and the other Class members.  Such questions include, but are not limited to:

(a).   Whether Defendant has imposed unauthorized fees on merchants, including Plaintiffs and the other Class members;

(b).   Whether Defendant has breached the Merchant Processing Application and Agreement with Plaintiffs and the other Class members, either directly or via the covenant of good faith and fair dealing;

(c).   Whether Defendant is liable to Plaintiffs and the other Class members for imposing improper fees on merchants for Defendant's own benefit;

(d).   Whether certain contractual provisions in Defendant's Program Guide are invalid exculpatory clauses, violate public policy, lack mutuality, are illusory, are procedurally and substantively unconscionable, and are otherwise void and unenforceable;

(e).   The proper method or methods by which to measure damages and/or restitution; and

(f).   Any declaratory and/or injunctive relief to which the Class is entitled.

76.   Defendant has engaged in a common course of conduct toward Plaintiffs and the other Class members.  The common issues arising from this conduct that affect Plaintiffs and the other Class members predominate over any individual issues.  Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

77.   **Typicality.**   Plaintiffs' claims are typical of the other Class members' claims because, among other things, all of the claims arise out of a common course of conduct and assert the same legal theories.  Further, Plaintiffs and members of the Class were comparably injured through the uniform misconduct described above.

78.   **Adequacy of Representation.**   Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members; Plaintiffs have retained counsel competent and experienced in complex commercial and class action litigation; and Plaintiffs intend to prosecute this action vigorously.  Class members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

79.   **Declaratory and Injunctive Relief.**   Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, thereby making appropriate final injunctive and declaratory relief, as described below.  Specifically, Defendant continues to knowingly overbill the Class and to enforce unconscionable or otherwise unenforceable contractual provisions in order to block the Class members from seeking legal relief.  Class-wide declaratory and/or injunctive relief is appropriate to put an end to these illicit practices.

80.   **Superiority.**   A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and each of the other Class members are small compared to the burden and expense that would be required to individually litigate their claims against Defendant, thus rendering it impracticable for Class members to individually seek redress for Defendant's wrongful conduct.  Even if Class members could afford individual litigation, the court system

could not.   Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CLAIMS FOR RELIEF

### COUNT ONE
### Breach of Contract and Breach of the
### Covenant of Good Faith and Fair Dealing

81.     Plaintiffs repeat paragraphs 1 through 80 above.

82.     The actions taken by Defendant have materially violated the specific terms of its Merchant Processing Application and Agreement.

83.     Further, Defendant has breached the contract by violating the covenant of good faith and fair dealing.  Defendant is liable for the losses of Plaintiffs and the Class that have resulted from its breaches of contract.

84.     Defendant violated the contract by assessing charges not provided for in the fee schedule in the Merchant Processing Application and by unilaterally marking up agreed-upon fees and charges without proper basis.  Furthermore, Defendant has assessed other fees in the guise of pass-through fees from the card networks which are actually retained by Defendant.  Thus, Defendant has materially breached the express terms of its own form contract.

85.     Plaintiffs and the Class have performed all, or substantially all, of the obligations imposed on them under the contracts.

86.     Plaintiffs and the Class sustained damages as a result of Defendant's breaches of contract.

87.     New York law imposes upon each party to a contract the duty of good faith and fair dealing.[2]   Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain.   Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.   Evading the spirit of the bargain and abusing the power to specify terms constitute violations of good faith and fair dealing in the performance of contracts.

88.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified.   A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

89.     By charging fees that are inconsistent with those laid out in the contract, including but not limited to, increasing the amounts of agreed-upon fees and imposing new categories of fees not referenced in the contract, Defendant has violated the spirit of the contract and breached the covenant of good faith and fair dealing.   Even if Defendant believed that it had given itself contractual discretion to increase mark-ups and fees, or add new fees, such discretion is constrained by good faith and fair dealing and Defendant's actions do not comport with this duty.

90.     Plaintiffs and the Class have performed all, or substantially all, of the obligations imposed on them under the contract.   There is no legitimate excuse or defense for Defendant's conduct.

91.     Defendant's anticipated attempts to defend its overbilling through reliance on contractual provisions in the Program Guide and elsewhere will be without merit.   Such provisions are either inapplicable or are unenforceable because they are void, illusory, lacking in

---

[2] The Program Guide provides that New York law applies.

mutuality, are invalid exculpatory clauses, violate public policy, and are procedurally and substantively unconscionable, among other reasons.  These provisions do not excuse Defendant's breaches or otherwise preclude Plaintiffs and the Class from recovering for such breaches.

92.    Plaintiffs and members of the Class sustained damages as a result of Defendant's direct breaches of the contract and Defendant's breaches of the covenant of good faith and fair dealing.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the proposed Class demand a jury trial on all claims so triable and judgment as follows:

1.    Certifying this case as a class action pursuant to Federal Rule 23;

2.    Temporarily and permanently enjoining Defendant from continuing the improper business practices alleged herein;

3.    Declaring certain contractual provisions to be unenforceable and enjoining their enforcement;

4.    Awarding restitution of all improper fees seized by Defendant from Plaintiffs and the Class as a result of the wrongs alleged herein in an amount to be determined at trial;

5.    Compelling disgorgement of the ill-gotten gains derived by Defendant from its misconduct;

6.    Awarding damages in an amount to be determined by a jury;

7.    Awarding compensatory, general, nominal, and punitive and exemplary damages, as allowed by law;

8.    Awarding pre-judgment interest at the maximum rate permitted; and

9.    Awarding such other relief as this Court deems just and proper.

DATED this 4th day of August, 2017.

Respectfully submitted,

BY:    WEBB, KLASE & LEMOND, LLC

_/s/ E. Adam Webb_____
E. Adam Webb*
 Georgia State Bar No. 743910

1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
(770) 444-0773
Adam@WebbLLC.com

Attorneys for Plaintiffs


* Motion for _Pro Hac Vice_ Admission to be filed
after case number assigned