**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PATTI'S PITAS, LLC, QUEEN CITY TOURS, MARK A. BABBITT, DDS, INC., IDEAL SALES, INC., LYTLE CAFÉ, and INDIAN TREE CHIROPRACTIC, P.C., individually and on behalf of all others similarly situated,<br><br>                       Plaintiffs,<br><br>v.<br><br>WELLS FARGO MERCHANT SERVICES, LLC,<br><br>                       Defendant. | CIVIL ACTION NO.<br><br>1:17-cv-04583 (GRB)<br><br>**Jury Trial Demanded** |

## SECOND AMENDED CLASS ACTION COMPLAINT

COME NOW Plaintiffs Patti's Pitas, LLC, Queen City Tours, Mark A. Babbitt, DDS, Inc., Ideal Sales Inc., Lytle Café, and Indian Tree Chiropractic, P.C., individually and on behalf of the classes of persons and entities preliminarily defined below, with the consent of Defendant and pursuant to Federal Rule of Civil Procedure 15(a)(2), and file this Second Amended Class Action Complaint, complaining and alleging as follows, based on personal knowledge, investigation of counsel, and information and belief.

## INTRODUCTION

1.      For years, Defendant Wells Fargo Merchant Services ("Defendant") has engaged in a multi-part scheme pursuant to which it induces merchants to retain its card payment processing services via fraudulent misrepresentations and omissions concerning the nature and amount of fees that merchants will pay. Then, once merchants are locked into long term contracts, Defendant buries them with numerous unanticipated, improper, inflated, and excessive fees, and deliberately obscures and hides the fees and upcharges so that merchants cannot reasonably detect that they have been improperly charged.

2.     Among other deceptive and improper fee practices, Defendant has employed a pervasive scheme whereby it induces merchants to enroll by promoting and promising them low card processing fees, and then actually charges merchants significantly higher rates and surcharges for the vast majority of transactions.  Defendant knows that the higher rates and surcharges will be charged for the vast majority of transactions, but deliberately misrepresents, obscures, and hides that critical information from merchants, including at the time merchants enroll and after merchants enroll and the upcharges commence.  This is not a small problem but rather causes significant harm on a monthly basis to the majority of Defendant's customers.  A conservative estimate of the illicit profits resulting only from the practices described herein is **over $200 million per year**.[1]

3.     Plaintiffs bring this action against Defendant for this card processing fee upcharge scheme and for the additional unfair, unlawful, and fraudulent fee and billing conduct alleged herein, including insofar as such conduct breaches Defendant's contracts with the merchants.

4.     In today's business world, the vast majority of merchants must accept payment for goods and services via credit and debit cards to stay competitive in the marketplace.  In order to accept these methods of payment, the merchant must utilize a payment processing service.  As used throughout this Second Amended Class Action Complaint, the word "merchant" should be taken to mean any person or entity that accepts credit or debit cards for payments.  This includes small businesses and professional offices (e.g., doctors, dentists) as well as non-profits, schools, churches, government agencies, and others.  Merchants of all kinds are subject to the same abusive treatment and misconduct by Defendant.

---

[1] Defendant had 474,000 customers in 2016 (and likely has more now).

5.      Merchants like Plaintiffs rely on companies like Defendant to provide this critical service in accordance with fair and transparent terms.  Indeed, for many merchants, fees for card processing services are the third highest expense following labor and product costs.

6.      The card processing system is complex and can be extremely difficult to understand, with many involved parties.  For instance, in addition to the merchant that receives payment and the customer who provides such payment, the processing of a card transaction involves several other parties:

a.      The Card Issuer – the company that issued the credit or debit card to the customer, which is typically a bank such as Chase, Bank of America, or Defendant's corporate affiliate Wells Fargo Bank, and which receives a fee whenever a customer uses one of its issued cards for a transaction.  The fees that the card issuer receives are usually calculated as a percentage of a transaction plus a per-transaction fee (e.g., 1.65% + $0.10/transaction).  There are hundreds of different card types and the exact fee received by the card issuer varies based on the type of card used, but most transactions are charged a rate of from 1.60% to 1.90% of the transaction amount plus 10 cents.  Differences between rates are generally explained by either different costs or risks to the card issuer.  For example, rewards credit cards – which require the issuer to provide perks for the user – command a higher fee for the card issuer than a card with no rewards program.  A lower rate will generally be applied to a prepaid card, which has a lower risk of non-payment.  Higher rates apply if the card is not present, due to the increased risk of fraud.  The fees paid to card issuers are generally known as "interchange fees."

b.      The Card Network – the card networks (i.e., Visa, MasterCard, and Discover) establish and publish interchange fees applicable to each type of card in their system.  The card networks charge additional per-transaction fees, such as access fees.  By way of

example, Visa assesses an access fee known as the "APF" ("Acquirer Processing Fee"), which is currently $0.0195 per Visa credit card transaction and $0.0155 per Visa debit card transaction, and MasterCard charges an access fee known as the "NABU" ("Network Access Brand Usage") fee, which is $0.195 per any MasterCard transaction.  The card networks also charge various other additional fees depending on the merchant and type of transaction.  These additional fees are generally known as "assessments."  The fees established by the card networks (including the interchange fees and assessments) apply universally and are not subject to negotiation no matter who the customer, merchant, or processor is.  No entity aside from the card networks has the authority to modify these particular fees.

        c.     <u>The Payment Processor</u> – this is the entity that actually processes the payment and ensures that whenever a merchant receives payment for an item or service with a credit or debit card, (i) the customer's card account is debited and the merchant's bank account is credited, (ii) the merchant is assessed all applicable fees, and (iii) such fees are distributed to the proper parties.  First Data Merchant Services Corporation, which co-owns Defendant with Wells Fargo Bank, N.A., serves as payment processor for all of Defendant's customers.  In this way, more of the revenues and profits from merchant-customer transactions stay with Defendant and its owners than would be the case if a non-affiliated payment processer were used.

        d.     <u>The Member Bank</u> – only banks such as Wells Fargo Bank may be members of card networks.  These member banks "sponsor" payment processors so they may process transactions through the card networks.  Unsurprisingly, Defendant works with Wells Fargo Bank as its member bank, thus, once again, allowing more of the revenue earned from merchant-customers to stay under the Wells Fargo corporate umbrella, and increasing group profits.

e.      <u>The Merchant Acquirer</u> – this is the company that markets the payment processor's services to merchants.  Merchant acquirers essentially act as a "middle man" between merchants and payment processors.  They enroll merchants in payment processing services and usually provide customer support to the merchant, such as sending monthly statements.  Merchant acquirers usually work with independent agents or companies, sometimes known as Independent Sales Organizations (ISOs) or Member Service Providers (MSPs), which sign up merchants.  The merchant acquirer then pays the ISO/MSP based on a percentage of the processing fees obtained from "their" merchants.  Defendant is a merchant acquirer but also signs up merchants directly, and so qualifies as an ISO/MSP as well.  Once again, because customer revenues are shared among Defendant, Wells Fargo Bank, and First Data, a larger amount of revenue and profit is kept "in house."

7.      The number of involved parties and moving pieces can make it difficult for merchants to understand what fees are assessed for each transaction and how they are calculated.  Merchants thus rely on merchant acquirers, like Defendant, to explain on the front end of their relationship exactly what fees will be charged.

8.      Unfortunately, Defendant exploits this position of power.  It induces merchants like Plaintiffs to execute standardized agreements that prominently disclose seemingly straightforward, transparent fees as an inducement to enter into business with Defendant.  However, all the while, Defendant knows that the merchant is going to be flooded with additional fees that either were never disclosed in the standardized agreements or were concealed in the fine print and never brought to the merchant's attention, and with inflated fees and charges above and beyond what Defendant promised to induce the merchant to enroll.

9.     Defendant aggressively perpetrates this scheme.  Its standardized proposals and contracts intentionally misrepresent, omit, and/or conceal key facts concerning the fees and rates it knows it will eventually charge merchants if they sign on the dotted line.

10.     Defendant engages in this fraud to induce merchants to do business with Defendant.  Indeed, Defendant knows full well that if merchants knew the true nature and extent of the fees they would eventually be charged, they would not agree to do business with Defendant.

11.     After inducing merchants to bind themselves to the standardized contract, Defendant then systematically crams merchants with fees that were either not disclosed in the agreement, were not sufficiently explained in the agreement, and/or that exceed the rates promised or otherwise violate the express terms of the agreement.  Making matters worse, Defendant formats its monthly statements in a manner designed to confuse and confound merchants, and to obscure and hide its overcharges so that merchants cannot reasonably detect that they have been improperly charged.

12.     This case challenges the nature and amount of the fees that Defendant imposes on its customers in the below defined classes, and seeks rescission, monetary damages, restitution, declaratory relief, and injunctive relief.

## THE WELLS FARGO CULTURE

13.     Over the past two years, numerous dramatic revelations about Wells Fargo's business practices have come to light.  Scrutiny from regulators, the press, and the legal system have forced Wells Fargo to reimburse hundreds of millions of dollars to harmed customers and to acknowledge egregious systemic misconduct that has occurred within multiple divisions of the bank.  Wells Fargo's improper business practices, and the culture of corruption at Wells Fargo, have also infected Defendant Wells Fargo Merchant Services.

14.    In or around April 2017, media reports surfaced regarding certain improper practices taking place at Defendant, forcing Defendant to acknowledge numerous problems it had known about for years.

15.    For example, the *Wall Street Journal* reported the following items on April 5, 2017:

    a.    For two years Defendant knew of policy violations at Merchant Services;

    b.    Wells Fargo restructured Merchant Services in the Fall of 2016 to reduce incentives for aggressive sales and other tactics;

    c.    Defendant fired at least two dozen employees based on their improper practices, such as misrepresenting merchant sales volume to increase commission income and pushing merchants into costly contracts they did not understand;

    d.    Customer complaints also related to improper "sales practices and fees"; and

    e.    Defendant has offered refunds and financial assistance to a few victims of its practices that were publicized in the media.

16.    The *Wall Street Journal* provided three examples of improper "sales practices and fees," including: an Arizona technology company that was charged much higher fees than promised; a North Carolina wellness coach that was stuck paying for unneeded payment processing equipment; and California food truck owners who paid fees for 18 months even though their business was not even operating.

17.    These allegations of wrongdoing were echoed by former employees of Defendant who recently told another publication that the company "made a practice of referring small businesses already using the bank to its credit card processing services . . . then keeping clients in

the dark about the escalating credit card processing fees that ate into their narrow margins." *See* Davis, O., "Small Business and the Little Red Stagecoach," *Dealbreaker* (April 5, 2017) (found at http://dealbreaker.com/2017/04/ last visited on Oct. 4, 2017).  Several other scandalous practices of Defendant have been characterized as widespread and well-known to Defendant's employees in media reports.

18.     For example, CNN reported the following based on statements from a former employee of Defendant:

> "We used to be told to go out and club the baby seals: mom-pop-shops that had no legal support," he said in an interview.  The former Wells Fargo employee spoke on the condition of anonymity, but CNNMoney verified that he worked for Wells Fargo Merchant Services.
> The former Wells Fargo employee told CNNMoney that when he worked there, from 2011 to 2013, it was nearly impossible for business owners to leave the merchant agreement.  "God would have had a hard time" escaping the contract, he said.  "It really was like a shady used car deal."

Egan, M., "Wells Fargo accused of ripping off mom-and-pop shops" (Aug. 11, 2017) (found at http://money.cnn.com/2017/08/11/investing/wells-fargo-small-business-credit-card-fees/index.html last visited on Oct. 4, 2017).

19.     Such practices are particularly appalling given that, in 2005, Wells Fargo paid more than $30 million to settle a class action filed by California merchants who claimed they were charged fees that were not authorized or disclosed appropriately.  Clearly, given the facts alleged herein, Defendant decided it was more profitable to continue engaging in such tactics, and to implement and/or continue to implement other deceptive and improper practices, rather than to adopt ethical policies and practices.

20.     Plaintiffs and the members of the proposed classes, preliminarily defined below, have been victimized by Defendant's deceptive and improper practices alleged herein.

## PARTIES

21.     Plaintiff Patti's Pitas, LLC ("Patti's Pitas") is a Pennsylvania limited liability company that previously operated a restaurant.  The restaurant did not succeed and was shuttered in May of 2017.  From January of 2017 to May of 2017, Patti's Pitas was a customer of Defendant.

22.     Plaintiff Queen City Tours ("Queen City") is a tour operator headquartered in Charlotte, North Carolina, focusing on African-American themed tours of Charlotte.  Juan Whipple is the owner and operator of the business which he started after completing his military service.  The business operates as a DBA and is not a corporation or a limited liability company.  Queen City was a customer of Defendant from October of 2015 through April of 2017.

23.     Plaintiff Mark A. Babbitt, DDS, Inc. ("Dr. Babbitt") is a California corporation operating a dental office.  Dr. Babbitt was a customer of Defendant from February of 2012 until 2014.

24.     Plaintiff Ideal Sales, Inc. ("Ideal Sales") is a California corporation that manufacturers and sells printed circuit boards.  It was a customer of Defendant from January of 2012 through May of 2017.

25.     Plaintiff Lytle Café is a Mexican restaurant in Lytle, Texas.  Juan Ramirez and Olivia Guerrero are the owners and operators of the business, which is a Texas-licensed partnership.  Lytle Café is a current customer of Defendant and has been a customer of Defendant since July of 2016.

26.     Plaintiff Indian Tree Chiropractic, P.C. ("Indian Tree Chiropractic") is a Colorado corporation that operates a chiropractic clinic.  Indian Tree is run by Dr. Ken Spresser, who has been selected as Colorado's Chiropractor of the Year an unprecedented six times by his peers.  Indian Tree Chiropractic was a customer of Defendant from June of 2014 through June of 2017.

27.     Defendant Wells Fargo Merchant Services, LLC ("Defendant") is a Delaware limited liability company that is co-owned by Wells Fargo Bank, N.A. and First Data Merchant Services Corporation ("First Data").  First Data is a wholly-owned subsidiary of First Data Corporation, which is the country's largest payment processor.  Defendant was formed in 1993 and has been incredibly successful for its two partners.  The current ownership percentages of the two partners are 60 percent for Wells Fargo and 40 percent for First Data.

28.     Defendant does not issue its own financial reports, but its finances can be gleaned from the reports submitted to the Securities and Exchange Commission by First Data Corporation.  In 2015, Defendant showed $514,125,000 in profits.  In 2016, Defendant earned $523,387,000.  Defendant also pays each partner over $100,000,000 each year for other "additional services" they purportedly provide.  These amounts are not included as profits of Defendant.  In total, the partners netted $766,630,000 from Defendant in 2016.

29.     The profitability of Defendant has steadily climbed in recent years, even as competition has increased in the merchant services industry.

## JURISDICTION AND VENUE

30.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d)(2) because there are more than 100 potential class members and the aggregate amount in controversy exceeds $5 million exclusive of interest, fees, and costs, and at least one class member is a citizen of a state other than Defendant's state of citizenship.

31.     Oddly, Defendant is not registered to do business in New York even though it contractually mandates that all disputes against it be pursued in New York courts.  This Court has personal jurisdiction over Defendant, however, because it has engaged in a continuous and systematic course of doing business in New York by offering and providing payment processing services to thousands of New York citizens and companies.

32.     Venue lies within this judicial district because Defendant mandates that suits against it be filed in Suffolk County, which falls entirely within this district.

## COMMON FACTUAL ALLEGATIONS

**A.**     **Defendant Induces Merchants to Do Business with Pricing Promises.**

33.     Defendant has a long history of inducing merchants to sign up for its services through omissions and misrepresentations regarding the fees charged.  Hundreds of complaints regarding Defendant's fraudulent and improper fee practices can be found on small business-oriented websites.

34.     Contrary to the impression that its sales people and its form contracts convey, and contrary to its representations and promises, Defendant's fees are often some of the highest that can be found in the payment industry.  Cardfellow, a website that reviews merchant acquirers, had this to say about Defendant:

> Wells Fargo Merchant Services is responsible for some of the highest rates and fees we have ever seen in the ten years we've been helping businesses secure the most competitive credit card processing company.
>
> We have seen competitive pricing from Wells Fargo, too, but it's few and far between.  From the statements, applications, and quotes we have reviewed over the years it is very apparent that Wells Fargo Merchant Services favors opaque tiered/bundled and bill-back pricing models with aggressive (high) fees.
>
> It leverages its banking relationships to lock its business clients into generally uncompetitive credit card processing solutions with lengthy contract terms and high cancellation fees.  It uses First Data as it's processor, so Wells Fargo does not offer any equipment or software options that cannot be found elsewhere through a far more competitive and transparent merchant service provider.
>
> Proceed with extreme caution if you're considering Wells Fargo Merchant Services to process your business's credit card transactions.

*See* "Wells Fargo Merchant Services Review" (found at https://www.cardfellow.com/credit-card-processors/wells-fargo-merchant-services/ last visited on Oct. 4, 2017).

35.     Defendant lures in customers through a standardized, deceptive marketing and enrollment process.  First, before they enroll, and to induce them to enroll in Defendant's services, Defendant provides every prospective customer, including the Plaintiffs, with a written proposal which supposedly sets forth the fees and rates the merchant will be charged if it enrolls in Defendant's services.  This is a short document called "Processing Proposal" or "Pricing Terms" that prominently discloses the seemingly applicable pricing.  Merchants are led to believe that the fees and rates disclosed in the proposal are the fees and rates that they will actually pay if they do business with Defendant.

36.     If the merchant is agreeable to the fees and charges set forth in the proposal, Defendant prepares and provides the merchant with a form Merchant Processing Application ("Application"), such as that attached hereto as Exhibit A.    The Application, which is often in excess of 15 dense, fine-print pages, also references another form document called the Program Guide (e.g., Exhibit B hereto), which has more than 50 pages of text, is a contract of adhesion drafted by Defendant and offered to merchants on a take-it-or-leave-it basis, and includes voluminous legalese that Defendant knows will not be read in its entirety or reasonably understood by its customers.  Both the Application and the Program Guide have been revised periodically and the versions attached hereto are merely samples.  Discovery is needed to determine when the various versions of each document applied.[2]  However, on information and belief, the relevant provisions cited or quoted herein have remained substantially the same throughout the relevant period.

_____

[2] For instance, Program Guide version "WFB1707 REV00 (7/14)" is attached hereto.  This is **not** the version of the Program Guide that governs some of the Plaintiffs' accounts.  For instance, Mark A. Babbitt DDS, Inc.'s Merchant Processing Application indicates that its account is governed by Program Guide version "WFB1405."  While it is believed that the versions are largely similar, discovery is needed.

37.     In a prominent section of the Application marked "Pricing Terms," Defendant identifies the fees and charges to which the merchant will be subject.  The pricing is a highly material part, if not the most critical part, of the deal to merchants.  The form of the Pricing Terms section is often identical to the form of the proposal the merchant has previously been provided, so a merchant need only compare the two to ensure the fees and charges it is agreeing to in the Application are the same as those it has already reviewed and approved.

38.     The Pricing Terms section of the Application always covers two general categories of fees and charges: (1) "card processing fees" that will be charged, on a per-transaction basis, for each of the credit and debit card transactions processed for the merchant; and (b) "other processing fees" consisting of certain other fees and charges that may apply to that particular merchant, some but not all of which are flat monthly fees.

39.     With respect to first category (the "card processing fees"), customers are subject to one of two programs offered by Defendant.  The most common option offered by Defendant's sales agents is the "fixed" pricing method.  Under "fixed" pricing, merchants agree to pay specified card "processing fee" rates for each card transaction.  *E.g.*, Exh. A, p. 4 (noting rates of 1.86% for Visa, MasterCard, and Discover credit card sales and 1.41% for Visa, MasterCard, and Discover debit card sales).  The second, less common option offered by Defendant is the "interchange plus" pricing method.  Under "interchange plus" pricing, merchants agree to pay the actual interchange fees and assessments set by the card networks (i.e., on a pass-through basis) plus a specified mark-up for Defendant.  Most of Defendant's customers sign up for the "fixed" pricing method, which is generally the only program that has been presented to them by Defendant's sales agents.

40.     For merchants that agree to the "fixed" pricing method, the Pricing Terms in the Application specify the fixed per-transaction card processing rates that will apply.  For merchants that agree to the "interchange plus" pricing method, the Pricing Terms specify the per transaction mark-up rates (i.e., the mark up above the pass-through fees) that will apply.

41.     The second category of fees covered by the Pricing Terms (the "other processing fees") lists other fees and charges to which the merchant may be subject.  *E.g.*, Exh. A, pp. 4-5 (disclosing various fees, such as a monthly service fee of $5.00, authorization fees of $0.25, and a monthly statement billing fee of $10.00, etc.).  Some of these "other processing fees" are only applicable to some merchants and/or are only applicable in certain circumstances, as specified.

42.     The Application's Pricing Terms thus inform the merchant of the fees and charges it will be charged if it agrees to enroll with Defendant.  The straightforward presentation of these terms is very important because of the complicated nature of the payment processing system and because Defendant's contract typically extends for a mandatory term of three years.  Wells Fargo and related sales representatives – who have previously been highly motivated by commission income – are notorious for telling potential customers they can cancel at any time without penalty.  If a customer desires to end its relationship with Defendant prior to the expiration of this term, however, it typically must pay an early termination fee ("ETF") of several hundred dollars.  *E.g.,* Exh. B, §§ 10.2 (noting three year term); 41.3 (specifying ETF of $500).

43.     Defendant has never had any intention of charging the merchant only those fees and rates set forth in the Processing Proposal or Pricing Terms.  Indeed, those fees and rates comprise only a fraction of the fees and rates that are actually imposed once a merchant starts to do business with Defendant.

**B.    Defendant Crams Merchants With Numerous Unexpected, Improper, and Inflated Fees That Exceed What Defendant Promised Merchants to Obtain Their Business**

44.     After Defendant begins providing payment processing services, immediately it begins increasing charges and cramming merchants with fees that are inconsistent with the agreed-upon fees and charges set forth in the Application.

45.     Defendant has implemented various schemes and practices whereby it systematically charges customers fees and rates that were not disclosed, were inadequately disclosed, and/or that far exceed what Defendant promised the merchants, in their Processing Proposal and Pricing Terms, in inducing them to do business with Defendant.  The overcharge schemes and practices described below are examples, and are not intended to be an exhaustive list of all of Defendant's unfair and improper fee and billing practices.  Discovery will be necessary to fully understand all of the improper charges Defendant has assessed on Plaintiffs and the proposed classes.

**1.    Defendant's Card Processing Fees Upcharge Scheme.**

46.     For those merchants that agree to the "fixed" pricing method for card processing fees, the Pricing Terms in their Applications prominently disclose the rates they supposedly will pay for each Visa, MasterCard, and Discover credit and debit card transaction.  *E.g.*, Exh. A, p. 4.  Thus, merchants are apprised of these rates before enrolling in Defendant's services.

47.     These prominently disclosed "fixed" rates are typically attractive, relatively low rates that are modestly higher than the interchange fees set by the card networks.  In the case of Plaintiff Dr. Babbitt, for example, the Pricing Terms specified a "fixed" rate of 1.86% for credit card transactions.  Exh. A, p. 4.  This is comparable to the average rates charged by the card networks (approximately 1.60%), and also includes a relatively modest mark-up for Defendant, which is to be expected.  A mark-up of .26% above the average of the actual interchange rates is

not unusual at other processors, but apparently such a profit margin is not enough to satisfy Defendant's appetite.

48.     In reality, Defendant's supposedly "fixed" card processing fee rates that are prominently specified in the merchants' Pricing Terms are largely a mirage, deliberately chosen and promoted by Defendant to bait merchants into enrolling in Defendant's services.  In fact, merchants only are charged this specified "fixed" rate for a very small percentage (on information and belief, as little as 10% or less) of credit and debit card transactions that Defendant unilaterally determines are "qualified" transactions.  ***All remaining transactions*** (i.e., the ***vast majority of transactions***; as many as 90% or more) are deemed by Defendant to be "non-qualified" and are charged exorbitantly higher rates, which include (a) the difference between the specified "fixed" rate and the actual pass through interchange rate and (b) an additional "surcharge" for Defendant.

49.     The actual card processing fees that Defendant charges merchants for the vast majority of card transactions (i.e., for the so-called "non-qualified" transactions) can be as high as double or even triple the "fixed" rates prominently specified in the merchant's "Processing Proposal" and/or Pricing Terms.

50.     Defendant goes to great lengths to conceal this upcharge scheme and to mislead merchants about the card processing fees they are charged.  For example, on the typical written proposal given to merchants before a relationship is formed, where the "fixed" card processing fee rates are prominently disclosed to merchants, there is absolutely no mention of the fact that these rates will actually only be charged for some credit and debit card transactions, let alone that these rates will, in fact, only apply to a *very small percentage* of card transactions and that significantly higher rates will be charged for most card transactions.  *E.g.*, Exh. A, p. 4.  Neither

the higher rates nor the surcharges that are applied to most transactions, nor anything even remotely suggesting their existence, are anywhere to be found in either the proposal or the Pricing Terms section of the Application.  There is not even a footnote or an asterisk next to the specified "fixed" rates to indicate any limitations or caveats applicable to the specified rates, even though Defendant's form proposal and Pricing Terms typically include no less than 14 explanatory footnotes applicable to other fee terms.  *E.g.*, Exh. A, p. 4.

51.    While the Program Guide includes a provision (e.g., Exh. B, § 5.6) that purports to give Defendant broad discretion to change fees after providing written notice, Defendant's card processing fee upcharge scheme is not implemented pursuant to that provision.  The upcharges in question begin for the so-called "non-qualified" transactions (i.e., the vast majority of card transactions) immediately after the merchant begins doing business with Defendant and no written notice of any kind is ever provided.

52.    The format and content of these forms is no accident.  Defendant knows the Pricing Proposal and Pricing Terms set forth the information that merchants are especially focused on.  Defendant has intentionally omitted from them the fact that the identified "fixed" rates will only apply to a very small percentage of card transactions so as to conceal its scheme from merchants when they are deciding whether to do business with Defendant.

53.    Rather than be forthright about this critical information, Defendant has instead buried anything even remotely resembling an "explanation" of its scheme deep in the fine print, far removed from the Pricing Terms in a later section of the Application merchants are unlikely to notice or read.  Even this buried language, however, fails to sufficiently explain the upcharge scheme.   Instead, it too utterly fails to accurately or clearly describe what Defendant actually does when assessing card processing fees.

54.     Even to the extent a merchant reads the buried language in question, Defendant intentionally words this buried language so as to mislead merchants into believing that the specified "fixed" card processing rates will, at the very least, be charged for most card transactions, when in fact such rates are only charged for a very small fraction of card transactions (with substantially higher rates charged for the vast majority of card transactions).

55.     In a section labeled "Interchange Pricing Summary," which appears for example *on pages 17 and 18* of Dr. Babbitt's 18-page Application, the following language is found:

**Your Discount Rates**

The discount rate(s) set forth in your merchant agreement ("Discount Rate(s)") anticipate that you will process your Visa, MasterCard, and Discover credit and non-PIN debit transactions at the following interchange levels ("Anticipated Interchange Levels"):

**Visa CPS Retail Credit & US Regulated Debit w/ Fraud Adjustment**
**MasterCard Merit III Credit & Regulated PO Debit w/ Fraud Adjustment**
**Discover PSL Retail Credit & Regulated Debit w/ Fraud Adjustment**

*E.g.*, Exh. A, p. 17 (emphasis in original).  The six items listed as "anticipated interchange levels" are six particular credit/debit card types – one credit card type and one debit card type for each of the three card networks (i.e., Visa, MasterCard, and Discover).  For each card network, the two card types that are listed for that network as being "anticipated," are in fact just two types of a dozen or more card types for that card network.  Thus, for example, "Visa CPS Retail Credit & US Regulated Debit w/ Fraud Adjustment," listed as "anticipated" for Visa, are just two (one credit and one debit) of hundreds of types of Visa credit and debit cards.

56.     The meaning of this text is open to multiple interpretations.  Defendant apparently interprets the term "interchange level" to mean "card type" so it can try to exploit this buried language to assert that the agreed-upon "fixed" card processing rates, specified in the Pricing Terms, are applicable only to transactions involving two of the hundreds of types of Visa cards,

18

two of the dozens of types of MasterCard cards, and two types of Discover cards.  The "fixed" rates specified in the merchants' Payment Terms are charged by Defendant *only* for transactions involving these six types of cards.  Transactions involving *all other cards* (which account for the vast majority of card transactions) are charged at significantly higher rates and are subject to massive surcharges by Defendant.

57.     This buried "disclosure" misleadingly states that it is "anticipated" that the merchant will process transactions through only the specific types of "interchange levels" (interpreted by Defendant as card types) that have been chosen by Defendant.   These six identified card types consist of very basic card types with no associated cardmember benefits and are used for only a small percentage (on information and belief, as little as 10% or less) of card transactions.  These particular cards are assigned low interchange rates by the card networks.  For example, the identified debit card types in Dr. Babbitt's Application are all charged rates of .05%, while the rates of the identified credit cards are 1.51% (Visa CPS Retail Credit), 1.58% (MasterCard Merit III Credit), and 1.56% (Discover PSL Retail Credit).  With respect to Dr. Babbitt, the agreed-upon credit card pricing will turn a profit for Defendant (i.e., 1.51% - 1.58% true interchange vs. 1.86% agreed rate).  Exh. A, p. 4.  Moreover, Defendant's profit on transactions made using the identified debit cards is enormous (i.e., .05% true interchange vs. 1.41% agreed rate).  *Id.*

58.     The use of the word "anticipated" in this "disclosure" by Defendant is grossly misleading and incorrectly suggests to merchants (to the extent they even see this language, and even assuming *arguendo* they can reasonably begin to understand it, which Plaintiffs dispute) that when they accept credit and debit cards, the transactions are predicted or expected by Defendant to be made using one of the six particular identified card types, the type names of

19

which are unknown to anyone but payment industry experts.  The impression created by this language is false and misleading, and willfully so on Defendant's part.  Defendant is well aware that only a very small percentage of merchants' card transactions involve these few so-called "anticipated" card types, and that the vast majority of card transactions involve other cards.  In fact, as Defendant is well aware, not only do the six "anticipated" card types account for just a very small percentage of the cards for the Visa, MasterCard, and Discover card networks, but consumers also use rewards cards, which provide them a variety of benefits, far more than the listed "anticipated" card types which provide them no benefits.  Thus, only a tiny fraction of transactions will ever actually be made using one of the so-called "anticipated" card types.

59.      In reality, Defendant not only "anticipates" that the vast majority of card transactions will ***not*** process at the so-called "anticipated interchange levels," ***it knows this for a fact***, and thus also knows for a fact that for the vast majority of card transactions, the merchant will be charged significantly higher rates than the specified "fixed" rates prominently disclosed and promised to the merchants.  Yet, nowhere do Defendant's form contracts or documents disclose any of this critical information.

60.      The buried "disclosure" language next notes that:

> In order to process transactions at these Anticipated Interchange Levels, you must satisfy certain qualification criteria established by Visa, MasterCard and Discover, also known as the payment networks.  The primary criteria are set forth below *(for more information about these qualification criteria, please call the number at the bottom of the page)*:  . . . .

*E.g.*, Exh. A, p. 17 (emphasis in original).

61.      This provision then proceeds to list the criteria, such as signatures being obtained for swiped cards, transactions must be authorized and settled within one day, authorization and settlement amount must match for non-PIN transactions, etc.  *Id.*

62.    This provision suggests that the merchant must meet all of these "qualification criteria" for a transaction to be processed at the "Anticipated Interchange Levels."

63.    However, even a merchant that sees and understands this buried language, and diligently ensures that it follows these "qualification criteria," will still usually not have its transactions processed at the "Anticipated Interchange Level" and will still usually be charged per-transaction card processing rates that are higher than the "fixed" rates they agreed to as specified in their Pricing Terms.  That is because there is another, *undisclosed* criteria – i.e., that the transaction in question involve one of the six "anticipated" card types.  Again, because the vast majority of customers do not use one of the "anticipated" cards (there is no way from looking at a card for the merchant to know whether it is one of the six "anticipated" card types or one of the hundreds of other card types), Defendant will, for the vast majority of transactions, charge far more than the agreed-upon "fixed" rate even though the merchant satisfies the listed qualification criteria.  Thus, under the scheme Defendant has concocted, a merchant is powerless to actually ensure that it qualifies for the "Anticipated Interchange Levels" and that it will be charged the card processing rates specified in their Pricing Terms.

64.    The next provision states:

**Non-Qualified Transactions and Fees**

Each interchange level has an associated interchange fee that is established by Visa, MasterCard or Discover.  If a transaction does not satisfy all the qualification criteria for your Anticipated Interchange Level, then Visa, MasterCard or Discover will not process the transaction at the Anticipated Interchange Level.  This type of transaction is often referred to as a "Non-Qualified Transaction."

For processing each Non-qualified Transaction, you will be assessed the Discount Rate and an additional fee.  The additional fee is made up of **TWO** components: **The Non-qualified Interchange Fee and a Non-qualified Surcharge**.

Exh. A, p. 18 (emphasis in original).

65.     The first sentence of this provision is true – each interchange level has an associated interchange fee set by Visa, MasterCard, or Discover.

66.     The second sentence, however, is a complete fabrication.  It suggests that Visa, MasterCard, and Discover determine whether a transaction qualifies or does not qualify for an "Anticipated Interchange Level."  In reality, the card networks have nothing to do with this decision.  Defendant misleads merchants into thinking that whether a transaction is "qualified" or "non-qualified" is something Defendant does not control, but in reality Defendant unilaterally makes this determination itself.

67.     By falsely attributing the decision as to whether a transaction is "qualified" or "non-qualified" to the card networks, Defendant ensures that even if merchants could reasonably locate and understand Defendant's interpretation of the buried "disclosure," they would be falsely led to believe that the higher fees and surcharges for "Non-Qualified Transactions" are being assessed by the card networks and are out of Defendant's control.

68.     Along the same lines, as discussed below, Defendant also falsely labels, in the merchants' monthly statements, the upcharges for the so-called "non-qualified" transactions as "Interchange Fees" (which they decidedly are not),[3] to further the false impression that these upcharges are mandated by the card networks and are out of Defendant's control, even though they are exclusively within Defendant's control and exist by Defendant's own deliberate design.

---

[3] Here is how one expert defined interchange fees:  "Member issuing banks have created a fee or cost called Interchange that is collected from merchants and passed on to them on a monthly basis. Interchange is the base cost comprised of a percentage rate and transaction fee that member banks determine based on card type, i.e. consumer vs business, credit vs debit card, and industry type, i.e. corporate, government, business to business (B2B), business to consumer (B2C), each with its own risk factor, liability, and profitability that affect their Interchange cost. Interchange is the gross income to the banks that issue credit and debit cards.  Interchange is commonly referred to as a Pass-Through Cost."  Nouri, A., *Credit Card Processing: Exposé*, p. 15 (2016).

69.     The additional fees that Defendant assesses for transactions it unilaterally determines are "Non-Qualified," are not minor and often cause the "fixed" rate to be doubled or even tripled.

70.     This pervasive upcharge scheme transforms a system that would be moderately profitable for Defendant into one that is outrageously favorable to Defendant and grossly unfair and harmful to the unwitting merchants.  It can rightly be said that no merchant understands the qualified/non-qualified scheme and, if they did, they would never agree to it.  Defendant uses its form documents, and the disclosures and omissions therein, to perpetrate this fraudulent scheme on an enormous scale.  At least hundreds of thousands of merchants in the United States, including all of the Plaintiffs, have been fraudulently induced into signing up for Defendant's services in this manner and have been subject to these and other upcharges.

71.     Even after merchants enroll in and begin receiving Defendant's services, Defendant continues to systematically and deliberately hide and obscure these card processing fee upcharges so that merchants cannot reasonably detect that they have been charged more than the agreed upon rates.  Indeed, Defendant craftily formats all of its monthly statements to confuse merchants and preclude them from detecting the upcharges, the existence of the so-called "non-qualified" transactions, or ever determining how much they are actually being charged for a given "non-qualified" transaction.

72.     For instance, despite knowing full well whether a given transaction is "qualified" or "non-qualified" contemporaneously when it clears, Defendant bills all card transactions for a given month at the agreed "fixed" rate on the merchant's corresponding monthly statement, thereby giving the merchant the impression that it was charged the agreed "fixed" rate for all of the card transactions.  Then, on the merchant's *next* monthly statement, Defendant includes

entries that are deliberately mislabeled by Defendant but that comprise the aggregated extra charges for the transactions from the prior month deemed "non-qualified."  *Compare*, *e.g.*, Indian Tree Chiropractic Jan. 2017 Statement *with* Indian Tree Chiropractic Feb. 2017 Statement (Exhs. C and D hereto).  Neither these mislabeled entries, nor anything else on the monthly statements, explains or mentions the existence or significance of "non-qualified" transactions.  This scheme can be described as "back-billing" and will be called "billback" below.  This deliberately misleading and confusing formatting of Defendant's monthly statements is systematic and applies to the monthly statements of Plaintiffs and the rest of the putative class members.  Critically for the success of Defendant's scheme, the first monthly statement shows only the agreed-upon rates and fees.

73.     As a result of this complicated "billback" method, a merchant would obviously have no information on its first monthly statement from Defendant even remotely suggesting it was charged anything but the agreed-upon card processing fee rates.

74.     The subsequent monthly statement would not provide clarity either.   Indeed, each "billback" billing entry (i.e., the aggregated upcharges) is incorrectly and misleadingly marked "IC" for "interchange charges."  Exh. D, pp. 5-6.  True interchange charges go to the member bank and they do not vary from one card processor to the next.  What Defendant calls "interchange charges" in its "billback" scheme are ***not*** true interchange charges, but consist primarily of money placed directly in its pocket as additional profit.  Defendant's monthly statements thus double down on the misrepresentation set forth in the Application that the card networks, as opposed to Defendant, are responsible for the non-qualified charges.  *E.g.,* Exh. D at 2 (defining "Interchange Charges" as "fees charged by Card Organizations").  Defendant's effort to deceive merchants is clear.

75.     By labeling "billback" charges – which are imposed by Defendant – as "IC," as opposed to "SC" (for "service charges") or "FEE," Defendant perpetuates the false notion that these charges are being imposed by Visa, MasterCard, and Discover.  This, of course, makes merchants much less likely to question them.

76.     The line-item descriptions for each "billback" amount on monthly statements are also misleading at best.  The descriptions list amounts from the prior month and state: "TRANSACTION CLEARED AT . . ." or "TRANS CLEARED AS . . ." to suggest that, at some time after the card was run by the merchant, Defendant learned that the card network or issuing bank had assessed a higher interchange rate.  Contrary to this misimpression, Defendant knows at the time each card is run what interchange rate will be paid to the issuing bank.  Indeed, there is no technical or logistical reason for Defendant's "billback" practice and it is not used by the vast majority of providers in the industry.

77.     Defendant refuses to tell merchants the truth about these entries even when they call to speak with a customer service representative or go to the website.  For example, on a webpage entitled "Interchange Rates and Fees for Merchants" on Wells Fargo Bank's website it offers the following series of lies and half-truths:

> Find out how a transaction clears at the best rate and what it means when a transaction doesn't qualify.
>
> Transaction qualifications
>
> **How a transaction qualifies**
> When you process a payment transaction, the transaction typically clears within your anticipated interchange program (also known as interchange level). This is usually the interchange program at which you were priced or at the interchange program where the majority of your transactions typically clear and helps you achieve the best possible processing rates.
>
> The payment networks (Visa®, Mastercard®, Discover®, and American Express®) establish the specific transaction criteria for each interchange program. As a Wells

Fargo Merchant Services customer, you can find the specific processing guidelines and qualification criteria for your anticipated interchange program on the online *Payment Network Qualification Matrix* which is provided to you when you sign up for a merchant account.

*See* https://www.wellsfargo.com/biz/merchant/manage/interchange-rates/ (last visited Oct. 4, 2017).  Defendant knows the first sentence to be untrue, since most transactions do not "qualify."  Thus, the use of the words "typically" and "anticipated" is misinformation.  The second sentence is even more nefarious, since Defendant knows that the "anticipated interchange program" is **NOT** "the interchange program where the majority of your transactions typically clear."  Further, rather than helping a customer "achieve the best possible processing rates" the program was designed with one goal, to fool merchants into paying far higher rates than they would ever willingly agree to.

78.     If anything, the second paragraph is even more misleading.  Once again, the determination of "non-qualified" is made by Defendant.

79.     The same webpage also includes the following:

**When a transaction doesn't qualify**
When a transaction clears within a different interchange program other than the one at which you are priced, or does not meet the specific qualification criteria established by the payment networks, you may be charged the difference between the clearing interchange rate and the priced interchange rate.  This difference is called a "non-qualified interchange fee" and the transaction is sometimes referred to as a downgrade.

Some common reasons why transactions clear within a different interchange program are:

- Foreign card processing
- Incomplete information for commercial card
- Processing changes (such as a delay in settlement)
- Missing information
- Not using AVS (Address Verification Service)

*Id.* Defendant misrepresents the extent of the upcharge by failing to include the surcharge, which usually represents a large portion, and in some cases the lion's share, of the "non-qualified" mark up.  Further, Defendant fails to acknowledge the simple reason for nearly all "non-qualified" determinations: Defendant has defined just a few cards as "qualified" so that it can mark up all other cards, sending enormous profits straight to its bottom line.

80.     Once again, there is no way that a customer could reasonably understand Defendant's scheme.  However, even if a merchant was able to understand the "billback" method and realize that it was Defendant (as opposed to the card networks) assessing the additional fees, the merchant *still* could not possibly verify the accuracy of the charges.

81.     First, there is no way for a merchant accepting a card payment to know whether that transaction will eventually be deemed "qualified" or "non-qualified."  For instance, there is nothing on each card that specifies the rate or whether it falls into one of Defendant's "Anticipated Interchange Levels."  Thus, a merchant is not in a position to accept or reject transactions that Defendant will claim are non-qualified.

82.     The merchant is forced to rely exclusively on Defendant to (a) correctly classify each transaction as "qualified" or "non-qualified" and (b) compute and charge the appropriate fees.

83.     Defendant could easily give the merchant sufficient information to ensure that each transaction has been appropriately classified and, if classified as non-qualified, that the correct non-qualified fees have been charged.  Defendant, however, fails to provide this information to merchants.

84.     Indeed, there is no possible way a merchant can consult its monthly statements and make this determination.  That is because for supposedly "non-qualified" transactions there

is no mention or explanation of any entries on the statements as being related to "non-qualified" transactions nor is the processing volume of each transaction listed. *E.g.*, Exh. D, pp. 5-6.

85.     Without knowing transaction amounts, the merchant cannot determine what transaction was involved and could never determine if it was accurately classified as "non-qualified" even if it knew of Defendant's scheme. Moreover, without knowing the processing volume, the merchant has no way to determine whether the "non-qualified" fees it has been assessed are too high.

86.     Defendant takes advantage of this "billback" method to conceal mark-ups and fees that go directly to its bottom line. The true purpose of Defendant's "billback" method is to confuse and confound merchants while obscuring the true transaction fees that they pay.

87.     To summarize Defendant's card processing upcharge scheme, Defendant intentionally (a) induces merchants to enroll in Defendant's services by prominently promising "fixed" card processing fee rates, including in the written proposal and the Application's Pricing Terms; (b) fails to disclose the scheme or the existence of the upcharges in the Pricing Terms or elsewhere; (c) buries misleading, false, and unclear "disclosures" in the fine print of the Application that fall far short of clearly disclosing the scheme; (d) once the merchant enrolls, systematically charges merchants card processing fee rates that are significantly higher (as much as double or even triple) than the "fixed" rates specified in the merchant's Pricing Terms, for the vast majority of card transactions; and (e) hides and obscures these overcharges on the merchants' monthly statements to avoid discovery.

88.     All of the Plaintiffs, and many thousands of other customers of Defendant, have been subjected to this upcharge scheme.

89.     Had Plaintiffs and the other merchant class members been informed of the true nature of the scheme and that their "fixed" rate would, in reality, only apply to a small percentage of card transactions and that they would pay much more for the remainder, they would not have agreed to contract with Defendant.

## 2.     Defendant Also Improperly Increases Various Rates in Bad Faith and Without Adequate Notice

90.     In addition to Defendant's above-described pervasive card processing fee upcharge scheme (which applied to all so-called "non-qualified" transactions for merchants that agreed to the "fixed" pricing option), Defendant also often unilaterally and improperly increases merchants' per transaction rates in other ways as well.

91.     For example, for merchants that agree to the "fixed" pricing option for their card processing fees, Defendant will typically charge them the specified "fixed" rate (specified in the Pricing Terms) for so-called "qualified" transactions (and an inflated rate for most transactions pursuant to Defendant's upcharge scheme) for approximately one year but then will periodically, and without adequate notice, increase the "fixed" rate thereafter, often by as much as 30 basis points (or 0.3%) at a time.  In practice, these improper increases affect both the rates charged for "qualified" transactions (i.e., the minority of transactions) and the already improperly inflated rates being charged for so-called "non-qualified" transactions (i.e., the vast majority of transactions), since the "fixed" rates are a factor in calculating the higher charges for the latter. In all, these improper increases can substantially raise a merchant's total monthly fees.  In the case of Dr. Babbitt for instance, each yearly 0.3% mark-up increased his card processing fees by as much as 16%.

92.     Defendant also periodically, and without adequate notice, increases the "non-qualified surcharges" that it charges for so-called "non-qualified" transactions (which surcharges

are already improper to begin with, even before the improper increases).  In the case of Ideal Sales for instance, Defendant increased the "non-qualified surcharge" rate, first from 0.99% to 1.5% and then, a year later, from 1.5% to 1.99%.  Thus, in the span of a little over a year, Defendant **more than doubled** this surcharge.

93.    These increases by Defendant are grossly excessive, unfair, and violate the spirit of the Defendant/merchant contractual relationship, are imposed by Defendant in bad faith, and are not based on, and are not commensurate with, any increased expenses for Defendant.

94.    Even if such massive increases could be deemed allowed by the contract, which Plaintiffs dispute, the Program Guide plainly requires that advance notice of such unilateral increases be communicated to merchants.  Exh. B, § 5.6.  Defendant does not, however, always provide notice when it increases rates.  And where any advance notice is ostensibly provided, it is not adequate notice.

95.    In many months, Defendant provides notice of various rate increases to merchants via their monthly statements.  Indeed, each statement has a section entitled "IMPORTANT INFORMATION ABOUT YOUR ACCOUNT" where Defendant often notes rate increases and explains the basis for the increase.  *E.g.*, Exh. C, pp. 1, 3; Exh. D, pp. 1, 3.  Thus, merchants are trained to review the statement messages to determine whether their fees and rates are being increased.

96.    Defendant does not, however, provide notice of either the increases to the "fixed" card processing fee rates or the increases to the "non-qualified surcharges" on the merchants' monthly merchant statements.  Rather, to the extent any notice is provided at all, Defendant deviates from this protocol, in some cases by mailing a *separate letter* to merchants that purports to disclose these particular huge rate increases.

97.     To make matters worse, Defendant includes these letters, to the extent they are sent, in a nondescript envelope that is similar to dozens of pieces of standard junk mail merchants receive every week.  This is compounded by the fact that some merchants are banking customers of Wells Fargo and often receive numerous junk mailings from Wells Fargo to open new accounts, credit lines, and credit cards.

98.     Defendant intentionally provides and formats these "notices," (when any notice is provided at all) so as to ensure that they will go *unnoticed* or be disregarded as junk mail by most merchants.  This is yet another example of the Wells Fargo "profit by deception" culture in action.

99.     Even if the notice could be deemed effective and the parties' contract lawfully gave Defendant discretion to increase these fees (an interpretation which Plaintiffs' dispute), good faith and fair dealing constrains Defendant's ability to use its discretion to increase fees in ways which were not contemplated by the parties.  Contractual discretion is not a license to steal.

100.    Defendant's canned justification for its unilateral increases is that they are necessary to respond to "the rising cost of providing an efficient, reliable, and secure card payment processing network to our customers."  This is false.  The increases, including to "fixed" card processing fee rates and to the "non-qualified surcharges," were implemented for no other reason than to increase profits at customer expense and not in response to external factors (such as increased costs).  That Defendant must lie about its reasoning for upping these particular rates is telling.

101.    Increases to the standard card network interchange rates, assessments, and access fees were already passed through to the customer via various other rate increases.  Thus, there

was absolutely no need to increase the "fixed" card processing fee rates and "non-qualified surcharges" to recoup any such additional costs.

102.    Furthermore, the increases to the "fixed" rates are uniform.  In the case of Dr. Babbitt, Ideal Sales, and Indian Tree Chiropractic – three different types of merchants, operating in three different areas of the country, in different years – the increases to the card processing fee rates were all .3% (or 30 basis points).  If the increases were truly caused by increased costs, they would not have been the same, as costs do not increase at a uniform rate every year.  Clearly, Defendant's imposition of these increases does not comport with good faith and fair dealing.

**C.    Defendant's Other Improper Fee Practices.**

103.    In addition to the card processing fee rate upcharge scheme and other improper rate increases described above, Defendant engages in other systematic practices of overcharging customers, in violation of both the spirit and letter of the agreed Pricing Terms and other contractual provisions, and in contravention of the promises Defendant made to induce customers to enroll in Defendant's services.

104.    For example, rather than pass through certain standard card network charges at cost as required by the Pricing Terms, Defendant often inflates and increases such charges, above and beyond the actual costs, and keeps the difference for itself.

105.    Defendant also increases agreed upon "other processing fees" (i.e., the second category of fees covered by the Application's Pricing Terms) above the amounts set forth in the Application and/or charges such fees in a manner that is contrary to the Application.

106.    Defendant crams merchants with unanticipated fees after the relationship has commenced and merchants are "locked in" to long term deals that are only terminable upon payment of hefty termination penalties.

107.   For example, Defendant has engaged in the following additional improper fee-related practices, among others:

a.   <u>Improper Minimum Monthly Payments</u>: Defendant has charged merchants minimum monthly charges in a given month even where a merchant's Pricing Terms specify that there will be no minimum monthly processing charge and the merchant had no card transaction activity that month.

b.   <u>Improper Statement Billing Fees</u>:  The "other processing fees" section of Defendant's form Pricing Terms includes an item called "Statement Billing Fee," generally set at $10.00 per month, for merchants that do not opt to receive their statements electronically.  A footnote in the Pricing Terms specifically states that the "Statement Billing Fee can be waived if [the merchant] elects to access the monthly statement online instead of receiving a paper copy by mail."  *E.g.*, Exh. A, p. 5.  Even when merchants have signed up for online statement access, however, Defendant will often still charge the merchant the $10 monthly Statement Billing Fee for many months thereafter.

c.   <u>Improper PCI Fees</u>:  The "other processing fees" section of Defendant's form Pricing Terms includes an item called "Non-Validation PCI Compliance Fee," generally set at $25.00 per month.  A footnote in the Pricing Terms specifically states that these particular fees "apply to Level 4 Clients who utilize a gateway or value added reseller (VAR)."  *E.g.*, Exh. A, p. 6.  Defendant will often assess the Non-Validation PCI Compliance Fees to merchants that do not meet the description provided in the footnote.

d.   <u>Other Overcharges</u>:  Defendant also charges merchants flat fees and per-transaction fees that are not provided for in the merchant's Pricing Terms or that are charged at rates higher than the rates provided for in the Pricing Terms.

108.    Defendant describes these fees on its monthly statements in a misleading fashion so as to preclude merchants from realizing the fees are improper and/or that Defendant (as opposed to, for example, the card networks) is responsible for the charges.  *E.g.*, ¶¶ 70-88, *supra*.

109.    Defendant then seizes these additional amounts from merchant bank accounts before merchants even know they are gone.  Even if merchants could effectively decipher Defendant's monthly statements (a) such statements do not provide sufficient information for merchants to effectively dispute a charge and (b) Defendant has already debited the identified amounts from the merchants' bank accounts.  As a result, merchant payments are not voluntary.

**D.    Defendant Buries Absurd, Unfair, Exculpatory Provisions in the Fine Print of the Program Guide.**

110.    In addition to concealing its card processing fee upcharge scheme from its customers, Defendant also goes to great lengths to bury other critical and unfair contractual provisions in the fine print.

111.    For example, the form Application does not indicate that (a) the various agreed-upon fees and rates set forth in the Pricing Terms can increase (nor would increases be expected since technology and competition have actually driven down costs for payment processing) or (b) that new, undisclosed fees and rates will be charged.

112.    Instead of conspicuously setting forth such critical provisions in the Application, Defendant buries certain attempted exculpatory clauses in the separate, fine print Program Guide – a boilerplate, non-negotiable document.  *E.g.*, Exh. B, p. 2 ("We will not accept any alterations or strike-outs to the Agreement and, if made, any such alterations or strike-outs shall not apply").

113.    Several terms in the Program Guide represent a unilateral effort by Defendant to (a) covertly backtrack from the rates and fees prominently set forth in the Application and Pricing Terms therein and (b) immunize itself from liability for improper practices.

114.    For example, the Program Guide purports to give Defendant unfettered discretion "to increase our fees or add new fees for Services for any other reason at any time, by notifying you thirty (30) days prior to the effective date of any such change or addition."  Exh. B, § 5.6.

115.    By way of additional examples, the Program Guide purports to (a) limit the total amount of Defendant's liability to $50,000 or twelve months of fees, whichever is less (*id.* at § 7.4), (b) reduce all applicable statutes of limitation to one year from the date the claim accrued, regardless of when it was discovered (*id.* at § 24.4), and (c) waive the merchants' right to a trial by jury (*id.* at § 24.3).

116.    Defendant uses these provisions, as well as the hefty early termination fee, as tools to discourage aggrieved merchants from terminating their relationships with Defendant or pursuing legal action for overcharges.

117.    Several of the provisions highlighted above, and others, violate public policy, lack mutuality, are illusory, unduly exculpatory, and unconscionable, and are otherwise void and unenforceable pursuant to applicable New York law.

**E.    The So-Called "Contractual Notification Requirements" Do Not Bar This Case.**

118.    Buried deep in the fine print of the version of the Program Guide attached hereto as Exhibit B are the following provisions:

> **5.2.    Should you have questions regarding any Non-Qualified fees (including Non-Qualified Interchange Fees or Non-Qualified Surcharge), submit a Non-Qualified Fee Inquiry (NFI) request in writing (either letter, fax or email) within 90 days from the mail date (post mark) of the monthly statement in question.  Note that NFI requests received after the 90 day limit may not be considered for refund review.  The subject line or reference at the top of your NFI request must state "Non-Qualified Fee Inquiry."  Your NFI request must include your merchant name, merchant number, billing address, and the month of the processing statement on which the non-qualified fees appeared.  When possible, also include a copy of the statement on which the fees in question appear.  Written fee inquiries should be submitted by email to nfirequest@wellsfargomerchantservicesllc.com; via**

fax to (954) 509-1822; or if mailed, sent to:  Wells Fargo Merchant Services, LLC, P.O. Box 6699, Hagerstown, MD, 21740, Attn:  NFI Investigations Unit.

We will provide a written response to your NFI with an explanation.  If through our research, we find that a refund is due, we will credit your account within 30 days from the date our research was completed.  NFI requests not received in accordance with the foregoing shall not be subject to the response times set forth in this Section.

**5.11.**   You agree to promptly and carefully review your merchant statements or other documents provided or made available to you (physically, electronically, or otherwise provided by Us or others) reflecting Card transaction activity, including, activity in your Settlement Account.  If you believe any adjustments should be made with respect to your Settlement Account, you must notify us in writing within sixty (60) days after any debit or credit is, or should have been effected or such shorter period as provided in the terms and conditions that govern such account.  If you notify us after sixty (60) days, we shall have no obligation to investigate or effect any adjustments.  Any voluntary efforts by us to assist you in investigating such matters shall not create any obligation to continue such investigation or any future investigation.

119.   According to Defendant, these provisions required Plaintiffs to provide written notice of any overcharges "within 60 or 90 days (depending on the type of fee being disputed) of the monthly statements."  *See* Dkt. No. 15, p. 2.  Defendant is wrong.

120.   As a preliminary matter, there is no indication that these provisions are applicable to each Plaintiff.  As previously noted, the Program Guide attached hereto is but one of several versions.  These provisions may not appear in the Program Guide that is actually applicable to certain Plaintiffs' accounts (such as Dr. Babbitt).

121.   Even if Sections 5.2 and 5.11 (or their substantive equivalents) do appear in each Plaintiff's Program Guide, since Plaintiffs were fraudulently induced to enter a contractual relationship with Defendant, the contract is subject to rescission and such provisions are not enforceable.

122.   Regardless, each of the provisions is plainly inapplicable.  Indeed, Section 5.2, by its own terms only applies to "questions regarding any Non-Qualified fee."  Thus, if a merchant

does not have a "question regarding any Non-Qualified fee," the NFI procedure is irrelevant. Here, Plaintiffs did not and do not have "questions" concerning non-qualified fees.  Because Section 5.2 relates only to "questions" as opposed to affirmative claims that Defendant's charging Plaintiffs and other merchants non-qualified fees and surcharges was completely improper as a categorical matter, it is inapposite here.

123.     Further, by its own terms, Section 5.2 is permissive in nature, not mandatory.  If a merchant has "questions regarding any Non-Qualified fee," it is given the option to submit an NFI request.  Section 5.2 does not explicitly (or implicitly) mandate that an NFI request must be submitted as a condition precedent to bringing suit against Defendant, to recover improper non-qualified fees or otherwise.

124.     *If* a questioning merchant decides to submit an NFI request pursuant to Section 5.2, it must do so "within 90 days from the mail date (post mark) of the monthly statement in question."[4]  If a submitted NFI request does not meet this deadline, Defendant is given discretion as to whether or not to process it "for refund review."  Moreover, if a questioning merchant timely submits an NFI request but fails to submit it in accordance with the exact specifications described in Section 5.2, Defendant's remedy is not that it need not respond at all, but only that it need not respond as quickly.  *Id.* ("NFI requests not received in accordance with the foregoing shall not be subject to the response times set forth in this Section").

125.     Plaintiffs did not need to comply with the NFI request protocol set forth in Section 5.2 as a condition precedent to this suit.

---

[4] Section 5.2 is silent as to when questions associated with statements that are received electronically (as opposed to by mail with a post mark) must be submitted or whether Section 5.2 even applies to questions associated with such statements.

126.    Section 5.11 is also inapplicable.  This provision tasks merchants with reviewing statements and other documents "reflecting Card transaction activity, including activity in your Settlement Account."  Merchants are tasked with checking how their "Card transaction activity" is reflected in their statements, comparing them to their own transaction records, and raising any discrepancies promptly.

127.    This requirement makes practical sense because: (a) merchants, not Defendant, are uniquely positioned to confirm the card transactions that occurred in their stores, and to note any discrepancies; and (b) adjustments to card transactions may affect parties beyond the merchant and Defendants (e.g., the customer who paid and the credit card company that is getting paid), making prompt resolution important.

128.    The same is *not* true for charges like non-qualified fees and flat monthly service fees (such as monthly service, PCI, and statement billing fees), which are levied directly by Defendant and not split with any third party.  Defendant is in the best position to know if and when it is levying these fees, and such fees have no potential impact on any third parties. Therefore, there is neither any need for merchants to alert Defendant that these charges have been assessed – since it knows full well what its systems have been programmed to do – nor any reason why these issues would need to be raised within the very truncated 60-day window.

129.    Industry experts, including those with extensive experience dealing with Defendant, have stated that the intention of this Section 5.11 (and similar provisions used by other payment processors) is clear:  merchants must promptly contact Defendant to correct any payment transactions that have been erroneously logged.  They confirm that such provisions have nothing to do with limiting refunds of Defendant's fees.

130.    Wells Fargo Merchant Services employees have often confirmed that the intent of this Section 5.11 – and the actual working interpretation used by Defendant – is that it applies to problems regarding payment transactions, not fees.  The new interpretation as described in Defendant's recent filings with the Court is merely an after-the-fact rationalization which has never actually been Defendant's policy.  Indeed, Defendant refunds fees without regard to the inapplicable 60-day rule.  For example, several Plaintiffs were provided refunds of fees without any regard to Section 5.11.

131.    As but one illustration of Defendant's true understanding of Section 5.11, in June of 2017 Indian Tree Chiropractic was refunded a full year of monthly service fees, when Defendant refunded 12 of the fees at one time.  The $60 refund was credited on June 28, 2017, and plainly described as a refund of the $5 monthly service fees.  By Defendant's own repeated action, the fact that Section 5.11 does not apply to fees has been proven time and again.

132.    Defendant will apparently claim that, since Section 5.11 requires merchants to provide timely notice as to adjustments to the merchant's "Settlement Account" and such term is defined to include "fees," Section 5.11 also requires merchants to notify Defendant of fee disputes.  At least some versions of the Program Guide do define "Settlement Account" in the "Glossary" section as follows:

> **Settlement Account:**  An account or account(s) at a financial institution designated by Client as the account to be debited and credit by Processor or Bank for Card transactions, fees, chargebacks and other amounts due under the Agreement or in connection with the Agreement.

This definition merely confirms the obvious: the customer's linked bank account is where all credits and debits of every kind will be posted.  This definition does nothing to alter the plain language of Section 5.11, however, which lists "activity in your Settlement Account" as a subset of "Card transaction activity."  The "Glossary" defines "Card" as:

**Card:**  Means a Credit Card and/or a Debit Card.

Thus, the clause about Settlement Account activity does not expand the activity at issue.  Such an interpretation would render the provision's reference to "Card transaction activity" meaningless and without effect.

133.    Indeed, the first sentence advises merchants to carefully review documents "reflecting *Card transaction activity*, including activity in your Settlement Account."  Thus, merchants must promptly look at all documents reflecting "Card transaction activity," regardless of whether such documents relate to the Settlement Account or not, and seek any associated adjustments promptly.  Defendant's interpretation would effectively write the term "Card transaction activity" out of Section 5.11 and must be rejected.

134.    In short, Section 5.11 requires merchants to provide prompt notice of adjustments relating to card transactions, not fees.  Because Plaintiffs do not allege that adjustments are needed to any card transaction activities, Section 5.11 is inapplicable here.

135.    Sections 5.2 and 5.11 are inapplicable and are no bar to this suit.  However, if these provisions are given the interpretations suggested by Defendant, they violate public policy, are unduly exculpatory and unconscionable, and are otherwise void and unenforceable pursuant to the applicable New York law.

136.    Sections 5.2 and 5.11 are further inapplicable (or the time periods provided therein were at least tolled) because, and to the extent that, Plaintiffs and the other merchants could not reasonably have discovered, or identified the nature of, the improper charges at issue due to the confusing and misleading formatting of Defendant's monthly statements, which obscured and concealed the charges.  With respect to the non-qualified fees and surcharges, for example, as set forth herein, Defendant deliberately explained these concepts in a misleading and

false fashion and further formatted its monthly statements provided to Plaintiffs and all of the other merchants so as to hide and obscure these overcharges and avoid their discovery.  *See* ¶¶ 52-102, *supra*.

137.    Additionally, even if Sections 5.2 and/or 5.11 are applicable and enforceable conditions precedent, Plaintiffs provided Defendant with timely, written notice of their grievances in compliance with these provisions.  *See* ¶¶ 138-269, *infra*.  Indeed, as detailed below, one Plaintiff (Lytle Café) is still a customer of Defendant and is still being subjected to improper charges even after filing this lawsuit and at least four others (Queen City, Patti's Pitas, Ideal Sales, and Indian Tree Chiropractic) provided written notices of their challenges to Defendant's fees that were timely under both Section 5.2 and 5.11.  These written notices are described in detail below.

## INDIVIDUAL FACTUAL ALLEGATIONS

A.      **Queen City.**

138.    Before doing business with Defendant, Plaintiff and its owner, Juan Whipple, had banked with Wells Fargo Bank for several years.

139.    In October of 2015, Queen City was using PayPal to process its credit and debit card transactions.  Queen City needed expanded capabilities, and was approached by Defendant.

140.    Mr. Whipple dealt with a sales consultant of Defendant, Nayeli Bacon.

141.    On October 5, 2015, Ms. Bacon made a written proposal to Mr. Whipple indicating exactly what Queen City would be charged if it switched its payment business to Defendant.  This proposal was set forth in a document labeled "Pricing Terms."  *See* Exh. E hereto.

142.    This document indicated that Queen City would pay a "fixed" rate of 1.85% on credit and debit card transactions.  *Id.*  It also specified that Queen City would pay several "Other Processing Fees," which were identified on the document.  *Id.*

143.    At no time was Mr. Whipple advised that these identified fees and charges would change, that the vast majority of transactions would be subject to higher fees and charges, or otherwise that the "fixed" rate would increase substantially, and surcharges would be applied, if Queen City's customers failed to use specified types of credit or debit cards.

144.    Queen City was satisfied with these terms and Ms. Bacon drew up a Merchant Processing Application that attached the agreed-upon Pricing Terms.  She sent it to Mr. Whipple as an email attachment and he signed it on or about October 5, 2015.

145.    After the parties began to do business, Queen City was repeatedly charged processing rates that were higher than the 1.85% rate specified in its Pricing Terms, pursuant to Defendant's card processing fee upcharge scheme.  For many of Queen City's card transactions, Queen City was charged higher, undisclosed "non-qualified" rates and a "non-qualified surcharge."   These higher rates and surcharges were charged for transactions throughout the time it was using Defendant's processing services.

146.    Queen City chose to enroll in Defendant's services in significant part because of the "fixed" card processing fee rates specified in the Pricing Terms.  Had it known the true card processing fees that would be charged, Queen City would not have done business with Defendant.

147.    Queen City could not discover or understand these upcharges and higher rates because they were not disclosed and were hidden and obscured from it, including pursuant to Defendant's monthly statement "billback" scheme.

148.    By way of example only, on its September of 2016 statement, which was not received until October of 2016, Queen City was assessed the following charges:

08/31/16  IC AUG BB083-TRANSACTION CLEARED AS ENHANCED  MC 2      -0.86
08/31/16  IC AUG BB190-TRANSACTION CLEARED AT REWARDS 2 SIG VI 1 -0.38

149.    Queen City had no idea what these entries meant.  They are not tied to any individual card transaction, which prevented Queen City from ascertaining exactly what they were for.  Queen City has recently learned in conjunction with its attorneys' investigations that these charges reflect the additional amounts above and beyond the agreed-upon 1.85% rate that Defendant back-billed for card transactions that occurred the prior month, in August of 2016.

150.    The charges reflected above are just two of many confusingly worded billing entries that appear on many of the monthly statements Queen City received from Defendant.

151.    Queen City was also subjected to other improper fee practices by Defendant.  For example, Queen City agreed to a contract with no monthly minimum charge.  This was an important provision for Queen City because the tour business is seasonal and, in some months of the year, there would be no transaction activity.  Queen City's contract stated: "Monthly Minimum Processing Fee(9)  $0.00 per month."  The contract further stated, at footnote (9): "If the total discount fee for Visa, MasterCard, Discover Network Card and American Express transactions in a given month is less than the Monthly Minimum Processing Fee, then in addition to the total discount fee Client will be charged an amount equal to the Monthly Minimum Processing Fee minus the total discount fee."[5]

152.    Defendant's Program Guide also deals with the Monthly Minimum Processing Fee.  For example, in Section 41.3 it states: "A Monthly Minimum Processing Fee will be

---

[5] By contrast, Plaintiff Ideal Sales' contract, for example, noted that it would pay a $5.00 "Monthly Minimum Processing Fee" and it was charged such a fee in months when it did not process any transactions.

calculated beginning thirty (30) days after the date Client's Application is approved. (Refer to pricing disclosures.)."  Defendant may contend that this provision allows the company to add such fees to unsuspecting merchants but, as described herein, such an interpretation would violate other clear provisions of the contract, and the specific terms of the Pricing Terms of Queen City's Application which expressly listed this particular fee at $0.00.

153.    Queen City's contract also provided for a "Monthly Service Fee."  This fee was not further described in the Pricing Terms or in the Program Guide.  Since, by its plain terms, it would not apply in a month when no services were rendered, Queen City was willing to accept such a fee provision.

154.    Ultimately, in each month when Queen City had no transaction activity, Defendant assessed a minimum fee.   Such fee began at $35 per month and, after complaints from Queen City, was reduced to $20 per month.  By way of example only, Queen City was charged the $35.00 minimum fee in its February of 2016 statement even though it had no transaction activity.  Queen City was also charged a $20.00 minimum fee in its April of 2016 statement under similar circumstances.

155.    Queen City was also improperly charged the monthly "Statement Billing Fee." Queen City's Application specifically stated that "[t]he monthly Statement Billing Fee can be waived if Client elects to access the monthly statement online instead of receiving a paper copy by mail."  Queen City promptly requested online statement access and did receive its statements electronically.  On numerous occasions thereafter, however, Queen City was assessed a "Statement Billing Fee" in the amount of $10 per month, including but not limited to on its February of 2016 statement.

156.    Queen City was also improperly charged the "Non-validation PCI Compliance Fee."  Queen City's Application specifically provided that "[t]hese fees apply to Level 4 Clients who utilize a gateway or value added reseller (VAR)."  Even if Queen City qualifies as a "Level 4 Client" it did not "utilize a gateway or value added reseller."  Indeed, Queen City does not allow payments through its website, and did not use any gateway or VAR.  It was thus exempt from the "Non-validation PCI Compliance Fee" by the express terms of the Application. Nevertheless, Defendant repeatedly assessed Queen City a monthly fee of $25 for "Non-Validation PCI Compliance," including but not limited to on its October of 2016 statement.

157.    These and numerous other improper fees were assessed against Queen City in each month from October 2015 through 2016.  Queen City does not have each and every monthly statement that Defendant issued to it but knows there are many other instances where it was charged the improper fees complained of herein.

158.    Mr. Whipple complained bitterly many times to Defendant, wasting dozens of hours on the phone with Defendant trying to get (a) some clarity as to why Queen City was being charged certain fees and (b) refunds of those fees which it believed were improper.  Mr. Whipple also complained in writing.  For instance on February 2, 2016, after spending more than one hour on the phone with Ms. Bacon, Mr. Whipple emailed her noting his confusion as to why he was being charged certain fees and seeking refunds, including the $10 fees he had recently been charged for paper statements and $25 PCI fees.

159.    Ms. Bacon did not respond to this email so on February 16, 2017, Mr. Whipple sent another email following up and also seeking refunds of new improper fees that were wrongfully seized from his account on February 10, 2016.

160.     Defendant responded by offering a few refunds, including for fees assessed more than 60 days prior to his written requests, but nowhere near the amount that Queen City had been overcharged.  On March 2, 2016, Mr. Whipple sent another email accusing Defendant of continuing to charge unauthorized fees in breach of the parties' contract.

161.     In December of 2016, Mr. Whipple complained again via email to Defendant (via Ms. Bacon) about being charged for the $25 PCI fee.

162.     At this point because Defendant continued to overcharge it, Queen City ceased using Defendant's services altogether, and switched to a competitive processor that offered better service and more transparent pricing.  Since Defendant stated that $500 would be owed to terminate the account, Queen City resigned itself to paying the improper monthly minimum fee of $20 per month until the purported term of the contact ended.

163.     Defendant continued to assess the $20 improper "service fee" (even though it was not providing any services) and automatically deduct it from Queen City's business account.  Eventually, the account became overdrawn because of these charges and Wells Fargo closed the account.

164.     Defendant, however, did not give up and began to send collection letters to Queen City claiming that it continued to owe the improper charges.  In early 2017, Queen City's owner had enough and complained to federal authorities.  It was only after the Consumer Financial Protection Bureau of the Federal Reserve notified Defendant about Queen City's written complaint that Defendant agreed to refund a few fees (including those incurred more than 60 days prior to his complaints) and close the account without assessing the $500 early termination fee.

165.     Queen City provided further written notice of its grievances with Defendant's fee practices via the original Complaint, which was filed on August 4, 2017, and served on August 14, 2017.

166.     Queen City was induced to enroll, and chose to enroll, in Defendant's services based on Defendant's representations regarding the "fixed" rates and pricing terms that would supposedly apply.  Had Queen City known the truth about Defendant's fee practices and the pricing that would actually apply, it would not have done business with Defendant.

**B.     Patti's Pitas.**

167.     In late 2016, Motty Chen was in the process of opening a new restaurant – Patti's Pitas.  Mr. Chen had banked with Wells Fargo Bank for years.

168.     Before the opening on January 1, 2017, a representative from Defendant visited the restaurant to discuss with Mr. Chen using Defendant's card processing services.  Mr. Chen does not recall the representative's name.

169.     The representative of Defendant made a written proposal to Mr. Chen indicating exactly what Patti's Pitas would be charged if it switched its processing business to Defendant. Specifically, this proposal for Pricing Terms indicated that Patti's Pitas would pay a "fixed" rate of 1.74% on credit and debit card transactions.  It also specified that Patti's Pitas would pay several "Other Processing Fees," which were identified on the document.

170.     At no time was Mr. Chen advised that these identified fees and charges would change, nor was he advised that the vast majority of transactions would be subject to higher fees and charges, or otherwise that the "fixed" rate would increase substantially, and surcharges would be applied, if Patti's Pita's customers failed to use specified types of credit or debit cards.

171.     Patti's Pitas was satisfied with these terms and in or about December of 2016 executed a Merchant Processing Application that attached the agreed-upon Pricing Terms.

172.     After the parties began to do business, Patti's Pitas was repeatedly charged processing rates that were higher than the "fixed" rates specified in the written proposal and contract, pursuant to Defendant's card processing fee upcharge scheme.

173.     For many of Patti's Pita's card transactions, Patti's Pitas was charged higher, undisclosed "non-qualified" rates and a "non-qualified surcharge." These higher rates and surcharges were charged for transactions throughout the time it was using Defendant's processing services.

174.     Patti's Pitas chose to enroll in Defendant's services in significant part because of the "fixed" card processing fee rates specified in the Pricing Terms. Had it known the true card processing fees that would be charged, Patti's Pitas would not have done business with Defendant.

175.     Patti's Pitas could not discover or understand these upcharges and higher rates because they were not disclosed and were hidden and obscured from it, including pursuant to Defendant's monthly statement "billback" scheme.

176.     By way of example only, on its June of 2017 statement, which was not received until July of 2017, Patti's Pitas was assessed the following charges:

05/31/17  IC  MAY BB068-TRANSACTION CLEARED AT HIGH VALUE WLD MC 1          -0.54
05/31/17  IC  MAY BB161-TRAN CLEARED AS SIGNATURE CARD ELECTRONIC SIG VI 5 -2.89

177.     Patti's Pitas had no idea what these entries meant. They are not tied to any individual card transaction, which prevented Patti's Pitas from ascertaining exactly what they were for. Patti's Pitas has recently learned in conjunction with its attorneys' investigations that these charges reflect the additional amounts above and beyond the agreed-upon 1.74% rate that Defendant back-billed for card transactions that occurred the prior month, in May of 2017.

178.    The charges reflected above are just two of the 17 confusingly worded billing entries that are reflected on Patti's Pitas' June of 2017 statement.  Similar entries appear on virtually every one of the monthly statements it received from Defendant.

179.    Patti's Pitas was also subjected to other improper fee practices by Defendant.  For example, Patti's Pitas was improperly charged the "Non-validation PCI Compliance Fee." Patti's Pitas' Application specifically provided that "[t]hese fees apply to Level 4 Clients who utilize a gateway or value added reseller (VAR)."  Even if Patti's Pitas qualifies as a "Level 4 Client" it did not "utilize a gateway or value added reseller."  Indeed, Patti's Pitas did not allow payments through its website, and did not use any gateway or VAR.  It was thus exempt from the "Non-validation PCI Compliance Fee" by the express terms of the Application.  Nevertheless, Defendant repeatedly assessed Patti's Pitas a monthly fee for "Non-Validation PCI Compliance" including but not limited to on its May of 2017 statement, which Patti's Pitas did not receive until June of 2017.

180.    Patti's Pitas was also hit with other improper fees by Defendant.

181.    Patti's Pitas stopped using Defendant's services when the restaurant closed in May of 2017.  Mr. Chen contacted Defendant to cancel the account.  He was initially told by Defendant that the contract was for three years and he could not quit.  Fortunately, by the time the business closed, Wells Fargo's improper false accounts sales practices had already come to light so, when Mr. Chen informed Defendant that he had not been told about a three-year term, Defendant closed the account without a termination fee.  Most of Defendant's customers are not so fortunate, rather they are put to a Hobson's Choice – pay the early termination fee (usually $500) or accept the overbilling for three years.

182.    As described above, however, even though the restaurant closed in May of 2017, Defendant's fees described herein continued to accrue, including the billed-back "non-qualified" fees and surcharges that did not arrive until the statement received in July of 2017.  Mr. Chen complained in writing to Defendant about all fees that were billed after the business closed.

183.    Patti's Pitas provided further notice of its grievances with Defendant's fee practices via the original Complaint, which was filed on August 4, 2017, and served on August 14, 2017.

184.    Patti's Pitas was induced to enroll, and chose to enroll, in Defendant's services based on Defendant's representations regarding the "fixed" rates and pricing terms that would supposedly apply.  Had Patti's Pitas known the truth about Defendant's fee practices and the pricing that would actually apply, it would not have done business with Defendant.

**C.    Dr. Babbitt.**

185.    By 2012, Dr. Mark Babbitt had banked with Wells Fargo for several years and had a mortgage through Wells Fargo.

186.    Dr. Babbitt was contacted by a sales representative of Defendant named Manuel Santiago on or about February 14, 2012.  Mr. Santiago made a written proposal to Dr. Babbitt indicating exactly what his practice would be charged if it switched its business to Defendant. *See* pp. 4-6 of Exh. A.

187.    Specifically, this proposal indicated that Mark A. Babbitt DDS would pay a "fixed" rate of 1.86% on credit card transactions and 1.41% of debit card transactions.  It also specified that Dr. Babbitt would pay several "Other Processing Fees," which were identified on the document.

188.    At no time was Dr. Babbitt advised that these identified fees and charges would change, nor was he advised that the vast majority of transactions would be subject to higher fees

and charges, or otherwise that the "fixed" rate would increase substantially, and surcharges applied, if his patients failed to use specified types of credit or debit cards.

190.    189.    Dr. Babbitt was satisfied with these terms and on or about February 14, 2012 executed a Merchant Processing Application that attached the agreed-upon Pricing Terms.  Exh. A.

190.    After the parties began to do business, Dr. Babbitt was repeatedly charged processing fee rates that were higher than the "fixed" rates specified in his Pricing Terms, pursuant to Defendant's card processing fee upcharge scheme.

191.    For many of Dr. Babbitt's card transactions, he was charged higher, undisclosed "non-qualified" rates and a "non-qualified surcharge."  These higher rates and surcharges were charged for transactions throughout the time he was using Defendant's processing services.

192.    Dr. Babbitt chose to enroll in Defendant's services in significant part because of the "fixed" card processing fee rates specified in the Pricing Terms.  Had he known the true card processing fees that would be charged, Dr. Babbitt would not have done business with Defendant.

193.    Dr. Babbitt could not discover or understand these upcharges and higher rates because they were not disclosed and were hidden and obscured from him, including pursuant to Defendant's monthly statement "billback" scheme.

194.    By way of example only, on its October of 2012 statement, which was not received until November of 2012, Dr. Babbitt was assessed the following charges:

```
09/30/12  IC  SEP BB189-TRANSACTION CLEARED AT REWARDS 1 SIG VI 12        -36.09
09/30/12  IC  SEP BB190-TRANSACTION CLEARED AT REWARDS 2 REW VI 1          -0.91
```

195.    Dr. Babbitt had no idea what these entries meant.  They are not tied to any individual card transaction, which prevented Dr. Babbitt from ascertaining exactly what they are

for.  Dr. Babbitt has recently learned in conjunction with his attorneys' investigations that these charges reflect the additional amounts above and beyond the agreed-upon 1.86% rate that Defendant back-billed for credit card transactions that occurred the prior month, in September of 2012.

196.    The charges reflected above are just two of the 15 confusingly worded billing entries that were listed on Dr. Babbitt's October of 2012 statement.  Similar entries appear on virtually every one of the monthly statements he received from Defendant.

197.    Dr. Babbitt was also subjected to other improper fee practices by Defendant.  For example, Defendant, unilaterally and without adequate notice, increased his "fixed" card processing fee rates (which affected both the rates he was charged for "qualified" and so-called "non-qualified" transactions, as discussed above) multiple times.  According to the "Pricing Terms" in his February 2012 Application, Dr. Babbitt contracted to pay "fixed" card processing fee rates of 1.86% on credit card transactions and 1.41% on debit card transactions.  Putting aside, for the moment, the pervasive improper significant upcharges Defendant imposed for so-called "non-qualified" transactions, Defendant adhered to this pricing until April of 2013, when it jacked the "fixed" rates up to 2.16% and 1.71%, respectively.  In February of 2014, Defendant jacked these rates up again, to 2.46% and 2.01%, respectively.  There was no even arguably colorable basis for either increase, such as increased rates adopted by the card networks.  The actual rates Defendant charged Dr. Babbitt for the vast majority of his card transactions (i.e., for so-called "non-qualified" transactions) were even higher because of Defendant's pervasive upcharge scheme, but even these higher, upcharge rates were affected by these unilateral "fixed" rate increases by Defendant.

198.    Thus, by the time it ceased doing business with Defendant in 2014, Defendant had increased the agreed-upon credit card and debit card "fixed" rates by 0.6% (or 60 basis points). As any business owner can attest, this difference is substantial and would be material when deciding whether to use a payment processor.

199.    Dr. Babbitt also contracted to pay $0.25 for each card authorization.  However, in April of 2014, Defendant unilaterally raised this to $0.30 per authorization and charged this amount for all subsequent card transactions on future statements.

200.    None of the increases were imposed or mandated by the card networks, but came straight from Defendant with the extra profit going directly to Defendant's bottom line.

201.    Dr. Babbitt did not receive advance notice of any of these increases and is unaware of any evidence that Defendant ever sent any advance notice.  Dr. Babbitt made a regular practice of receiving and checking the U.S. mail but there is no record of receiving any such notice and no one at Dr. Babbitt's office received such a document.

202.    Dr. Babbitt provided written notice of his grievances with Defendant's fee practices via the Amended Complaint, which was filed and served on October 6, 2017.

203.    Dr. Babbitt was induced to enroll, and chose to enroll, in Defendant's services based on Defendant's representations regarding the "fixed" rates and pricing terms that would supposedly apply.  Had Dr. Babbitt known the truth about Defendant's fee practices and the pricing that would actually apply, he would not have done business with Defendant.

**D.    Ideal Sales.**

204.    By 2012, Ideal Sales had banked with Wells Fargo Bank for approximately two years.

205.    On or about January 13, 2012, Ideal Sales owner Mari McGarry was contacted by a sales representative of Defendant named Greg MacIsaac.  Mr. MacIsaac made a written

proposal to Ideal Sales indicating exactly what it would be charged if it switched its business to Defendant.

206.    Specifically, this proposal indicated that Ideal Sales would pay a "fixed" rate of 3.25% on credit and debit card transactions.  It also specified that Ideal Sales would pay several "Other Processing Fees," which were identified on the document.

207.    At no time was Ideal Sales advised that these identified fees and charges would change, nor was it advised that the vast majority of transactions would be subject to higher fees and charges, or otherwise that the "fixed" rate would increase substantially, and surcharges applied, if its customers failed to use specified types of credit or debit cards.

208.    Ideal Sales was satisfied with these terms and on or about January 18, 2012 executed a Merchant Processing Application that attached the agreed-upon Pricing Terms.

209.    After the parties began to do business, Ideal Sales was repeatedly charged processing rates that were higher than the "fixed" rates specified in its Pricing Terms, pursuant to Defendant's card processing fee upcharge scheme.

210.    For many of Ideal Sales card transactions, it was charged higher, undisclosed "non-qualified" rates and a "non-qualified surcharge."  These higher rates and surcharges were charged for transactions throughout the time it was using Defendant's processing services.

211.    Ideal Sales could not discover or understand these upcharges and higher rates because they were not disclosed and were hidden and obscured from it, including pursuant to Defendant's monthly statement "billback" scheme.

212.    By way of example only, on its June of 2017 statement, which was not received until July of 2017, Ideal Sales was assessed the following charge:

05/31/17  IC  MAYBB084-TRANS CLEARED AT COM CARD W/O LEVEL 2 FLT MC 1       -290.71

213.    Ideal Sales had no idea what this entry meant.  It is not tied to any individual card transaction, which prevented Ideal Sales from ascertaining exactly what it is for.  Ideal Sales has recently learned in conjunction with its attorneys' investigations that this charge reflects the additional amount above and beyond the agreed-upon "fixed" rate that Defendant back-billed for credit card transactions that occurred the prior month, in May of 2017.

214.    Similar confusingly-worded billing entries appear on virtually every one of the monthly statements Ideal Sales received from Defendant from February of 2012 through June of 2017.

215.    Ideal Sales was also subjected to other improper fee practices by Defendant.  For example, Defendant, unilaterally and without adequate notice, increased its "fixed" card processing fee rates (which affected both the rates he was charged for "qualified" and so-called "non-qualified" transactions, as discussed above) and its "non-qualified surcharge" rates. According to the "Pricing Terms" in its February 2012 Application, Ideal Sales contracted to pay "fixed" card processing fee rates of 3.25% on credit and debit card transactions.  Putting aside, for the moment, the pervasive improper significant upcharges Defendant imposed for so-called "non-qualified" transactions, Defendant adhered to this highly-profitable pricing until June of 2013, when it jacked these rates up to 3.55%.  In April of 2014, Defendant jacked these rates up again, to 3.85%.  In March of 2015, Defendant raised these rates yet again, to 4.15%.  The rates went up again in March of 2016, to 4.45%.  Such rates are obscene.  There was no even arguably colorable basis for any of these increases, such as increased rates adopted by the card networks. Of course, since only a small fraction of cards were deemed "qualified" by Defendant, the rates assessed were usually much higher.  Ideal Sales' total costs for payment processing often *exceeded 10%*.

216.     Thus, by the time it ceased doing business with Defendant in May of 2017, Defendant had unilaterally increased the agreed "fixed" rate by a total of 1.2% (or 120 basis points).  The actual rates Defendant charged Ideal Sales for the vast majority of its card transactions (i.e., for so-called "non-qualified" transactions) was increased by these amounts but the other elements of the "non-qualified" fee formula were also increased.

217.     The "non-qualified surcharge" language that is buried in Ideal Sales' February 2012 Application indicates that the "non-qualified surcharge" will be 0.99%.  Defendant adhered to this rate (which itself was improperly charged as alleged herein) until March of 2015, when it jacked up this fee to 1.5%.  In March of 2016, Defendant jacked up this rate again, this time to 1.99%.

218.     Thus, by the time it ceased doing business with Defendant in May of 2017, Defendant had unilaterally more than doubled the "non-qualified surcharge."  When all of the improper increases and upcharges are added to the "fixed" card processing rates Ideal Sales agreed to, Ideal Sales' effective rate was often *in excess of 10%* per transaction, more than tripling the average industry rate.

219.     None of the increases were imposed or mandated by the card networks, but came straight from Defendant with the extra profit going directly to Defendant's bottom line.

220.     When added to the unilateral increases to its already high "fixed" rates and non-qualified surcharges, Ideal Sales' effective cost for payment processing was about three times what it had agreed to, even as competition drove rates down in the industry.

221.     Ideal Sales became alerted to these ridiculous rates in or about May of 2017 and promptly stopped processing transactions with Defendant.  Ideal Sales continued to receive monthly statements containing the charges described herein until July of 2017.

222.    In June of 2017, Ms. McGarry went to her Wells Fargo Bank branch to complain. The manager Amirala Ashton Rashidi, who is also Ideal Sales' personal banker, was shocked at the rates Ideal Sales was being charged, which she acknowledged were far too high.

223.    Ms. Rashidi put Ms. McGarry in touch with a representative of Defendant who, on June 6, 2017, confirmed that the processing account had been terminated.  Ideal Sales also instructed Wells Fargo Bank to block Defendant from automatically debiting its checking account for future charges.

224.    On August 30, 2017, Ideal Sales mailed a letter to Defendant disputing the legitimacy of the $290.71 in "billback" charges that were assessed on its June of 2017 statement (received by Ideal Sales in early July of 2017).

225.    Ideal Sales provided further written notice of its grievances with Defendant's fee practices via the Amended Complaint, which was filed and served on October 6, 2017.

226.    Ideal Sales was induced to enroll, and chose to enroll, in Defendant's services based on Defendant's representations regarding the "fixed" rates and pricing terms that would supposedly apply.  Had Ideal Sales known the truth about Defendant's fee practices and the pricing that would actually apply, it would not have done business with Defendant.

**E.      Lytle Café.**

227.    In 2016, Lytle Café was banking with Wells Fargo Bank when it was approached by Defendant.

228.    On July 27, 2016, Lytle Café received a written proposal from Defendant's sales representative Aurelio Palos that indicated exactly what the restaurant would be charged if it enrolled in Defendant's services.

229.    Specifically, this proposal indicated that Lytle Café would pay "fixed" rates of 1.659% on credit card transactions and 1.309% on debit card transactions.  It also specified that Lytle Café would pay several "Other Processing Fees," which were identified on the document.

230.    At no time was Lytle Café advised that these identified fees and charges would change, nor was it advised that the vast majority of transactions would be subject to higher fees and charges, or otherwise that the "fixed" rate would increase substantially, and surcharges applied, if its customers failed to use specified types of credit or debit cards.

231.    Lytle Café was satisfied with these terms and on or about July 27, 2016, executed a Merchant Processing Application that attached the agreed-upon Pricing Terms.

232.    After the parties began to do business, Lytle Café was repeatedly charged processing fee rates that were higher than the "fixed" rates specified in its Pricing Terms, pursuant to Defendant's card processing fee upcharge scheme.

233.    For many of Lytle Café's card transactions, it was charged higher, undisclosed "non-qualified" rates and a "non-qualified surcharge."  These higher rates and surcharges have been charged for transactions throughout the time Lytle Café has used Defendant's processing services.

234.    Lytle Café could not discover or understand these upcharges and higher rates because they were not disclosed and were hidden and obscured from it, including pursuant to Defendant's monthly statement "billback" scheme.

235.    By way of example only, on its October of 2016 statement, which was not received until November of 2016, Lytle Café was assessed the following charges:

```
09/30/16  IC  SEP BB083-TRANSACTION CLEARED AS ENHANCED MC 1        -0.37
09/30/16  IC  SEP BB190-TRANSACTION CLEARED AT REWARDS 2 REW VI 1    -0.52
```

236.     Lytle Café had no idea what these entries meant.  They were not tied to any individual card transaction, which prevented Lytle Café from ascertaining exactly what they were for.

237.     After receiving this statement, Lytle's Café's owner Olivia Guerrero contacted Defendant for an explanation.  She was told the additional charges were being incurred because the café was accepting too many rewards credit cards.

238.     Until this interaction, Ms. Guerrero had no idea that Defendant charged different card processing fee rates for different cards, but rather believed that all credit card transactions would be charged a per transaction card processing fee of 1.659%, the rate Lytle Café agreed to pay and that is specified in its July 2016 Application.

239.     This news was extremely distressing to Ms. Guerrero.  Every penny counts given her small restaurant's razor thin profit margin.  She sought to terminate her contract with Defendant at that time, but was told that the restaurant would first have to pay an early termination fee.  Because the restaurant could not afford to pay such a high fee, she asked if there was anything she could do to reduce her fees.  She was told by Defendant to stop accepting rewards credit cards.

240.     From this point forward, Ms. Guerrero instructed her staff to ask patrons who wished to pay with credit cards that contained the word "rewards" somewhere on it to ask the customer if they could pay with cash or another card.  There were many instances where customers obliged her requests.

241.     This tactic, however, had little effect on the amount of her subsequent payment processing charges.  Although Ms. Guerrero and her staff have been very diligent about not accepting "rewards" credit cards unless absolutely necessary, the restaurant to this day continues

to be hammered each and every month with upcharges and surcharges for so-called "non-qualified" transactions, pursuant to Defendant's card processing fee upcharge scheme.

242.    Lytle Café was also subjected to other fees that are not reflected in its July 2016 Application or that exceeded the charges set forth in its Application, including an "AUG PURCHASE MPRT TERMINAL BILLING FEE" of $35.00 and an "AUG TERMINAL PUR/RENT TAX TERMINAL PUR/RENT TAX" of $2.90 in August of 2016.  Lytle Café was also assessed an annual fee of $75.00 in November of 2016, even though its Application indicates it will only be charged $45.00 for such fee.

243.    Lytle Café has complained bitterly on many occasions to Defendant's customer service department via telephone.

244.    Lytle Café provided written notice of its grievances with Defendant's fee practices via the Amended Complaint, which was filed and served on October 6, 2017.

245.    Lytle Café was induced to enroll, and chose to enroll, in Defendant's services based on Defendant's representations regarding the "fixed" rates and pricing terms that would supposedly apply.  Had Lytle Café known the truth about Defendant's fee practices and the pricing that would actually apply, it would not have done business with Defendant.

**F.    Indian Tree Chiropractic.**

246.    Dr. Ken Spresser communicated with a sales representative of Defendant in June of 2014 about switching card processing for his business Indian Tree Chiropractic to Defendant. Dr. Spresser does not recall the name of this sales representative.

247.    The sales representative made a written proposal to Dr. Spresser indicating exactly what his practice would be charged if it switched its business to Defendant.

248.    Specifically, this proposal indicated that Indian Tree Chiropractic would pay a "fixed" rate of 1.826% on credit and debit card transactions.  It also specified that Indian Tree Chiropractic would pay several "Other Processing Fees," which were identified on the document.

249.    At no time was Dr. Spresser advised that these identified fees and charges would change, nor was he advised that the vast majority of transactions would be subject to higher fees and charges, or otherwise that the "fixed" rate would increase substantially, and surcharges applied, if his patients failed to use specified types of credit or debit cards.

250.    Dr. Spresser was satisfied with these terms and in June of 2014 executed a Merchant Processing Application that attached the agreed-upon Pricing Terms.

251.    After the parties began to do business, Indian Tree Chiropractic was repeatedly charged processing fee rates that were higher than the "fixed" rates specified in its Pricing Terms, pursuant to Defendant's card processing fee upcharge scheme.

252.    For many of Indian Tree Chiropractic's card transactions, it was charged higher, undisclosed "non-qualified" rates and a "non-qualified surcharge."  These higher rates and surcharges were charged for transactions throughout the time it was using Defendant's processing services.

253.    Indian Tree Chiropractic could not discover or understand these upcharges and higher rates because they were not disclosed and were hidden and obscured from it, including pursuant to Defendant's monthly statement "billback" scheme.

254.    By way of example only, on its May of 2017 statement, which was not received until June of 2017, Indian Tree Chiropractic was assessed the following charges:

```
04/30/17  IC  SEP BB189-TRANSACTION CLEARED AT REWARDS 1 SIG VI 12       -0.72
04/30/17  IC  SEP BB163-TRAN CLEARED AT CHECK CARD DEBIT/PREPAID VI 1     -0.53
```

255.    Dr. Spresser had no idea what these entries meant.  They were not tied to any individual card transaction, which prevented Dr. Spresser from ascertaining exactly what they were for.  Dr. Spresser has recently learned in conjunction with his attorneys' investigations that these charges reflect the additional amounts above and beyond the agreed-upon "fixed" rate that Defendant back-billed for credit card transactions that occurred the prior month, in April of 2017.

256.    Similar confusingly worded billing entries appear on virtually every one of the monthly statements Indian Tree Chiropractic received from Defendant over the course of its three-year relationship.

257.    Indian Tree Chiropractic was also subjected to other improper fee practices by Defendant.  For example, Defendant, unilaterally and without adequate notice, increased its "fixed" card processing fee rates (which affected both the rates it was charged for "qualified" and so-called "non-qualified" transactions, as discussed above).  According to the "Pricing Terms" in the June 2014 Application, Indian Tree Chiropractic contracted to pay "fixed" card processing fee rates of 1.826% on credit and debit card transactions.  Putting aside, for the moment, the pervasive improper significant upcharges Defendant imposed for so-called "non-qualified" transactions, Defendant adhered to this pricing until March of 2015, when it jacked this rate up to 2.126%.  In March of 2016, Defendant again jacked this rate up, this time to 2.426%.  There was no even arguably colorable basis for either increase, such as increased rates adopted by the card networks.

258.    Thus, by the time it ceased doing business with Defendant in June of 2017, Defendant had increased the agreed-upon credit card and debit card "fixed" rates by 0.6% (or 60 basis points).  The actual rates Defendant charged Indian Tree Chiropractic for the vast majority

of its card transactions (i.e., for so-called "non-qualified" transactions) was even higher because of Defendant's pervasive upcharge scheme, but even these higher, upcharge rates were affected by these unilateral "fixed" rate increases by Defendant.

259.    These increases were not imposed or mandated by the card networks, but came straight from Defendant with the extra profit going to Defendant's bottom line.

260.    Indian Tree Chiropractic did not receive advance notice of these increases and is unaware of any evidence that Defendant ever sent any advance notice.  It made a regular practice of receiving and checking the U.S. mail but there is no record of receiving any such notice and no one at Indian Tree Chiropractic's office received such a document.

261.    In March of 2017, Indian Tree Chiropractic learned that it was being overcharged by Defendant and contacted Defendant seeking to terminate its relationship with Defendant. Defendant would not acquiesce to termination unless Indian Tree Chiropractic paid a $500 early termination fee.  It was only after Dr. Spresser filed written complaints over the course of the next few months with multiple federal agencies, including the Office of the Comptroller of the Currency and the Federal Deposit Insurance Corporation, that Defendant finally agreed to waive the early termination fee.

262.    Indian Tree Chiropractic provided additional written notice of its grievances with Defendant's fee practices via the Amended Complaint, which was filed and served on October 6, 2017.

263.    Indian Tree Chiropractic was induced to enroll, and chose to enroll, in Defendant's services based on Defendant's representations regarding the "fixed" rates and pricing terms that would supposedly apply.  Had Indian Tree Chiropractic known the truth about

Defendant's fee practices and the pricing that would actually apply, it would not have done business with Defendant.

264.    As a consequence of Defendant's fraudulent, unfair, and improper policies and practices, Plaintiffs and the members of the proposed classes were fraudulently induced into doing business with Defendant and have been wrongfully forced to pay unauthorized fees and charges, including as set forth herein.  Defendant has improperly deprived Plaintiffs and those similarly situated of significant funds, causing ascertainable monetary losses and damages.

265.    The improper fees and charges described herein are illustrative only and are not intended to provide a full listing of the hundreds of improper fees paid by Plaintiffs.  Indeed, as previously noted, Defendant formats its statements so as to make it impossible for Plaintiffs to discover the nature and amount of all overcharges, including but not limited to the additional fees and surcharges for so-called "non-qualified" transactions.

266.    In discovery, Plaintiffs expect to obtain the full level of detail needed to verify the legitimacy of all of the amounts they have been charged.

## CLASS ALLEGATIONS

267.    Plaintiffs bring this action on behalf of themselves and the following classes, preliminarily defined as follows:

268.    The "Rate Upcharge Class" consists of:

> All United States customers of Wells Fargo Merchant Services, LLC that agreed to the "fixed" pricing option for card processing fees and that were charged one or more card processing fees at the "non-qualified" rate.

269.    The "Fee Increase Class" consists of:

> All United States customers of Wells Fargo Merchant Services, LLC that had a "fixed" card processing fee rate, "non-qualified surcharge" rate, or other fee or charge set forth in their Pricing Terms unilaterally increased by Defendant, (this

includes the assessment of a minimum monthly fee higher than the listed Monthly Minimum Processing Fee).

270.    The "PCI Fee Class" consists of:

All United States customers of Wells Fargo Merchant Services, LLC that: (a) were charged one or more Non-validation PCI Compliance Fees; and (b) were not a Level 4 Client of Defendant and/or did not utilize either a gateway or value added reseller.

271.    The "Statement Billing Fee Class" consists of:

All United States customers of Wells Fargo Merchant Services, LLC that were charged one or more Statement Billing Fees after they had elected to access their statements online.

272.    Plaintiffs reserve the right to modify, supplement, or amend the definitions of the proposed Classes, or any of them, before the Court determines whether certification is appropriate and as the Court may otherwise allow.

273.    Excluded from the Classes are Defendant, its parents, subsidiaries, affiliates, officers, and directors, any entity in which Defendant has a controlling interest, all customers who make a timely election to be excluded, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

274.    The time period for each of the Classes is the number of years immediately preceding the date on which the initial Complaint was filed as allowed by the applicable statute of limitations, going forward into the future until such time as Defendant remedies the conduct complained of herein.  If New York law is deemed to apply, then the relevant period is likely to begin August 4, 2011 and extend through Defendant's change in conduct or the conclusion of the case.

275.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can meet all the applicable requirements of Federal Rule of Civil Procedure 23 and can

prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

276.   **Numerosity.**   The members of each of the Classes are so numerous that individual joinder of all the members is impracticable.   There are hundreds of thousands of merchants that have been damaged by Defendant's wrongful conduct as alleged herein, and each of the Classes includes at least thousands of merchants.   The precise number of Class members and their addresses is presently unknown to Plaintiffs, but can readily be ascertained from Defendant's books and records.   Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, and/or published notice.

277.   **Commonality and Predominance.**   Numerous common questions of law and fact exist as to the claims of Plaintiffs and the other Class members.   Such questions include, but are not limited to:

a.      Whether Defendant acted and continues to act fraudulently in inducing merchants, including Plaintiffs and the other Class members, to contract with Defendant;

b.      Whether Defendant has imposed and continues to impose improper fees on merchants;

c.      Whether Defendant has breached its Agreement with merchants and/or violated the covenant of good faith and fair dealing;

d.      Whether Defendant is liable to Plaintiffs and the other Class members for imposing improper fees on merchants for Defendant's own benefit;

e.       Whether certain contractual provisions in Defendant's form contracts are invalid exculpatory clauses, violate public policy, lack mutuality, are illusory, are procedurally and substantively unconscionable, and/or are otherwise void and unenforceable;

f.       The proper method or methods by which to measure damages and/or restitution; and

g.       Whether Defendant should be enjoined from engaging in any or all of the unlawful, deceptive, misleading, and/or fraudulent practices complained of herein.

278.     Defendant has engaged in a common course of conduct toward Plaintiffs and the other members of the classes.  The common issues arising from this conduct that affect Plaintiffs and the other Class members predominate over any individual issues.  Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

279.     **Typicality.**  Plaintiffs' claims are typical of the other Class members' claims because, among other things, all of the claims arise out of a common course of conduct and assert the same legal theories.  Further, Plaintiffs and members of the Classes were comparably injured through the uniform misconduct described above.

280.     **Adequacy of Representation.**  Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members; Plaintiffs have retained counsel competent and experienced in complex commercial and class action litigation; and Plaintiffs intend to prosecute this action vigorously.  Class members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

281.     **Declaratory and Injunctive Relief.**  Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, thereby making appropriate final injunctive and declaratory relief, as described below.  Specifically, Defendant

continues to fraudulently induce merchants to do business and continues to knowingly overcharge the Classes and to enforce unconscionable or otherwise unenforceable contractual provisions in order to block the Class members from seeking legal relief.  Class-wide declaratory and/or injunctive relief is appropriate to put an end to these illicit practices.

282.   **Superiority.**  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and each of the other Class members are small compared to the burden and expense that would be required to individually litigate their claims against Defendant, thus rendering it impracticable for Class members to individually seek redress for Defendant's wrongful conduct.  Even if Class members could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

### CLAIMS FOR RELIEF

### COUNT ONE
### Breach of Contract and Breach of the
### Covenant of Good Faith and Fair Dealing

283.   Plaintiffs repeat paragraphs 1 through 282 above.

284.   Plaintiffs and the Class members each entered into form contracts with Defendant.

285.   Through its conduct alleged herein, Defendant has materially violated the specific terms of its form contracts with Plaintiffs and the Class members, including the form Applications, such as by:

(a)    charging "Monthly Service Fees" during months when no services were provided;

(b)    charging "Statement Billing Fees" after merchants had elected to access their statements online;

(c)    charging Non-validation PCI Compliance Fees to merchants that were not a Level 4 Client of Defendant and/or did not utilize either a gateway or value added reseller;

(d)    charging additional "Other Processing Fees" that either were not specified in the Pricing Terms, violated the conditions placed on such fees by the Pricing Terms, or were specified in lesser amounts in the Pricing Terms;

(e)    assessing fees in the guise of pass-through fees from the card networks in amounts that are greater than those set by the card networks and retaining the difference;

(f)    raising the amounts of existing fees or adding new fees without first providing required notice; and

(g)    charging non-qualified fees and surcharges in excess of the amounts provided in merchants' Pricing Terms.

286.    Further, through its conduct alleged herein, Defendant has separately breached its form contracts with Plaintiffs and the Class members by exercising the discretion afforded by Sections 5.5 and 5.6 of the Program Guide (or equivalent provisions in other versions) to raise fees or add new fees in violation of the covenant of good faith and fair dealing.

287.    For instance, in exercising its discretion to raise the amounts of the credit and debit card processing rates and per authorization fees, Defendant abused that discretion.  Indeed, Defendant imposed these increases not in response to any external factor but merely to pad its own bottom line.  The increased fees far exceed what Plaintiffs and the Class members

reasonably expected and were led by Defendant to expect.  This conduct by Defendant was arbitrary and in bad faith.

288.    Defendant also violated the covenant of good faith and fair dealing by abusing any discretion Defendant may have had to impose Statement Billing Fees after merchants had elected to receive their statements online.   This conduct by Defendant was arbitrary and in bad faith.

289.    Defendant also violated the covenant of good faith and fair dealing by assessing pervasive non-qualified upcharges and surcharges on the majority of card transactions under the false guise that the cards used were not cards Defendant "anticipated" would be used for transactions, and by concealing and obscuring this scheme at all stages.  This conduct by Defendant was arbitrary and did not comport with good faith and fair dealing.

290.    Defendant's conduct described herein has had the effect, and the purpose, of denying Plaintiffs and the Class members the full fruits of their bargains with Defendant.

291.    Plaintiffs and the Class members have performed all, or substantially all, of the obligations imposed on them under the contract.  There is no legitimate excuse or defense for Defendant's conduct.

292.    Defendant's anticipated attempts to defend its overcharging through reliance on contractual provisions in the Program Guide and elsewhere will be without merit.  Such provisions are either inapplicable or are unenforceable because they are void, illusory, lacking in mutuality, are invalid exculpatory clauses, violate public policy, are procedurally and substantively unconscionable, and are unenforceable in light of the hidden nature of Defendant's misconduct, among other reasons.  These provisions do not excuse Defendant's breaches or otherwise preclude Plaintiffs and the Classes from recovering for such breaches.

293. Plaintiffs and members of the Classes sustained damages as a result of Defendant's direct breaches of the contract and Defendant's breaches of the covenant of good faith and fair dealing.

## COUNT TWO
## Fraudulent Inducement

294. Plaintiffs repeat paragraphs 1 through 282 above.

295. As alleged herein, Defendant concealed (and continues to conceal) its true pricing terms, and intentionally and fraudulently induced Plaintiffs and the Class members to enter into contracts with Defendant through its material omissions and material affirmative promises of pricing terms that Defendant never had any intention to honor.

296. Among other things, Defendant intentionally (a) prominently promised Plaintiffs and the Class members, as an inducement to enter into business with Defendant, card processing fee rates and other fees and charges that were lower and different than what Defendant knew would be charged, (b) failed to properly disclose its card processing fee upcharge scheme, or the true applicable card processing rates, in the Pricing Terms or elsewhere, (c) buried highly misleading, false disclosures related to this scheme in the fine print of its lengthy form contracts, (d) failed to inform prospective merchants of the known impact of this scheme (i.e., that the merchant will, for the majority of transactions, pay significantly higher card transaction fee rates than the "fixed" rates specified without condition in the merchant's Pricing Terms), and (e) disclosed "Pricing Terms" that do not reflect, omit, conceal, and affirmatively misrepresent the true pricing model that Defendant knew it would use in processing payments.

297. Defendant knew that its disclosed pricing terms did not accurately reflect the prices and fees it would ultimately charge merchants, including Plaintiffs and the other Class members, at the time the pricing terms were provided to such merchants. Defendant made the

foregoing misrepresentations and omissions alleged herein to induce Plaintiffs and the other members of the Classes to rely on them.

298.    Defendant's misrepresentations and omissions alleged herein were material, including in that they would be considered very important to merchants in deciding whether or not to do business with Defendant, and were known by Defendant to be false and misleading.

299.    Defendant's true pricing terms and model include, *inter alia*: (a) outrageous hidden additional fees and surcharges for all transactions it unilaterally deems to be "non-qualified" (which end up being the vast majority of all processed transactions), (b) marked up "fixed" rates, (c) marked up pass through card network fees, (d) marked up other fees, (e) fees charged to merchants under circumstances where Defendant's disclosures indicated such fees would not be charged, and (f) additional undisclosed fees.

300.    Prior to executing Applications and forming a contract with Defendant, Plaintiffs and the other Class members were deceived by Defendant with respect to the pricing terms and model Defendant would use in processing payments on their behalf.

301.    The nature and amounts of fees charged, as represented by Defendant at the time of merchant enrolment (including in the in the Application's Pricing Terms) were material to and justifiably relied upon by Plaintiffs and the other Class members.  Had Defendant accurately represented its true pricing terms and model to Plaintiffs and the other Class members, and not misrepresented, obscured, and concealed its true pricing terms model from them, Plaintiffs and the Class members would not have contracted with Defendant to receive payment processing services.

302.    Accordingly, Plaintiffs and the other Class members were fraudulently induced to enter into contracts with Defendant.

303.     Plaintiffs are entitled to seek damages and/or rescission of their contracts with Defendant, or other equitable relief, including restitution of funds Defendant took from them without permission.

304.     Plaintiffs will make any necessary election of remedies at the appropriate juncture.

## COUNT THREE
### Unjust Enrichment

305.     Plaintiffs repeat paragraphs 1 through 282 above.

306.     Plaintiffs, on behalf of themselves and the other Class members, assert a common law claim for unjust enrichment.  This claim is brought in the alternative and is contingent on Defendant's contracts with Plaintiffs and the Class members being deemed ineffective, inapplicable, void, or unenforceable.  In such scenario, unjust enrichment will dictate that Defendant disgorge all fees unjustly received.

307.     As alleged herein, Defendant was unjustly enriched at the expense of Plaintiffs and the other Class members, who were improperly charged and overcharged by Defendant.

308.     Plaintiffs and the other Class members were unjustly deprived of money obtained by Defendant as a direct and proximate result of its undisclosed, deceptive, unfair, unscrupulous, and unconscionable fee and billing practices alleged herein.

309.     It would be inequitable and unconscionable for Defendant to retain the profit, benefit, and other compensation it obtained from Plaintiffs and the other Class members as a result of its wrongful conduct alleged herein.

310.     Plaintiffs and the other Class members are entitled to seek restitution from Defendant as well as an order from this Court requiring disgorgement of all profits, benefits, and other compensation obtained by Defendant by virtue of its wrongful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class members, demand a jury trial on all claims so triable and judgment as follows:

1.      Certifying this case as a class action pursuant to Federal Rule 23;

2.      Temporarily and permanently enjoining Defendant from continuing the improper business practices alleged herein;

3.      Granting rescission of the contracts;

4.      Declaring certain contractual provisions to be unenforceable and enjoining their enforcement;

5.      Awarding restitution of all improper fees seized by Defendant from Plaintiffs and the Class members as a result of the wrongs alleged herein in an amount to be determined at trial;

6.      Compelling disgorgement of the ill-gotten gains derived by Defendant from its misconduct;

7.      Awarding damages in an amount to be determined by a jury;

8.      Awarding compensatory, general, nominal, and punitive and exemplary damages, as allowed by law;

9.      Awarding pre-judgment interest at the maximum rate permitted; and

10.     Awarding such other relief as this Court deems just and proper.

DATED this 28th day of November, 2017

Respectfully submitted,

LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP

BY: /s/ David S. Stellings
David S. Stellings
New York Bar No. 2635282
dstellings@lchb.com
250 Hudson Street, 8th Floor
New York, NY 10013
Tel: (212) 355-9500

Roger N. Heller*
California Bar No. 215348
rheller@lchb.com
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Tel: (415) 956-1000

WEBB, KLASE & LEMOND, LLC

BY: /s/ E. Adam Webb
E. Adam Webb*
Georgia Bar No. 743910
Adam@WebbLLC.com
1900 The Exchange, S.E.
Suite 480
Atlanta, GA 30339
Tel: (770) 444-0773

*Attorneys for Plaintiffs*

* Admitted *Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of November, 2017, I caused the foregoing document to be electronically filed with the Clerk of Court using the CM/ECF system which automatically sends email notification of such filing to all attorneys of record.

/s/ E. Adam Webb
E. Adam Webb