**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

----------------------------------------------------------------

PATTI'S PITAS, LLC, QUEEN CITY
TOURS, MARK A BABBITT, DDS, INC.,
IDEAL SALES, INC., LYTLE CAFÉ, and
INDIAN TREE CHIROPRACTIC, P.C.,
individually and on behalf of all
others similarly situated,

                    Plaintiffs,

     v.

WELLS FARGO MERCHANT SERVICES,
LLC,

                    Defendant.

              CIVIL ACTION NO.

              1:17-CV-04583-LDW-GRB

----------------------------------------------------------------

### DEFENDANT WELLS FARGO MERCHANT SERVICES LLC'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

Mary J. Hackett (NY Id. No. 4587622)
mhackett@mcguirewoods.com
Tel: 412-667-7944
Jarrod D. Shaw (*Admitted pro hac vice*)
jshaw@mcguirewoods.com
Tel: 412-667-7907
McGuireWoods LLP
Tower Two-Sixty
260 Forbes Avenue
Suite 1800
Pittsburgh, PA 15222

*Attorneys for Defendant*

**TABLE OF CONTENTS** <span style="float:right">Page</span>

TABLE OF AUTHORITIES ............................................................................................... iii

I.     INTRODUCTION ................................................................................................. 1

II.    STATEMENT OF THE CASE ............................................................................. 2

     A.    General Framework of Merchant Payment Processing Services and
          Related Fees ............................................................................................. 2

     B.    Relevant Agreements, Contractual Provisions, and the Alleged Improper
          Fees ......................................................................................................... 4

     C.    Queen City's Specific and Individualized Allegations ......................... 8

     D.    Patti's Pitas' Specific and Individualized Allegations .......................... 9

     E.    Babbitt's Specific and Individualized Allegations ............................... 10

     F.    Ideal Sales' Specific and Individualized Allegations .......................... 11

     G.    Lytle Café's Specific and Individualized Allegations .......................... 12

     H.    Indian Tree's Specific and Individualized Allegations......................... 12

III.   LEGAL STANDARD .......................................................................................... 13

IV.   ARGUMENT ....................................................................................................... 14

     A.    The Plain Terms of the Agreements Preclude Plaintiffs' Claims for Breach
          of Contract and Violation of the Covenant of Good Faith and Fair Dealing....... 15

          i.    Plaintiffs' Allegations Against the Applicability and Enforceability
               of the Relevant Condition Precedent Lack Merit, and the Failure
               To Plead Compliance with the Condition Precedent Bars Plaintiffs'
               Claims ..................................................................................... 18

               1.    Plaintiffs Have Failed to Comply with Sections 5.2 and
                    5.11........................................................................... 19

               2.    The "Contractual Notification Requirements" Are an
                    Enforceable Condition Precedent that Applies to Plaintiffs'
                    Claims ...................................................................... 21

          ii.   Plaintiffs Fail to Allege an Actionable Breach of any Term of the
               Agreement................................................................................ 24

i

        iii.     Certain Plaintiffs Cannot Avoid the Statute of Limitations by
Failing to Plead Relevant Dates ............................................................ 31

B.    Plaintiffs Have Failed to State a Fraudulent Inducement Claim......................... 32

      i.     The Integration Clause in the Program Guide Bars Plaintiffs'
Fraudulent Inducement Claims ............................................................... 32

      ii.    Plaintiffs' Fraudulent Inducement Claim Fails to Plead Sufficient
Facts ........................................................................................................ 33

C.    Plaintiffs Cannot Assert a Claim for Unjust Enrichment where an
Enforceable Contract Exists.................................................................................. 34

V.    CONCLUSION.................................................................................................................. 35

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)............................................................................................13, 14, 23

*Beatie & Osborn LLP v. Patriot Sci. Corp.,*
  431 F. Supp. 2d 367 (S.D.N.Y. 2006)...................................................................34

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007)..............................................................................................13, 14

*Benex LC v. First Data Merch. Servs. Corp.,*
  No. 14-cv-6393, 2016 WL 1069657 (E.D.N.Y. Mar. 16, 2016)..........................19, 21, 23, 35

*Brink's, Inc. v. City of New York,*
  528 F. Supp. 1084 (S.D.N.Y. 1981)......................................................................31

*Broder v. Cablevision Sys. Corp.,*
  418 F.3d 187 (2d Cir. 2005)..................................................................................17

*Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.,*
  516 N.E.2d 190, 70 N.Y.2d 382 (1987).................................................................34

*Cortec Indus., Inc. v. Sum Holding L.P.,*
  949 F.2d 42 (2d Cir. 1991)....................................................................................5

*Davis v. Clearway Mortg., LLC,*
  No. 08-CV-6492L, 2009 WL 2843255 (W.D.N.Y. Aug. 31, 2009)......................30

*Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.,*
  850 N.E.2d 653, 7 N.Y.3d 96 (2006)....................................................................28

*Gally v. Columbia Univ.,*
  22 F. Supp. 2d 199 (S.D.N.Y. 1998).....................................................................27

*Gaston v. New York City Dept. of Health Office of Chief Med. Exam'r,*
  432 F. Supp. 2d 321 (S.D.N.Y. 2006)...................................................................31

*Gold v. Deutsche Aktiengesellschaft,*
  365 F.3d 144 (2d Cir. 2004)..................................................................................16

*Harris v. Provident Life & Accident Ins. Co.,*
  310 F.3d 73 (2d Cir. 2002)....................................................................................16

*Imperatore v. Putnam Lovell NBF Secs. Inc.*,
    No. 05 CV 4966, 2006 WL 648214 (S.D.N.Y. Mar. 15, 2006)............................................16

*Int'l Audiotext Network, Inc., v. Am. Tel. and Tel. Co.*,
    62 F.3d 69 (2d Cir. 1995) .............................................................................................5, 14

*Int'l CableTel Inc. v. Le Groupe Videotron Ltee*,
    978 F. Supp. 483 (S.D.N.Y. 1997).......................................................................................33

*Knox v. Countrywide Bank*,
    4 F. Supp. 3d 499 (E.D.N.Y. 2014) .....................................................................................23

*Liberty Media Corp. v. Vivendi Universal, S.A.*,
    02 Civ. 5571, 2004 U.S. Dist. LEXIS 7015 (S.D.N.Y. April 22, 2004).................................32

*LJL 33rd St. Assocs., LLC v. Pitcairn Props., Inc.*,
    725 F.3d 184 (2d Cir. 2013).................................................................................................17

*Martino v. Kaschak*,
    208 A.D.2d 698, 617 N.Y.S.2d 529 (App. Div. 2d Dep't. 1994) ...........................................15

*McGee v. State Farm Mut. Auto Ins. Co.*,
    No. 09 Civ. 3579, 2011 WL 5409393 (E.D.N.Y. Nov. 8, 2011) ............................................16

*Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*,
    418 F.3d 168 (2d Cir. 2005)..................................................................................................34

*MRW Constr. Co. v. City of New York*,
    223 A.D.2d 473, 636 N.Y.S.2d 344 (App. Div. 1st Dep't 1996) ...........................................19

*Paraco Gas Corp. v. Travelers Cas. & Sur. Co. of Am.*,
    51 F. Supp. 3d 379 (S.D.N.Y. 2014).................................................................................15, 16

*Radin v. Albert Einstein Coll. of Med. of Yeshiva Univ.*,
    No. 04 Civ. 704, 2005 WL 1214281 (S.D.N.Y. May 20, 2005).........................26, 27, 30, 31

*Reingold v. Deloitte Haskins & Sells*,
    599 F. Supp. 1241 (S.D.N.Y. 1984).......................................................................................33

*Stamelman v. Fleishman-Hillard, Inc.*,
    No. 02-cv-8318, 2003 WL 21782645 (S.D.N.Y. July 31, 2003)...........................................33

*Tarleton Bldg. Corp. v. Spider Staging Sales Co.*,
    26 A.D.2d 809, 274 N.Y.S.2d 43 (App. Div. 1st Dep't 1966) ..............................................22

*In re Toscano*,
    799 F. Supp. 2d 230 (E.D.N.Y. 2011) ..................................................................................34

*Travelers Cas. & Sur. Co. v. Dormitory Auth.-State of New York*,
   735 F. Supp. 2d 42 (S.D.N.Y. 2010) ................................................................. 19

*UA Theatre Circuit, Inc. v. Sun Plaza Enter. Corp.*,
   352 F. Supp. 2d 342 (E.D.N.Y. 2005) ............................................................... 33

*Udell v. Berkshire Life Ins. Co. of Am.*,
   No. CV032721, 2005 WL 1243497 (E.D.N.Y. May 25, 2005) ........................... 19

*Victory M LLC v. Frederic*,
   507085, 2015 N.Y. Misc. LEXIS 2612 (Kings Cty. July 7, 2015) ................. 28, 29

*Zam & Zam Super Market, LLC v. Ignite Payments, LLC*,
   Case No. 2:16-cv-06370 (E.D.N.Y. Oct. 31, 2017) (J. Feuerstein) ............... *passim*

**Other Authorities**

CPLR § 201 ............................................................................................................ 31

Fed. R. Civ. P. 9(b) ............................................................................................... 33

## I.    INTRODUCTION

This is Plaintiffs'[1] second attempt to cure the deficiencies in their allegations to overcome dispositive legal precedent and factual bars to their claims.  Notwithstanding these issues, Plaintiffs have filed a third iteration of their complaint, seeking to bring claims for breach of contract and breach of the covenant of good faith and fair dealing, fraudulent inducement, and unjust enrichment against Defendant Wells Fargo Merchant Services LLC ("WFMS").  These claims arise out of unfounded allegations that WFMS charged Plaintiffs improper fees in connection with the provision of credit card processing services.  But Plaintiffs fail to identify any contractual breaches, or even what contractual provisions WFMS allegedly breached.  Nor do they adequately identify specific fees (date/amount/charge) that were improper.  Plaintiffs do not even attach all of the purportedly breached agreements to the Second Amended Complaint ("SAC"), which is not surprising, because the terms of those agreements expressly preclude Plaintiffs' claims and disclose the fees Plaintiffs allege were not disclosed.

As an initial matter, Plaintiffs' claims are barred either because they are untimely and/or because Plaintiffs have failed to comply with the contractual preconditions set forth in the applicable contracts.  To avoid the one-year contractual statute of limitations governing their claims, Plaintiffs—with a few carefully selected exceptions—fail to plead when the allegedly improper fees were assessed.  The contracts also require as a precondition to bringing a claim that Plaintiffs raise any concerns as to fees within 60 or 90 days.  Plaintiffs fail to plead compliance with this condition precedent or plead the timing of the alleged fees with sufficient specificity to withstand dismissal.  This exact issue was recently taken up in this Court in *Zam & Zam Super*

---

[1] The Plaintiffs in this action are Patti's Pitas ("Patti's Pitas"), Queen City Tours ("Queen City"), Mark A. Babbitt, DDS, Inc., ("Babbitt"), Ideal Sales, Inc. ("Ideal Sales"), Lytle Café ("Lytle Café"), and Indian Tree Chiropractic, P.C. ("Indian Tree").

*Market, LLC v. Ignite Payments, LLC*, Case No. 2:16-cv-06370, [D.E. 51 at p. 15] (E.D.N.Y. Oct. 31, 2017) (J. Feuerstein).  A copy of the decision in *Zam & Zam Super Market* is attached as Exhibit 2 to the Declaration of Jarrod D. Shaw ("Shaw Declaration").  In that case, Judge Feuerstein granted a motion to dismiss, with prejudice, after analyzing the same contractual language at issue here and holding that Plaintiffs' failure to comply with contractual preconditions barred their claims.  As this Court's precedent shows, Plaintiffs' failure is fatal to their claims.

Plaintiffs' remaining claims fare no better.  Their claim for breach of the covenant of good faith and fair dealing is barred under New York law, because it merely repeats their contract claim.  Further, Plaintiffs do not meet the heightened pleading standard required to support their fraudulent inducement claim.  And their unjust enrichment claim fails because there is an express agreement.  These fatal deficiencies warrant dismissal with prejudice.

## II.    STATEMENT OF THE CASE

### A.    General Framework of Merchant Payment Processing Services and Related Fees

Plaintiffs allege that WFMS acts as a "merchant acquirer" that enrolls merchants such as Plaintiffs in payment processing services.  [D.E. 18], SAC ¶ 6(e).  A merchant acquirer "markets the payment processor's services to merchants" and essentially acts as a "middle man" between merchants and payment processors.  *Id.*  Payment processors, in turn, process payments made by a customer to a merchant using a debit or credit card and ensure that the debits and credits occur, that the merchant is assessed all applicable fees, and that such fees are distributed to the proper parties.  *Id.* ¶ 6(c).  WFMS' agreements with merchants set forth the various fees merchants incur in the course of the credit or debit card transaction process.  *See generally* [D.E. 18-1].

For qualified transactions, as described in WFMS' agreements, merchants are charged fixed processing fees for each credit or debit card transaction.  *See* [D.E. 18-1 at p. 5].  These

processing fees are also known as "discount rates."  *See* [D.E. 18-2 at p. 54] (defining a discount rate as "[a] percentage rate charged to merchants, as applicable, for processing Card transactions"). Additionally, merchants may be subject to "other processing fees" as specified in WFMS' agreement with each merchant.  *See* [D.E. 18-1 at pp. 5-6].  The amounts of the discount rates/fixed card processing fees and other processing fees are set forth in the agreements.  *Id.*

The agreements further provide that the discount rates "anticipate that [the merchant] will process" its card and debit transactions at specified "Anticipated Interchange Levels," which are set forth in the agreements.  *Id.* at p. 18.  If, however, a transaction "does not satisfy all the qualification criteria for [the merchant's] Anticipated Interchange Level, then Visa, MasterCard or Discover will not process the transaction at the Anticipated Interchange Level," and that transaction is considered a "Non-Qualified Transaction."  *Id.* at p. 19.

As made clear in WFMS' agreement with each merchant, for each Non-Qualified Transaction, a merchant is assessed the discount rate/fixed card processing fee plus an additional fee.  *Id.*  The additional fee consists of the Non-Qualified Interchange Fee and a Non-Qualified Surcharge.  *Id.*  Each component of the additional fee is described in detail in the agreement.  *Id.* For ease of reference, the fees charged for Non-Qualified Transactions are collectively referred to herein as "Non-Qualified Interchange Fees."

Although the Non-Qualified Interchange Fees are clearly disclosed in WFMS' agreements with merchants, Plaintiffs describe the Non-Qualified Transactions as the "upcharge scheme" and allege that WFMS "has engaged in a multi-part scheme pursuant to which it induces merchants to retain its credit card processing services via fraudulent misrepresentations and omissions concerning the nature and amount of fees that merchants will pay." SAC ¶¶ 1, 48-50.  Additionally, Plaintiffs allege that WFMS subjects merchants to "fees that [are] either not disclosed in the

3

agreement, [are] not sufficiently explained in the agreement, and/or that exceed the rates promised or otherwise violate the express terms of the agreement." *Id.* ¶ 11.

**B.      Relevant Agreements, Contractual Provisions, and the Alleged Improper Fees**

Plaintiffs contend that the relevant agreements include the Merchant Processing Application, which references a more extensive Program Guide, as well as "Pricing Terms".[2]  SAC ¶¶ 36-37.  According to Plaintiffs, "[i]f the merchant is agreeable to the fees and charges set forth in the proposal," which initially discloses the pricing, WFMS then prepares and provides the merchant with the Merchant Processing Application ("Application"). *Id.* ¶ 36.  Plaintiffs attach the Application for Babbitt as an example, along with the Confirmation Page and Pricing Terms. SAC ¶ 36, [D.E. 18-1].  Plaintiffs allege that a "prominent section of the Application marked 'Pricing Terms' … identifies the fees and charges to which the merchant will be subject" and note that the Pricing Terms are usually identical to the initial proposal the merchant reviews prior to entering into a relationship with WFMS, as a simple comparison can be made to ensure that the fees in the Pricing Terms are "the same as those already reviewed and approved" by the merchant. SAC ¶ 37.

A review of the terms of these documents shows that the allegedly undisclosed fees are all, in fact, set forth clearly in the agreements into which Plaintiffs entered.  The relevant portions of these documents—as they relate to each Plaintiff—provide the framework integral to Plaintiffs' claims in this case.

***The Confirmation Page & Program Guide.***  All Plaintiffs received a "Confirmation Page," which lists nine items to assist merchants with commonly asked questions and specifically

---

[2] The Merchant Processing Application, the Program Guide and the Pricing Terms are referred to herein as the "Agreements."

provides:

- "If you dispute any charge or funding, you must notify us within 60 days of the date of the statement where the charge or funding appears for card processing,"

- Your fees for certain Services set forth in this Agreement are based on the interchange rates set by the Card Organization. Any transactions that fail to qualify at your Anticipated Interchange Levels will be charged an additional fee … See Section 5…,"

- "The Agreement contains a provision that in the event you terminate the Agreement prior to the expiration of the applicable term, you may be responsible for payment of an early termination fee as set forth in Section 41.3 under 'Additional Important Information.'")

*See* [D.E. 18-2 at p. 6].[3] Every one of the Plaintiffs executed the Confirmation Page, in which they warranted that they "Review[ed] and Understand the terms of the Merchant Agreement" and that they "received … and read the complete Program Guide … consisting of 63 pages (including this confirmation), which is incorporated into its Agreement, and agreed to comply with the all terms set forth therein." [*Id.*] Copies of each Plaintiff's executed Confirmation Page, with minor variations, are attached as Exhibit 3 to the Shaw Declaration.[4]

All Plaintiffs acknowledge that they also received the Program Guide[5], which outlines not only the Operating Procedures relating to the processing of transactions, but includes, among other guidance, a summary of many key operational requirements imposed by the Payment Network

---

[3] Page numbers referenced herein to items on the docket refer to the ECF page number at the header of the page.

[4] In deciding a motion to dismiss, a complaint is deemed to include "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Int'l Audiotext Network, Inc., v. Am. Tel. and Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995). Accordingly, "when a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint, the defendant may produce the [document] when attacking the complaint for its failure to state a claim, because plaintiff should not so easily be allowed to escape the consequences of its own failure." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991).

[5] Plaintiffs acknowledge that the relevant provisions of the Program Guide were substantially the same for each of the Plaintiffs. SAC ¶ 36.

Rules and outlines of terms relating to ancillary services that the merchant may elect to receive.

*See* [D.E. 18-2].

The Program Guide contains several provisions relevant here.  First, in Section 5.11,

Plaintiffs agreed to the following provision regarding complaints about fees generally:

> *You agree to promptly and carefully review your merchant statements* or other
> documents provided or made available to you (physically, electronically or
> otherwise provide by Us or others) *reflecting Card transaction activity*, including,
> activity in your Settlement Account.  *If you believe any adjustments should be made*
> with respect to your Settlement Account, *you must notify us **in writing** within sixty*
> ***(60) days*** after any debit or credit is, or should have been effected or such shorter
> period as provided in the terms and conditions that govern such account.  *If you*
> *notify us after sixty (60) days, **we shall have no obligation** to investigate or effect*
> *any adjustments.  **Any voluntary efforts by us to assist you in investigating such***
> ***matters shall not create any obligation to continue such investigate or any future***
> ***investigation.***

*See* [D.E. 18-2 at p. 10], §5.11 (emphasis added).

In addition, in Section 5.1 of the Program Guide, Plaintiffs agreed to the following

regarding the Non-Qualified Interchange Fees at the center of most of Plaintiffs' allegations:

> If a transaction fails to qualify for your anticipated interchange programs or you
> inadvertently or intentionally accept a transaction other than anticipated for your
> account (including a different card type), then, as applicable to your pricing method,
> you may be charged higher fees as disclosed in your providing disclosures…

[D.E. 18-2 at p. 9], §5.1; *see also* [D.E. 18-2 at p. 56], §41.3 ("If a transaction fails to qualify for

your anticipated interchange programs, you will be billed a Non-Qualified Interchange Fee, plus a

Non-Qualified Surcharge…").  The Program Guide further sets forth a mandatory process for

questions or disputes relating to Non-Qualified Interchange Fees, as follows:

> **Should you have questions regarding any Non-Qualified fees (including Non-**
> **Qualified Interchange Fees or Non-Qualified Surcharge) submit a Non-**
> **Qualified Fee Inquiry (NFI) request in writing (either letter, fax, or email)**
> **within 90 days from the mail date (post mark) of the monthly statement in**
> **question.  Note that NFI requests received after the 90 day limit may not be**
> **considered for refund review.**

[D.E. 18-2 at p. 9], §5.2 (emphasis in original).  Therefore, there is a *90-day window* within which

to address concerns over Non-Qualified fees.  [*Id.*]  Section 5.6 explains that "we may also increase our fees, or add new fees for Services for any other reason at any time by notifying you thirty (30) days prior to the effective of any such change or addition."  [*Id.* at p. 10], §5.6.  To the extent that fee increases provided for pursuant to Section 5.6 are not acceptable to the merchant, the merchant can "terminate this Agreement without further cause or penalty by notifying [WFMS] that [they] are terminating this Agreement prior to the effective date of such new fees or increases."  [*Id.* at p. 12], §10.3.

The Program Guide provides that a one-year statute of limitations will apply to all claims. [*Id.*], § 24.4 (Plaintiffs agree to bring any claim within "(1) year of the date on which [Plaintiffs'] claim first accrued, without regard to the date on which [Plaintiff's] claim was discovered."). Plaintiffs further agreed that "[a]ny action that is not commenced and filed by [Plaintiffs] within such one (1) year time period shall be barred, without regard to any other limitations period set forth by law or statute."  [*Id.*].

***Merchant Processing Application.***  In the Merchant Processing Application, the merchant (here, each Plaintiff) provides relevant business information and again acknowledges "having received and reviewed a copy of the attached Program Guide, the provisions of which are incorporated herein by reference."  *See* [D.E. 18-1 at p. 3].  The Merchant Processing Application also includes a Checklist, Acknowledgement and Signature Page, and as part of the Checklist, the merchant also warrants that it received a variety of documents, including the Program Guide and Pricing Terms.  [*Id.* at p. 9].  Therefore, the merchant acknowledges these terms and signs in two different places.  [*Id.*]  Each Plaintiff's Merchant Processing Application is attached to the Shaw Declaration as Exhibit 4.

The Pricing Terms and Interchange Pricing Summaries specifically outline the categories

of fees Plaintiffs claim were improperly charged.  As set forth in detail below, when each of the purportedly improper fees are analyzed in the context of each Plaintiff, the Agreements show why those fees were appropriate and disclosed under the contracts referenced above.

### C.    Queen City's Specific and Individualized Allegations

Plaintiff Queen City alleges that it is a tour operator headquartered in Charlotte, North Carolina, and that its merchant processing relationship with WFMS began in 2015.  SAC ¶¶ 22, 139-40.  Queen City complains about various "fees" that were allegedly not disclosed in the Agreements between Queen City and WFMS.  *Id.* ¶¶ 142-45, 147-66.

*Non-Qualified Rates and Surcharge.*  Queen City alleges that the Agreements indicated that it would pay a "fixed" rate on debit and credit card transactions but was improperly charged "non-qualified" rates and a "non-qualified surcharge."  *Id.* ¶¶ 142-45, 149.  Additionally, Queen City alleges that the billing entries on the statements it received were "confusingly worded" [*Id.* ¶ 150] and that it did not know what the entries meant [*Id.* ¶ 149].

*Monthly Minimum Processing Fee.*  Queen City alleges that it was not obligated to pay a "Monthly Minimum Processing Fee."  *Id.* ¶ 151.  However, Queen City *never alleges that it was actually charged a Monthly Minimum Processing Fee*, does not provide any account statements showing this charge, and does not identify any months in which a charge was made or specific amounts charged.

*Monthly Service Fee.*  Queen City acknowledges that its agreement provided for a "Monthly Service Fee."  Then, without citing any contractual language or support for its statement, Queen City alleges that "by its plain terms, [the Monthly Services Fee] would not apply in a month when no services were rendered."  *Id.* ¶ 153.  Queen City further alleges that it was assessed a $35 fee, but that after it complained, the fee was reduced to $20.  *Id.* ¶ 154.

*Statement Billing Fee.*  Queen City alleges generally that it was charged a monthly

Statement Billing Fee.  *Id.* ¶ 155.  Queen City alleges that it was assessed this fee after requesting electronic statements, although it does not allege it complied with the applicable contractual provisions regarding such statements.[6]  *Id.*

*Non-validation PCI Compliance Fee.*  Queen City alleges that it was improperly charged a monthly $25 Non-Validation PCI Compliance Fee because "[t]hese fees apply to Level 4 Clients who utilize a gateway or value added reseller (VAR)," and Queen City claims that it "did not utilize a gateway or value added reseller."  *Id.* ¶ 156.  Queen City makes these allegations without providing any information as to the date of the charges.  *Id.*

Queen City also alleges that it complained via email on February 2, 2016, regarding a statement billing fee and PCI fees [*Id.* ¶ 158]; on February 16, 2017 [*sic*], regarding the same fees and "new improper fees" [*Id.* ¶ 159]; on March 2, 2016, regarding "unauthorized fees" [*Id.* ¶ 160]; in December 2016 regarding the $25 PCI fee" [*Id.* ¶ 161]; and via its original Complaint [*Id.* ¶ 165].  Queen City does not allege that it submitted these complaints in accordance with the timing and form requirements set forth in Section 5.2 of the Program Guide.

### D.    Patti's Pitas' Specific and Individualized Allegations

Patti's Pitas alleges that it operated a restaurant from January 2017 to May 2017 and during that time it was enrolled in a program with WFMS.  SAC ¶ 21.

*Non-Qualified Rates and Surcharge.*  Patti's Pitas alleges that it received an undated proposal from an unidentified individual for a "fixed" rate on credit and debit card transactions, but Patti's Pitas was charged "non-qualified" rates and a "non-qualified surcharge."  *Id.* ¶¶ 169, 173.  Additionally, Patti's Pitas alleges that the billing entries on the statements it received were "confusingly worded" [*Id.* ¶ 178], and that it did not know what the entries meant [*Id.* ¶ 177].

---

[6] As referenced more fully below, a merchant also had to effectively sign up for online statements.

*Non-validation PCI Compliance Fee.*  Patti's Pitas alleges also that it was improperly charged a Non-validation PCI Compliance Fee even though it "did not utilize any gateway or value added reseller." *Id.* ¶ 179.  Other than a reference to a "June 2017 statement," Patti's Pitas provides no citation to any Agreement terms, and no monthly statements showing dates of the alleged charges or proof of any complaints. *Id.*

With respect to complaints in particular, Patti's Pitas vaguely alleges that it "complained in writing to Defendant about all fees that were billed after the business closed" [*Id.* ¶ 182] and that it provided "further notice of its grievances" via the original Complaint [*Id.* ¶ 183].  Patti's Pitas does not allege that it followed the mandatory complaints procedure spelled out in the Agreements.

### E.    Babbitt's Specific and Individualized Allegations

Although Babbitt (unlike the other Plaintiffs) attached his Application, Confirmation Page, Pricing Terms, and Program Guide to the Second Amended Complaint, which defeat his claims, it nonetheless alleges that fees were improperly charged.  Babbitt alleges that it is a dental office, and that it was a customer of WFMS from February 2012 until sometime in 2014.  SAC ¶ 23.

*Non-Qualified Rates and Surcharge.*  Babbitt alleges that a representative of WFMS made it a proposal indicating a "fixed" rate on credit and debit card transactions, and that Babbitt was charged more than the fixed pricing by virtue of "higher, undisclosed 'non-qualified' rates and a 'non-qualified' surcharge." *Id.* ¶¶ 187, 191.  Babbitt alleges that these rates were "hidden and obscured" from it due to the fees appearing on a later monthly statement. *Id.* ¶ 193.  Additionally, Babbitt alleges that the billing entries on the statements it received were "confusingly worded" [*Id.* ¶ 196], and that it did not know what the entries meant [*Id.* ¶ 195].

*Increased Rates Without Notice.*  Babbitt also alleges that WFMS increased its "fixed" card processing fee rates multiple times, without providing notice. *Id.* ¶ 197.  Specifically, Babbitt

alleges WFMS increased fixed rates in April 2013 and February 2014, with an increase of $0.25 for each card authorization in April 2014. *Id.* ¶¶ 197-201. Babbitt does not allege that it complained to WFMS regarding any allegedly improper fees until the filing of the Amended Complaint in October 2017, more than three years after the termination of Babbitt's relationship with WFMS. *See id.* ¶ 202.

### F.   Ideal Sales' Specific and Individualized Allegations

Ideal Sales does not attach any of its Agreements to the SAC. *See* SAC. Ideal Sales alleges that it manufactures and sells printed circuit boards and that it was a customer of WFMS from January 2012 through May 2017. *Id.* ¶ 24.

*Non-Qualified Rates and Surcharge.* Ideal Sales alleges that a representative of WFMS proposed that Ideal Sales would pay a "fixed" rate on credit and debit card transactions, and that Ideal Sales was charged more than the fixed pricing by virtue of "higher, undisclosed 'non-qualified' rates and a 'non-qualified' surcharge." *Id.* ¶¶ 206, 210. Ideal Sales alleges that these rates were "hidden and obscured from it" due to the fees appearing on a later monthly statement. *Id.* ¶ 211. Additionally, Ideal Sales alleges that the billing entries on the statements it received were "confusingly-worded" [*Id.* ¶ 214], and that it did not know what the entries meant [*Id.* ¶ 213].

*Increased Rates.* Ideal Sales also alleges that WFMS increased the "fixed" card processing fixed rates numerous times, including in June 2013, April 2014, March 2015 and March 2016, and also increased non-qualified surcharge in March 2015 and March 2016. *Id.* ¶¶ 215-18. Tellingly, Ideal Sales fails to allege that it did not receive notice of these increases. *Id.* ¶¶ 219-21.

Ideal Sales alleges that it complained in person at a branch in June 2017 [*Id.* ¶ 222] and that it mailed a letter to WFMS on August 30, 2017, disputing charges appearing on the June 2017 statement [*Id.* ¶ 224]. Ideal Sales also alleges that it provided "further written notice of its grievances" via the Amended Complaint filed on October 6, 2017. *Id.* ¶ 225. Notably, Ideal Sales

does not allege that it followed the mandatory complaints procedure prescribed by the Program Guide, or that it submitted its complaints in a timely manner.

### G. Lytle Café's Specific and Individualized Allegations

Lytle Café alleges that it operates a Mexican restaurant, and that it has been a customer of WFMS since July 2016.  *Id.* ¶ 25.

*Non-Qualified Rates and Surcharge.*  Lytle Café alleges that a representative of WFMS provided a proposal indicating that Lytle Café would pay "fixed" rates on credit and debit card transactions, and that Lytle Café was charged more than the fixed pricing by virtue of "higher, undisclosed 'non-qualified' rates and a 'non-qualified' surcharge."  *Id.* ¶¶ 229, 233.  Lytle Café alleges that these rates were "hidden and obscured from it" due to the fees appearing on a later monthly statement.  *Id.* ¶ 234.  Additionally, Lytle Café alleges that it could not understand the charges from the statements it received.  *Id.* ¶ 236.

*Other Miscellaneous Fees.*  Lytle Café also alleges in an entirely conclusory fashion that other fees were improper, including a fee described as "AUG PURCHASE MPRT TERMINAL BILLING FEE" of $35.00, a fee described as "AUG TERMINAL PUR/RENT TAX TERMINAL PUR/RENT TAX" of $2.90 in August 2016, along with an annual fee of $75.00 in November 2016.  *Id.* ¶ 242.  Lytle Café alleges that the Annual Fee in its Application was $45.00.  *Id.*

Lytle Café alleges that it complained to WFMS "via telephone" [*Id.* ¶ 243] and that it "provided written notice of its grievances" on October 6, 2017, via the Amended Complaint [*Id.* ¶ 244].  Lytle Café does not allege that it complained timely and in writing, or that it followed the complaints procedure required in the Program Guide.

### H. Indian Tree's Specific and Individualized Allegations

Indian Tree does not attach any of its Agreements to the Second Amended Complaint.  *See* SAC.  Indian Tree alleges that it operates as a chiropractic clinic and that it was a customer of

WFMS from June 2014 through June 2017.  *Id.* ¶ 26.

*Non-Qualified Rates and Surcharge.*  Indian Tree alleges that it received a written proposal from an unidentified WFMS representative that provided for a "fixed" rate on credit and debit card transactions, and that Indian Tree was charged more than the fixed pricing by virtue of "higher, undisclosed 'non-qualified' rates and a 'non-qualified' surcharge."  *Id.* ¶¶ 248, 252.  Indian Tree alleges that these rates were "hidden and obscured from it" due to the fees appearing on a later monthly statement.  *Id.* ¶ 253.  Additionally, Indian Tree alleges that the billing entries on the statements it received were "confusingly worded" [*Id.* ¶ 256], and that it did not know what the entries meant [*Id.* ¶ 255].

*Increased Rates Without Notice.*  Indian Tree also alleges that WFMS increased its "fixed" card processing fee rates numerous times, without providing notice.  *Id.* ¶ 257.  Specifically, Indian Tree alleges fixed fee increases in March 2015 and March 2016, without prior notice.  *Id.* ¶¶ 257-60.  Indian Tree does not allege that it complained about any of the fees or transactions in accordance with the requirements of the Program Guide.  In fact, the only "complaints" alleged are the ones Indian Tree filed with "multiple federal agencies" and this Court, via the Amended Complaint.  *Id.* ¶¶ 261-62.

## III.   <u>LEGAL STANDARD</u>

To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While courts are required to accept all allegations in a complaint as true, this concept is "inapplicable to legal conclusions."  *Id.*  Thus, "[t]hreadbare recitals of a cause of action's elements, supported by mere conclusory statements" do not suffice.  *Id.* (citing

13

*Twombly*, 550 U.S. at 555).

On a motion to dismiss, the Court "must limit itself to facts alleged in the complaint, which are accepted as true; to documents attached to the complaint as exhibits or incorporated in the complaint by reference; to matters of which judicial notice may be taken; or to documents whose terms and effect are relied heavily upon in the complaint and, thus, are rendered 'integral' to the complaint." *Zam & Zam Super Market*, Case No. 2:16-cv-06370, at p. 15 (citations omitted). The court is "not constrained to accept the allegations of the complaint in respect of the construction of [an] [a]greement…" particularly where the agreement is integral to the complaint's allegations. *Int'l Audiotext Network, Inc. v. Am. Tel. and Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995). The Court's plausibility determination is a "context-specific task that requires the reviewing court to draw on its own judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## IV.   ARGUMENT

While ignoring the express terms of the Agreements, Plaintiffs assert the following claims on behalf of alleged putative classes relating to certain fees specific to each Plaintiff: (1) breach of contract and breach of the covenant of good faith and fair dealing; (2) fraudulent inducement; and (3) unjust enrichment. *See* SAC ¶¶ 284-310. Remarkably, Plaintiffs admit that the contractual provisions actually *permit* the charges at issue. *See id.* ¶ 292 (acknowledging that WFMS could "defend its overcharging through reliance on contractual provisions in the Program Guide and elsewhere…") and ¶ 286 (recognizing that WFMS "exercise[ed] the discretion afforded by Sections 5.5 and 5.6 of the Program Guide" to allegedly raise Plaintiff's fees). Nonetheless, Plaintiffs now offer a *third* iteration of these allegations, suggesting that the Court should ignore the terms of the Agreements, terms that Plaintiffs conceded in writing they reviewed and agreed to, because these terms are "either inapplicable or are unenforceable because they are void, illusory, lacking in mutuality, are invalid exculpatory clauses, violate public policy, and are

14

procedurally and substantively unconscionable, and are unenforceable in light of the hidden nature

of Defendant's misconduct, among other reasons." *Id.* ¶ 292.  These conclusory and self-serving

allegations cannot plausibly support a viable claim for relief, and Plaintiffs' Second Amended

Complaint should be dismissed with prejudice.

A. **The Plain Terms of the Agreements Preclude Plaintiffs' Claims for Breach of Contract and Violation of the Covenant of Good Faith and Fair Dealing**

Plaintiffs seek to assert claims for breach of contract and violation of the covenant of good

faith and fair dealing, all while failing to allege any provisions of the Agreements that were actually

breached.  This is because if the Agreements' provisions are actually considered, it is apparent that

there was no breach of contract and therefore no breach of the covenant of good faith and fair

dealing.  Plaintiffs cannot ignore the terms of the Agreements, claim that they didn't understand

them or didn't read them (even after acknowledging in writing that they had read them), and then

make unfounded allegations about their alleged breach.   The plain terms of the Agreements

themselves foreclose these claims.

Under New York law, "[a] party is under an obligation to read a document before he or she

signs it, and a party cannot generally avoid the effect of a [document] on the ground that he or she

did not read it or know its contents."[7]  *Martino v. Kaschak*, 208 A.D.2d 698, 617 N.Y.S.2d 529

(App. Div. 2d Dep't. 1994); *see also Paraco Gas Corp. v. Travelers Cas. & Sur. Co. of Am.*, 51 F.

Supp. 3d 379, 393 (S.D.N.Y. 2014).  In particular, "courts applying general principles of contract

law have little empathy for parties who fail to read and make sure they understand the terms of

agreements they sign." *Paraco Gas*, 51 F. Supp. 3d at 394 (rejecting argument that an insurance

policy was procured by fraud where it was "70 pages in length" and contained "language only an

---

[7] The Plaintiffs' Agreements are governed by and construed in accordance with New York law. *See* [D.E. 18-2 at p. 29], §§24.1, 24.2.

individual familiar with insurance policies could comprehend"); *Imperatore v. Putnam Lovell NBF Secs. Inc.*, No. 05 CV 4966, 2006 WL 648214, at *5 (S.D.N.Y. Mar. 15, 2006) (upholding agreement in favor of defendant, finding that plaintiff was a "competent adult" who "[did] not claim he could not read the print on the form or otherwise understand it," such that it was plaintiff's ultimate "responsibility to read and make sure he understood the contracts he signed."); *Gold v. Deutsche Aktiengesellschaft*, 365 F.3d 144, 149 (2d Cir. 2004) (upholding agreement in favor of defendant, finding that even if plaintiff did not understand the contract or had questions about it, the burden was on him to have such concerns addressed before signing, as it was his responsibility to ensure that he understood the document he signed).

Further, "New York law 'does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a contract claim, based on the same facts, is also pled.'"  *Paraco Gas*, 51 F. Supp. 3d at 403 (citing *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002)).  Thus, "a claim for breach of the implied covenant of good faith can survive a motion to dismiss only if it is based on allegations different from those underlying the accompanying breach of contract claim."  *Id.*; *see also Zam & Zam Super Market*, Case No. 2:16-cv-06370, at pp. 39-41 (dismissing breach of the implied covenant of good faith and fair dealing as duplicative of breach of contract claim in merchant services case); *McGee v. State Farm Mut. Auto Ins. Co.*, No. 09 Civ. 3579, 2011 WL 5409393, at *8 (E.D.N.Y. Nov. 8, 2011) (dismissing breach of the duty of good faith and fair dealing claim as duplicative of breach of contract claim).

Moreover, while the "implied covenant of good faith and fair dealing bars a party from taking actions 'so directly to impair the value of the contract for another party that it may be assumed that they are inconsistent with the intent of the parties,'" the implied covenant "cannot

create duties that negate explicit rights under a contract." *LJL 33rd St. Assocs., LLC v. Pitcairn Props., Inc.*, 725 F.3d 184, 195-96 (2d Cir. 2013) (citation omitted) (affirming dismissal based on plaintiff's failure to state a claim where exercise of contractual right could not be deemed a breach of the duty of good faith); *see also Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 198-99 (2d Cir. 2005) (finding that breach of the covenant of good faith did not "save" the failed breach of contract claims, because the implied covenant "can only impose an obligation 'consistent with other mutually agreed upon terms of the contract'" and cannot add "'a substantive provision not included by the parties'") (citation omitted). Therefore, Plaintiffs' conclusory allegations that they did not read or understand the Agreements, which were freely entered into, is not an excuse under applicable law that might permit Plaintiffs to avoid the application of the Agreements' terms.

Here, none of the Plaintiffs claim that they were forced through duress or other unlawful means into entering the merchant services relationship with WFMS. To the contrary, Plaintiffs, small businesses engaged in a variety of commercial and banking activities, affirmatively acknowledged *numerous* times that they received, read, and would abide by the terms of Program Agreement. *See* [D.E. 18-1 at p. 10] and Shaw Decl., Ex. 3 (all of Plaintiffs' Confirmation Pages) (warranting that Plaintiffs "Review and Understand the terms of the Merchant Agreement" and "received … and read the complete Program Guide … consisting of 63 pages (including this confirmation), which is incorporated into its Agreement, and agreed to comply with the all terms set forth therein."); *see also* Shaw Decl., Ex. 4 (Applications for all Plaintiffs) (acknowledging "having received and reviewed a copy of the attached Program Guide, the provisions of which are incorporated herein by reference"); *id.* at signature page (acknowledging receipt of Program Guide and Pricing Terms). As such, Plaintiffs are bound by the express terms of the Agreements, which preclude all of Plaintiffs' claims.

    **i.**    **Plaintiffs' Allegations Against the Applicability and Enforceability of the Relevant Condition Precedent Lack Merit, and the Failure To Plead Compliance with the Condition Precedent Bars Plaintiffs' Claims**

Remarkably, none of the Plaintiffs alleges compliance with any of the contractually mandated conditions precedent to bringing a claim.  In those rare instances that Plaintiffs allege that they complained about fees, they provide no details as to those complaints, when they were submitted, which fees they related to, or when the fees were charged.  Instead, in anticipation of this motion, Plaintiffs have amended their complaint to include a kitchen-sink, preemptive attack on the conditions precedent, alleging that the contractual requirements are inapplicable, unenforceable, permissive, unconscionable, violative of public policy, and unduly exculpatory. SAC ¶¶ 120-`36.  In the event this attack fails, which it should, Plaintiffs conclusorily allege that they timely and appropriately complained of the allegedly improper charges.  *Id.* ¶ 137.  Plaintiffs' pleading gamesmanship cannot salvage these claims.

Under the Agreement, including Section 5.11 of the Program Guide, Plaintiffs agreed to notify WFMS, in writing, within sixty (60) days of any fee that they wished to dispute.  Plaintiffs' failure to notify WFMS of any dispute absolves WFMS of liability.  *See* [D.E. 18-2 at p. 10], § 5.11.  Further, the Confirmation Page signed by all Plaintiffs states, "If you dispute any charge or funding, you must notify us within 60 days of the date of the statement where the charge or funding appears for card processing."  *See* Shaw Decl., Ex. 3 (attaching all Plaintiffs' Confirmation Pages).  In addition, the Program Guide itself sets forth a process for questions or disputes relating to Non-Qualified fees and Non-Qualified surcharges, including requiring merchants to notify WFMS of any questions regarding those fees within 90 days of a monthly statement.  [D.E. 18-2 at p. 9], § 5.2.  To the extent that a complaint is made after the 90 days, the Program Guide provides that WFMS has no obligation to consider a refund review.  *Id.*

New York law provides that "express conditions precedent, which are those agreed to and imposed by the parties themselves, must be literally performed." *Travelers Cas. & Sur. Co. v. Dormitory Auth.-State of New York*, 735 F. Supp. 2d 42, 75 (S.D.N.Y. 2010) (citation omitted). Specific to the case at hand, failure to strictly comply with a contractual notice and documentation provision has consistently been held to constitute a waiver of any claim for damages. *Zam & Zam Super Market, LLC*, Case No. 2:16-cv-06370, at p. 35-39 (dismissing breach of contract claim arising out of merchant services agreement, enforcing exact same condition precedent at issue here); *Benex LC v. First Data Merch. Servs. Corp.*, No. 14-cv-6393, 2016 WL 1069657, at *4 (E.D.N.Y. Mar. 16, 2016) (dismissing claims arising out of merchant services agreement where merchant failed to comply with contractually required condition precedent).[8]   None of the allegations Plaintiffs mount against the condition precedent saves their claims from dismissal.

### 1.   Plaintiffs Have Failed to Comply with Sections 5.2 and 5.11

Plaintiffs have not alleged that they complied with Sections 5.2 and 5.11.  Queen City alleges that it sent emails in February, March, and December 2016 to a representative of WFMS complaining about PCI fees.  SAC ¶¶ 158-161.  Queen City also alleges that it provided further notice of its grievances via the Complaint filed on August 4, 2017.  *Id.* ¶ 165.  What Queen City fails to allege, however, is the dates of the allegedly improper fees, whether its "complaints" met the time parameters set forth in Sections 5.2 and 5.11, or whether the complaints were submitted pursuant to the NFI request procedure explained in Section 5.2.  As a result, Queen City has failed

---

[8] *See also Udell v. Berkshire Life Ins. Co. of Am.*, No. CV032721, 2005 WL 1243497, at *5 (E.D.N.Y. May 25, 2005) (granting defendant's motion to dismiss breach of contract claim for failure to state a claim where plaintiff failed to illustrate compliance with the conditions of the underlying agreement); *see also MRW Constr. Co. v. City of New York*, 223 A.D.2d 473, 636 N.Y.S.2d 344 (App. Div. 1st Dep't 1996) (upholding trial court's decision to grant defendant's motion to dismiss where plaintiff failed to establish that it met a condition precedent to recover under the parties' agreement).

to adequately allege it met the contractual preconditions required to bring suit.

Patti's Pitas also alleges in passing that its owner "complained in writing to Defendant about all fees that were billed after the business closed" [*Id.* ¶ 182] and "provided further notice of its grievances with Defendant's fee practices via the original Complaint" *Id.* ¶ 183.[9]   Again, there are no allegations as to the dates or fees involved, whether any communication occurred within the timeframe[s] and in the form required in the Agreements and whether, when Patti's Pitas did complain, the challenged fees were repaid—thus mooting any claims.

Other than references to the Amended Complaint filed on October 6, 2017, Babbitt and Indian Tree do not allege that they made ***any*** complaints as required under the Agreements.  *See id.* ¶¶ 202, 262.

Ideal Sales claims that it complained in person in June 2017 [*Id.* ¶ 222], that it sent a letter on August 30, 2017 concerning charges appearing on the June 2017 statement [*Id.* ¶ 224], and that it complained via the Amended Complaint [*Id.* ¶ 225].  Ideal Sales' in-person complaint does not meet the in-writing requirements of Sections 5.2 and 5.11.   Ideal Sales also does not allege that the August 30, 2017 letter followed the formatting and submission requirements of Sections 5.2 and 5.11.  Rather, Ideal Sales makes the general allegation that it "provided further written notice of its grievances" without identification of the specific fees at issue as required under Sections 5.2 and 5.11.  *Id.* ¶ 225.  Consequently, the Amended Complaint on its face fails to meet those requirements.  Further, the Amended Complaint itself, which was filed in October 2017, is also untimely under Section 5.11. Ideal Sales also fails to allege that it properly complained about any

---

[9] The timing of Patti's Pitas' alleged complaint—following the failure of the business—strongly suggests the plaintiff only complained, and sued, when it became clear that there was no longer a business need for WFMS's services and it had nothing to lose by mounting a spurious attack on services it had enjoyed so long as the business was viable.

other allegedly improper charges that it claims go as far back as 2012.  *Id.* ¶ 214.

Lytle Café's owner alleges that she reached out for an explanation of charges [*Id.* ¶ 237] and "complained bitterly on many occasions . . . via telephone" [*Id.* ¶ 243] and the Amended Complaint [*Id.* ¶ 244].  Lytle Café does not allege the dates of the charges or that it complied with the timing, formatting, or content requirements pertaining to the claims process.  In addition, Lytle Café's telephonic complaints were improper because they were not submitted in writing.

In sum, Plaintiffs have failed to allege the preconditions necessary to assert a cause of action for breach of contract and dismissal is warranted.

> **2.    The "Contractual Notification Requirements" Are an Enforceable Condition Precedent that Applies to Plaintiffs' Claims**

Faced with their failure to comply with the requirements of Sections 5.2 and 5.11 of the Program Guide and this Court's decisions in *Benex* and *Zam & Zam Super Market*, Plaintiffs attempt, in vain, to use creative pleading to salvage their case.  First, Plaintiffs claim that "there is no indication" that Sections 5.2 and 5.11 apply to all Plaintiffs because multiple versions of the Program Guide may exist.  SAC ¶ 120.  This allegation, however, is belied by the Program Guide attached to the SAC, which contains the provision, as well as Plaintiffs admission that "the relevant provisions cited or quoted [in the SAC] have remained substantially the same throughout the relevant period."  SAC ¶ 36; *see also* SAC ¶ 118 (quoting Sections 5.2 and 5.11).  It is incumbent upon Plaintiffs to actually allege that it *does not* apply rather than to attempt to plead around this case-defeating issue through innuendo and conjecture.

Second, Plaintiffs claim that Sections 5.2 and 5.11 are not enforceable and subject to rescission because Plaintiffs were fraudulently induced to enter into the Agreements.  *Id.* ¶ 121.  This argument likewise fails, as evidenced by this Court's rejection of a similar allegation in *Zam & Zam Super Market*.  There the plaintiff asked this Court to waive the notice requirement because

21

the defendant allegedly engaged in "deception" in charging a certain fee.  2:16-cv-06370-SJF-AYS, at p. 39.  The *Zam & Zam* court rejected plaintiff's argument on the basis that it had not properly pled a fraud claim.  Here too, plaintiffs cannot avoid the benefit of the bargain struck with WFMS by claiming fraudulent inducement where they have not asserted (and could not assert) a fraud claim.[10]

Third, Plaintiffs contend that Section 5.2 is inapplicable because it applies only to "questions" regarding fees.  SAC ¶ 122.  Plaintiffs' splitting-hairs interpretation of the notification requirement is another attempt to avoid the consequences of their failure to comply with a condition precedent.  Section 5.2 provides a mechanism for a merchant to investigate a fee and to qualify for a refund, if appropriate.  By signing the [acknowledgement], Plaintiffs agreed to afford WFMS this opportunity but failed to do so here.  A complete reading of the provision does not limit its applicability to questions versus claims or any other communications regarding fees.

Fourth, Plaintiffs also allege that Section 5.2 is permissive because the submittal of a Non-Qualified Inquiry ("NFI") request is optional.  SAC ¶ 123.  While it is certainly up to Plaintiffs to submit an NFI request in connection with a fee, such a request is required if a refund is desired.  *See* [D.E. 18-2 at p. 9] § 5.2 ("Note that NFI requests received after the 90 day limit may not be considered for refund review.").  As such, a properly-submitted NFI request constitutes an express condition to seeking recovery regarding non-qualified fees.

---

[10] Furthermore, rescission is not an appropriate remedy in this case because WFMS has provided services to Plaintiffs that cannot be undone, and the parties cannot be returned to their *status quo ante*.  *See Tarleton Bldg. Corp. v. Spider Staging Sales Co.*, 26 A.D.2d 809, 274 N.Y.S.2d 43, 44 (App. Div. 1st Dep't 1966) ("Plaintiffs would not have a right to rescind so long as the nature of the transaction . . . does not lend itself to a substantial restoration to the status quo ante of the breaching [party].").

Fifth, Plaintiffs claim that Sections 5.2 and 5.11 "violate public policy, are unduly exculpatory and unconscionable, and are otherwise void and unenforceable pursuant to the applicable New York law."  SAC ¶ 135.  This rhetoric contains no factual allegations and falls short of the *Iqbal* standard.  *Iqbal*, 556 U.S. at 678.  In any event, unconscionability is an affirmative defense that may not be used to seek affirmative relief.  *See Knox v. Countrywide Bank*, 4 F.Supp.3d 499, 513 (E.D.N.Y. 2014) ("to the extent that the complaint alleges causes of action based on . . . unconscionability, those claims are dismissed.").

Sixth, Plaintiffs allege that Sections 5.2 and 5.11 are inapplicable because Plaintiffs "could not reasonably have discovered, or identified the nature of, the improper charges at issue due to the confusing and misleading formatting of Defendant's monthly statements, which obscured and concealed the charges."  SAC ¶ 136.  Plaintiffs cannot avoid the dispositive impact of their non-compliance with these conditions precedent by claiming that the account statements were hard for them to understand.  In *Benex*, this Court rejected the plaintiff's similar claim that it did not understand the relevant statements, observing that the allegations were "belied by the Complaint," which listed an example of the allegedly improper fee the defendant charged.  2016 WL 1069657, at *13 ("This example alone should have triggered the notice of claim provisions.").

Just as in *Benex*, each Plaintiff here provides at least one example of an allegedly improper fee in the Second Amended Complaint.  *See, e.g.*, SAC ¶¶ 148 (Queen City), 176 (Patti's Pitas), 194 (Babbitt), 212 (Ideal Sales), 235 (Lytle Café), 254 (Indian Tree).  As this Court concluded in *Benex*, these examples alone demonstrate Plaintiffs' ability to parse the relevant statements and should have triggered their compliance with Sections 5.2 and 5.11.  Plaintiffs' failure to follow the claims procedure precludes the relief they seek in this Court.

Lastly, Plaintiffs allege that Section 5.11 does not apply because it concerns transactions,

not fees. *Id.* ¶¶ 126-34. This Court, however, has already rejected an identical argument. In *Zam & Zam Super Market*, this Court rejected the plaintiff's argument that a section nearly identical to Section 5.11 applied only to card transactions and not fees. *Zam & Zam Super Market*, 2:16-cv-06370-SJF-AYS, at p. 38. The Court's analysis was based on the definition of the term "Settlement Account" in the plaintiff's agreement. *Id.* ("Likewise, the definition of a merchant's 'Settlement Account' includes 'Card transactions, *fees*, Chargebacks *and other amounts under the Agreement or in connection with the Agreement*.' . . . . Thus, by its plain terms this provision in conjunction with the definition of 'Settlement Account' provides a clear indication that § 19.11 applied not only to card transactions but to 'fees' and 'other amounts' as well.") (emphasis in original).

Here, Section 5.11 requires written notice within 60 days if Plaintiffs seek adjustments to their Settlement Accounts. *See* [D.E. 18-2 at p. 10]. Similar to the document in *Zam & Zam Supermarket*, the Program Guide defines "Settlement Account" as "An account or account(s) at a financial institution designated by Client as the account to be debited and credited by Processor or Bank for card transactions, fess, chargebacks and other amounts due under the Agreement or in connection with the Agreement." *Id.* at p. 55. Based on the holding in *Zam & Zam Super Market*, the term "Settlement Account" clearly includes the fees Plaintiffs challenge in this lawsuit, and Plaintiffs had to complain about those fees under Section 5.11 prior to bringing this case.

### ii. Plaintiffs Fail to Allege an Actionable Breach of any Term of the Agreement

In addition to failing to satisfy the conditions precedent to filing suit, Plaintiffs' claims also fail as a matter of law because they fail to actually allege a breach of any specific term in the Agreements.

Queen City makes allegations as to five allegedly improper fees that are clearly foreclosed by the relevant contractual terms, specifically: (1) non-qualified rates and non-qualified surcharge,

24

with billback;[11] (2) a monthly minimum processing fee; (3) a monthly service fee; (4) a statement billing fee; and (5) a non-validation PCI compliance fee.  Patti's Pitas' allegations focus on a subset of the fees Queens City complains about, namely:  (1) non-qualified rates and non-qualified surcharge, with billback; and (2) a non-validation PCI compliance fee.

Babbitt and Indian Tree make allegations about an even smaller sub-set set of fees, specifically:  (1) non-qualified rates and non-qualified surcharge, with billback; and (2) increased fees without notice.  Ideal Sales makes allegations as to:  (1) non-qualified rates and non-qualified surcharge, with billback; and (2) increased fees, but does not allege that the increased fees were actually improper due to lack of notice.  Lytle Café makes allegations as to:  (1) non-qualified rates and non-qualified surcharge, with billback; and (2) miscellaneous fees, including an annual fee.

None of these claims is cognizable when viewed in conjunction with the underlying Agreements.

***Non-Qualified Rates and Surcharge, with Billback (All Plaintiffs).***  All Plaintiffs allege that the Non-Qualified Interchange Fees "were not disclosed and were hidden and obscured" and that Plaintiffs were not advised that the "fixed" rate "would increase substantially, and surcharges applied, if [their] customers failed to use specified types of credit or debit cards."  *See, e.g.*, SAC ¶¶ 147, 207.  However, these allegations are directly contradicted by the terms of each Plaintiff's Application and Pricing Terms, as well as the Program Guide.  For instance, the cover page of the Pricing Terms, attached to the Second Amended Complaint, expressly notified Plaintiffs of Non-Qualified Interchange Fees:

> IMPORTANT:  Pursuant to the terms of your merchant contract, we may add a Non-qualified Surcharge Fee to the Non-Qualified Interchange Fees.  The amount of your Non-qualified Surcharge Fee is reflected on the Interchange Pricing

---

[11] Plaintiffs appear to use this term as part of their allegations that fees were often included on a trailing basis, in the following month's statement.  *See* SAC ¶ 72.

> Summary (included as part of your Non-Qualified Interchange Fee Schedule).
> Please review the information on the Interchange Pricing Summary for
> more information about when the Non-Qualified Interchange Fees and Non-qualified
> Surcharges apply, as well as the amount of such Fees and Surcharges.

[D.E. 18-1 at p. 7, n.15]; *see also* Shaw Decl., Ex. 5 (containing copies of each Plaintiffs' Pricing

Terms).  Further, within the Pricing Terms there are multiple schedules showing the Non-Qualified

Interchange Fees [D.E. 18-1 at pp. 11-17], as well as an Interchange Pricing Summary, which

spells out Non-Qualified Transactions, Non-qualified Interchange Fees, and Non-qualified

Surcharges in detail.  [*See* D.E. 18-1 at pp. 18-19]; *see also* Shaw Decl., Ex. 5 (containing similar

information for each Plaintiff).  Moreover, the Program Guide explains the following:

> If a transaction fails to qualify for your anticipated interchange programs or you
> inadvertently or intentionally accept a transaction other than anticipated for your
> account (including a different card type), then, as applicable to your pricing method,
> you may be charged higher fees as disclosed in your providing disclosures…

[D.E. 18-2 at p. 9], § 5.1.  These were *again* explained in Section 41.3 of the Program Guide, [D.E.

18-2 at p. 56] ("If a transaction fails to qualify for your anticipated interchange programs, you will

be billed a Non-Qualified Interchange Fee, plus a Non-Qualified Surcharge…").

Plaintiffs also allege that since the fees appeared on a trailing basis on the following

monthly statement, they did not "understand these upcharges and higher rates."  SAC ¶¶ 147-50,

175-78, 193-96, 211-14, 234-37, 253-56.  Plaintiffs refer to this as "billback."  *Id.*  However,

Plaintiffs fail to adequately allege how this constitutes a breach of the Agreement.  Under New

York law, "to state a valid claim for a breach of contract, a plaintiff must state when and how the

defendant breached the specific contractual promise."  *Radin v. Albert Einstein Coll. of Med. of

Yeshiva Univ.*, No. 04 Civ. 704, 2005 WL 1214281, at *10 (S.D.N.Y. May 20, 2005) (citations

omitted) (granting motion to dismiss breach of contract claim where complaint failed to identify

any specific promise that defendant failed to keep).  Thus, "the mere allegation of mistreatment

without the identification of a specific breached promise or obligation does not state a claim on

which relief can be granted." *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 207 (S.D.N.Y. 1998). Plaintiffs cannot prevail on a breach of contract theory were no contractual provision was breached, and their express and implied contract claims should therefore be dismissed.

*Increased Fees Without Notice (Babbitt, Indian Tree).* Babbitt, Indian Tree, and Ideal Sales further allege that various fees were increased without any notice, even though Section 5.6 of the Program Guide explains, "we may also increase our fees, or add new fees for Services for any other reason at any time by notifying you thirty (30) days prior to the effective of any such change or addition." [D.E. 18-2 at p. 10], § 5.6. Further, to the extent that fee increases were not acceptable to the merchant, it was free to "terminate this Agreement without further cause or penalty by notifying [WFMS] that [they] are terminating this Agreement prior to the effective date of such new fees or increases." [*Id.* at p. 12], § 10.3. Babbitt alleges fee increases without notice in April 2013, February 2014, and April 2014. SAC ¶¶ 197-201. Indian Tree alleges fee increases without notice in March 2015 and March 2016. *Id.* ¶¶ 257-260. But notices that Babbitt and Indian Tree received directly contradict any purported failure to provide prior notice, and they do not allege that they even attempted to avail themselves of their right to terminate their Agreements upon learning of the increases. *See* Shaw Decl., Ex. 6 (compiling notices provided to Babbitt and Indian Tree).[12]

*Monthly Minimum Processing Fee (Queen City Only).* Queen City raises allegations regarding the monthly minimum processing fee, yet, remarkably, does not actually allege that it was charged any such fee. SAC ¶¶ 151-52. This makes sense, because the Pricing Terms set the

---

[12] Ideal Sales alleges fee increases, but alleges no lack of prior notice. SAC ¶¶ 216-20. Therefore, there is no basis for the fees to be improper. *Radin*, 2005 WL 1214281, at *10 ("[T]o state a valid claim for a breach of contract, a plaintiff must state when and how the defendant breached the specific contractual promise.").

"Monthly Minimum Processing Fee" at "$0.00 per month." *See* Shaw Decl., Ex. 5 (Queen City) at p. 1.  Because Queen City does not allege that it was charged this fee, and the Agreement confirms that it was not, any claims concerning this "fee" must be dismissed.

 *Monthly Service Fee (Queen City Only).*   Queen City also alleges that its agreement provided for a "Monthly Service Fee" but that "by its plain terms, it would not apply in a month when no services were rendered."  SAC ¶¶ 153-54.  This conclusory statement is at odds with the pricing Queen City agreed to, including a "Monthly Service Fee (per location)" of "$35.00 per month."  Shaw Decl., Ex. 5 (Queen City) at p. 1.  By the fee's own terms, it is charged *per month*, without qualification or limitation.  Queen City cannot, as a matter of law, allege in conclusory fashion that the charge is improper when the Agreement permitted WFMS to charge the fee.  *See Victory M LLC v. Frederic*, 507085, 2015 N.Y. Misc. LEXIS 2612, at *2 (Kings Cty. July 7, 2015) (concluding that conditions not appearing on the face of the parties' contract are unenforceable)).[13]

 *Statement Billing Fee (Queen City Only).*   Queen City alleges that its contractual terms included a "Statement Billing Fee" that "can be waived if Client elects to access the monthly statement online instead of receiving a paper copy by mail."  SAC ¶ 155.  Queen City claims that it was assessed a monthly statement billing fee after requesting electronic statements, but it ignores the remaining provision of the Pricing Terms, which state in full:

> The monthly Statement Billing Fee can be waived if Client elects to access the monthly statement online instead of receiving a paper copy by mail. *After Business Track access has been activated,* please contact Customer Service at 1-800-451-5817 to request that paper statements no longer be mailed. *If Business Track access is terminated by Client or as a result of inactivity, paper statements will be*

---

[13] Queen City also alleges that at some point it complained, and the fee was reduced to $20.  SAC ¶ 154. By Queen City's own admission, it waived any further complaint over this fee.  *See e.g.*, *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 850 N.E.2d 653, 658, 7 N.Y.3d 96 (2006) (under New York law, where a party's conduct clearly manifests an intention to relinquish a contractual right, that right will be waived.).

> *reinstated with the applicable monthly Statement Billing Fee.  Enroll anytime at businesstrack.com.*

Shaw Decl., Ex. 5 (Queen City), Pricing Terms at p. 2, n. 7 (emphasis added).  Queen City, notably, does not allege that it ever set up access to Business Track or that it maintained activity on Business Track, both of which the Agreement imposes as conditions to waiving the monthly statement billing fee.  Queen City, therefore, has not alleged (and cannot allege) the conditions precedent to state a claim relating to the monthly statement billing fee.

      ***Non-validation PCI Compliance Fee (Queen City and Patti's Pitas).***  Queen City alleges that it was improperly charged a $25 Non-Validation PCI Compliance Fee because it "did not utilize a gateway or value added reseller" and the Application explained "[t]hese fees apply to Level 4 Clients who utilize a gateway or value added reseller (VAR)."  SAC ¶ 156.  This contention is contradicted, however, by Queen City's Pricing Terms, which show that Queen City utilized the "Internet Gateway Authorizenet."  Shaw Decl., Ex. 5 (Queen City) at pp. 1-2.  In light of Queen City's use of a gateway, the Pricing Terms included a "Non-validation PCI Compliance Fee" of "$25.00 per month, per location."  *Id.* at p. 2.  The notes relating to this fee explain that, "[i]f Client does not comply or fails the PCI DSS certification process, Client will be charged a monthly Non-validation PCI Compliance Fee until the account becomes compliant."  *Id.* at p. 3, n. 8.  Queen City has not alleged, and cannot allege, that it satisfied the PCI DSS certification process, so it was obligated to pay the non-validation PCI Compliance Fee.  As such, these allegations fail.

      Patti's Pitas alleges that it too was improperly charged the "Non-validation PCI Compliance Fee."  SAC ¶ 179.  Like Queen City, Patti's Pitas' Pricing Terms included a "Non-validation PCI Compliance Fee" of "$25.00 per month, per location."  Shaw Decl., Ex. 5 (Patti's Pitas), Pricing Terms at p. 2.  The notes relating to this fee were the same as those in Queen City's Pricing Terms.  *Id.* at p. 3, n. 8.  Patti's Pitas' Pricing Terms also included the use of the Internet

Gateway "FreedomPay FreeWay GW Ret, MOTO – v1." *Id.* at pp. 1-2.  Also like Queen City, Patti's Pitas has not, and cannot, allege that it satisfied the PCI DSS certification process to avoid being charged the Non-validation PCI Compliance Fee.  As such, Patti's Pitas also fails to state a claim with respect to this fee.

   ***Annual Fee and Other Non-Specific Fees (Lytle Café).***  Lytle Café makes conclusory allegations as to various other fees that it claims were some type of violation, but it has either failed to provide sufficient detail, or again, the claim is directly contradicted by the terms of Lytle Café's Application and Pricing Terms.[14]  Lytle Café alleges that it was assessed an annual fee of $75.00, but that the "Application indicates that it will only be charged $45.00 for such a fee."  SAC ¶ 242.  Lytle Café notably failed to attach a copy of its Pricing Terms to the Second Amended Complaint, which is not surprising since they clearly note that the Annual Fee is, in fact, $75.00.  *See* Shaw Decl., Ex. 5 (Lytle Café) at p. 1.  Lytle Café's claim as to the Annual Fee should be dismissed.

   Further, Lytle Café alleges improper fees described as "AUG PURCHASE MPRT TERMINAL BILLING FEE" of $35.00 and "AUG TERMINAL PUR/RENT TAX TERMINAL PUR/RENT TAX" of $2.90, but *provides no additional information as to how these fees were a breach of any agreement.*  SAC ¶ 242; *Radin*, 2005 WL 1214281, at *10 ("[T]o state a valid claim

---

[14] *Termination Fee (Queen City, Patti's Pitas, Lytle Café, Indian Tree).*  Various Plaintiffs also make part of their litany of allegations that they did not know about any "Termination Fee." *See* SAC ¶¶ 164, 181, 239, 261.  The Program Guide specifically discloses that termination fee can apply upon termination of account under certain circumstances.  [D.E. 18-2], § 41.3.  The early termination fee was flagged as one of nine key items on the Confirmation Page, and the Early Termination Fee was referenced in the Pricing Terms for all Plaintiffs.  *See* Shaw Decl., Exs. 1 and 3.  Even further, *no Plaintiff alleges it ever paid the fee. See Davis v. Clearway Mortg., LLC*, No. 08-CV-6492L, 2009 WL 2843255, at *1-2 (W.D.N.Y. Aug. 31, 2009) (granting motion to dismiss breach of contract claim where element of the cause of action requiring the allegation of damages resulting from the breach was not evidenced in the complaint).  For multiple reasons, Plaintiffs have failed to state a claim as to any "Termination Fee."

for a breach of contract, a plaintiff must state when and how the defendant breached the specific

contractual promise.").  As such, these claims should be dismissed.

### iii.      Certain Plaintiffs Cannot Avoid the Statute of Limitations by Failing to Plead Relevant Dates

Plaintiffs fail to allege particular dates of any allegedly improper fees, or when they do, it

is clear that the allegations are time-barred.  In most instances, the Program Guide provides a one-

year statute of limitations and provides that "*[a]ny action that is not commenced and filed by you*

*within such one (1) year time period shall be barred, without regarding to any other limitations*

*period set forth by law or statute.*"  [D.E. 18-2 at p. 29], § 24.4 (emphasis added).  Pursuant to NY

CLS CPLR § 201, "[a]n action ... must be commenced within the time specified in this article

unless a different time is prescribed by law or a shorter time is prescribed by written agreement."

New York courts have consistently confirmed that "parties may cut back on the Statute of

Limitations by agreeing that any suit must be commenced within a shorter period than is prescribed

by law."  *Brink's, Inc. v. City of New York*, 528 F. Supp. 1084, 1086 (S.D.N.Y. 1981).  "[T]o state

a valid claim for a breach of contract, a plaintiff must state ***when*** and how the defendant breached

the specific contractual promise."  *Radin*, 2005 WL 1214281, at *10 (emphasis added).  Courts

grant motions to dismiss where a plaintiff's failure to allege specific dates precludes the court from

ruling as to whether claims are time-barred by the statute of limitations.  *See, e.g.*, *Gaston v. New*

*York City Dept. of Health Office of Chief Med. Exam'r*, 432 F. Supp. 2d 321, 328 (S.D.N.Y. 2006).

Plaintiffs thus cannot omit allegations to plead around a time-barred claim,[15] but they

attempt to do just that.  For example, and entirely dispositive of Babbitt's claim, is that Babbitt

admits that it ceased its relationship with WFMS in 2014, such that no fees could have been

---

[15] For instance, Queen City's allegations as to Paper Statement Fees, if properly pled, are entirely barred by the statute of limitations, as the only time those charges occurred was more than one year prior to the filing of the Complaint.  *See* Shaw Decl., Ex. 7, example monthly statements.

incurred within the applicable one-year statute of limitations.  SAC ¶ 23.  Ideal Sales attempts to avoid the statute of limitations issue by not pleading the dates of the allegedly improper fees, even though its customer relationship with WFMS spans January 2012 to May 2017.  *Id.* ¶ 24.  Indian Tree, which was a customer from June 2014 through June 2017, likewise sidesteps the one-year statute of limitations issue, as does Lytle Café, which has been a customer since July 2016.  *Id.* ¶¶ 25-26.  Queen City alleges vaguely that "[t]hese and numerous other improper fees were assessed against Queen City in each month from October 2015 through 2016 [*sic*]."  *Id.* ¶ 157.  Consequently, just because each Plaintiff has now provided dates related to some of the fees at issue, these allegations are insufficient to save Plaintiffs claims which are either expressly time-barred or for which no dates have been alleged.[16]

With the possible exception of a few examples, Plaintiffs have failed to plead compliance with the contractual one-year statute of limitations, and their claims should therefore be dismissed.

**B.     Plaintiffs Have Failed to State a Fraudulent Inducement Claim**

**i.     The Integration Clause in the Program Guide Bars Plaintiffs' Fraudulent Inducement Claims**

Plaintiffs' fraudulent inducement claims are predicated entirely on WFMS' *pre-contract* statements.  *See* SAC ¶¶ 141-43, 168-70, 186-88, 205-07, 228-30, 246-49, 295-96.  The Program Guide, however, contains an integration clause that unequivocally provides:  "This Agreement constitutes the entire Agreement between the parties with respect to the subject matter thereof and supersedes any previous agreements and understandings." [D.E. 18-2 at p. 29], § 25.6.

New York courts routinely enforce similar clauses to preclude reliance on extra-contractual representations.  *See, e.g.*, *Liberty Media Corp. v. Vivendi Universal, S.A.*, 02 Civ. 5571, 2004 U.S.

---

[16] Furthermore, the specific examples of fees provided by Babbitt and Lytle Café are time-barred because those fees were charged in 2012 and on September 30, 2016, respectively, more than a year before the filing of the Amended Complaint on October 6, 2017.  SAC ¶¶ 194, 237.

Dist. LEXIS 7015, at *4 (S.D.N.Y. April 22, 2004) (finding that integration clause bars plaintiffs from relying on extracontractual representations not contained in merger agreement to support fraud claim); *UA Theatre Circuit, Inc. v. Sun Plaza Enter. Corp.*, 352 F. Supp. 2d 342, 351 (E.D.N.Y. 2005) ("Plaintiff's fraud claim fails for the same reason that its breach of contract claim fails, namely, the integration clause in the lease agreement bars any cause of action predicated on purported oral representations made prior to the execution of that agreement in March 1998.").

Based on the foregoing, the representations Plaintiffs rely on in support of their fraudulent inducement claims, all of which pre-date the execution of the Agreements, are barred by the integration clause.  Consequently, these claims must be dismissed as a matter of law.

### ii.    Plaintiffs' Fraudulent Inducement Claim Fails to Plead Sufficient Facts

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  In order to prove fraudulent inducement, a plaintiff must show: "(1) a representation of a material fact (2) falsity (3) scienter (4) reasonable reliance and (5) injury." *Stamelman v. Fleishman-Hillard, Inc.*, No. 02-cv-8318, 2003 WL 21782645, at *5 (S.D.N.Y. July 31, 2003) (granting defendant's motion to dismiss complaint where plaintiff failed to plead fraud with particularity).  The "complaint must allege the time, place, speaker, and sometimes even the content of the alleged misrepresentation."  *Id.* (citation omitted).  "Therefore, mere conclusory allegations that the defendant[']s conduct was fraudulent are not enough."[17] *Reingold v. Deloitte Haskins & Sells*, 599 F. Supp. 1241, 1266 (S.D.N.Y. 1984).

---

[17] Further, "[i]t is well settled under New York law that 'a contract action cannot be converted to one for fraud merely by alleging that the contracting party did not intend to meet its contractual obligations'" and that "a false promise can support a claim for fraud only where that promise was 'collateral or extraneous' to the terms of an enforceable agreement in place between the parties." *Int'l CableTel Inc. v. Le Groupe Videotron Ltee*, 978 F. Supp. 483, 486-87 (S.D.N.Y. 1997)

Here, Plaintiffs' allegations fail to meet Rule 9(b)'s stringent requirements, because they provide no factual detail as to particular misrepresentations made prior to Plaintiffs' entry into the Agreements to support a fraudulent inducement claim.   There are no allegations of specific statements, specific dates, or the identity of anyone that sought to fraudulently induce Plaintiffs into entering the Agreements.   In describing the alleged interactions Plaintiffs had with WFMS representatives prior to entering into the Agreements, Plaintiffs do not allege that the representatives acted with scienter, or that the representations and proposals they made were false. To the contrary, each of the proposals Plaintiffs received contained the same Pricing Terms that later became part of the Agreements.   SAC ¶¶ 36-37, 141, 169, 189, 208, 232, 252.   At bottom, Plaintiffs' claims that they were duped amount to little more than non-actionable complaints that they did not read or understand the terms to which they agreed.   *See In re Toscano*, 799 F. Supp. 2d 230, 246 (E.D.N.Y. 2011) (holding that where plaintiff chose to sign binding document without reading it, both his failure to read it and "not to procure it to be read" were negligent, and court would not invalidate the agreement on the ground of fraudulent inducement as plaintiff was bound to the writing); *Beatie & Osborn LLP v. Patriot Sci. Corp.*, 431 F. Supp. 2d 367, 392 (S.D.N.Y. 2006) (rejecting argument that contract was invalid because the party alleging fraud "had a duty to read and understand the contents of the [contract] before accepting it").

### C.      Plaintiffs Cannot Assert a Claim for Unjust Enrichment where an Enforceable Contract Exists

Recovery for a claim of unjust enrichment is not permitted if the parties have an enforceable contract that governs the same subject matter.   *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005).   This is because recovery on

---

(citations omitted) (explaining that where a party is merely seeking to enforce a bargain, a tort claim cannot lie).  Stated differently,

an unjust enrichment claim is based on a "quasi contract" theory which "only applies in the absence of an express agreement, and is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment." *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193, 70 N.Y.2d 382 (1987). Accordingly, courts applying New York law claims for unjust enrichment where there exists a valid and enforceable agreement between the parties. *See Benex LC*, 2016 WL 1069657, at *4 (dismissing unjust enrichment claim arising out of merchant services agreement where the dispute was encompassed by the contract between the parties); *Zam & Zam Super Market*, Case No. 2:16-cv-06370, at pp. 42-47 (same).

Here, the Agreements provide for the terms that governed Plaintiffs' and WFMS' relationship. SAC ¶¶ 35-37. Having sued for breach of these agreements, Plaintiffs have acknowledge the existence of contracts that govern the matters at hand, and as such, the unjust enrichment claim should be dismissed.

## V.   CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' Second Amended Complaint in its entirety, with prejudice.

January 8, 2018

Respectfully submitted,

*/s/ Jarrod D. Shaw*
Mary J. Hackett (NY Id. No. 4587622)
mhackett@mcguirewoods.com
Tel: 412-667-7944
Jarrod D. Shaw *(pro hac pending)*
jshaw@mcguirewoods.com
Tel: 412-667-7907
McGuireWoods LLP
Tower Two-Sixty
260 Forbes Avenue
Suite 1800
Pittsburgh, PA 15222
*Attorneys for Defendant Wells Fargo Merchant Services, LLC*
