**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **PATTI'S PITAS, LLC, QUEEN CITY TOURS, MARK A. BABBITT, DDS, INC., IDEAL SALES, INC., LYTLE CAFÉ, and INDIAN TREE CHIROPRACTIC, P.C., individually and on behalf of all others similarly situated,** | **CIVIL ACTION NO.** <br><br> 1:17-cv-04583 (GRB) |
| **Plaintiff,** | |
| **v.** | |
| **WELLS FARGO MERCHANT SERVICES, LLC,** | |
| **Defendant.** | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO**
**<u>DEFENDANT'S MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ....................................................................................................... 1

II.  FACTUAL BACKGROUND .................................................................................... 2

   A.  Wells Fargo Lures in Customers Through Fraudulent Promises and Omissions Regarding Pricing and Rates. ......................................................................... 3

   B.  Wells Fargo Crams Customers with Fees and Rates that Exceed What Was Promised to Lure Them in and that Otherwise Violate Their Contracts. .............. 3

      1.  Wells Fargo's "Non-Qualified" Card Processing Fee Upcharge/Billback Scheme. ................................................................................................... 4

      2.  Wells Fargo's Improper Rate and Surcharge Increases. .................................. 5

      3.  Wells Fargo's Other Improper Fee Practices. .............................................. 5

   C.  Plaintiff-Specific Allegations. ......................................................................... 6

      1.  Queen City. ............................................................................................. 6

      2.  Patti's Pitas. ............................................................................................ 7

      3.  Dr. Babbitt. ............................................................................................. 7

      4.  Ideal Sales. ............................................................................................. 8

      5.  Lytle Café. .............................................................................................. 9

      6.  Indian Tree Chiropractic. ......................................................................... 10

III. LEGAL STANDARD ............................................................................................ 10

IV.  ARGUMENT ......................................................................................................... 11

   A.  Plaintiffs' Fraudulent Inducement Claim Is Well Pled. ..................................... 11

   B.  Plaintiffs' Contract Claims Are Well Pled. ...................................................... 17

      1.  Plaintiffs Validly Plead Direct Breach Claims. ........................................... 18

      2.  Plaintiffs Validly Plead Good Faith and Fair Dealing Claims. ....................... 22

      3.  Sections 5.2 and 5.11 Provide No Basis for Dismissing Plaintiffs' Contract Claims. ................................................................................................... 28

      4.  The Shortened Statute of Limitations Clause (Section 24.4) Does Not Bar Plaintiffs' Claims. ................................................................................... 41

   C.  Plaintiffs' Unjust Enrichment Claim Is Well Pled in the Alternative. .................. 44

   D.  Plaintiffs Should Be Given Leave to Cure Any Deficiencies. ............................. 45

V.   CONCLUSION ...................................................................................................... 45

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**Cases**

*511 W. 232nd Owners Corp. v. Jennifer Realty Co.*,
　98 N.Y.2d 144 (N.Y. 2002) ............................................................................. 23

*A.H.A. Gen. Constr. v. N.Y.C. Hous. Auth.*,
　92 N.Y.2d 20 (N.Y. 1998) ............................................................................... 36

*ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.*,
　307 F.3d 24 (2d Cir. 2002) ............................................................................. 30

*Ahmed Elkoulily, M.D., P.C. v. N.Y. State Catholic Healthplan, Inc.*,
　153 A.D.3d 768 (N.Y. App. Div. 2017) ......................................................... 23

*Allianz Ins. Co. v. Lerner*,
　416 F.3d 109 (2d Cir. 2005) ........................................................................... 35

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009) ........................................................................................ 10

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
　547 F.3d 109 (2d Cir. 2008) ..................................................................... 15, 32

*B & F Prod. Dev., Inc. v. Fasst Prods. LLC*,
　No. 13303/08, 2009 WL 81145 (N.Y. Sup. Ct. Jan. 13, 2009) ..................... 12

*Bank of N.Y. Mellon Trust Co. v. Morgan Stanley Mortg. Capital, Inc.*,
　821 F.3d 297 (2d Cir. 2016) ........................................................................... 30

*Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*,
　692 F.3d 42 (2d Cir. 2012) ............................................................................. 35

*Benex LC v. First Data Merch. Servs. Corp.*,
　695 F. App'x 12 (2d Cir. 2017) ...................................................................... 32

*Bethka v. Jensen*,
　672 N.Y.S.2d 494 (N.Y. App. Div. 1998) ...................................................... 17

*Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*,
　373 F.3d 296 (2d Cir. 2004) ........................................................................... 44

*Burkett v. Smith & Nephew Gmbh*,
　No. 12-CV-4895, 2014 WL 1315315 (E.D.N.Y. Mar. 31, 2014) ............. 15, 16

*Burton v. Iyogi, Inc.*,
　No. 13-CV-6296, 2015 WL 4385665 (S.D.N.Y. Mar. 16, 2015) ................... 45

*Carvel Corp. v. Diversified Mgmt. Grp., Inc.*,
　930 F.2d 228 (2d Cir. 1991) ........................................................................... 22

*Centronics Fin. Corp. v. El Conquistador Hotel Corp.*,
　573 F.2d 779 (2d Cir. 1978) ........................................................................... 36

*Certified Fence Corp. v. Felix Indus., Inc.*,
  260 A.D.2d 338 (N.Y. App. Div. 1999) ............................................................... 43

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002) ............................................................................ 21

*Chapman v. Skype Inc.*,
  220 Cal. App. 4th 217 (2013) ......................................................................... 17

*Cross & Cross Props., Ltd. v. Everett Allied Co.*,
  886 F.2d 497 (2d Cir. 1989) ...................................................................... 22, 36

*Dalton v. Educ. Testing Serv.*,
  87 N.Y.2d 384 (N.Y. 1995) ............................................................................ 22

*Danann Realty Corp. v. Harris*,
  5 N.Y.2d 317 (N.Y. 1959) ............................................................................. 12

*DiCroce v. Wells Fargo Bank, N.A.*,
  No. 13-CV-1768, 2014 WL 4904458 (E.D.N.Y. Sept. 30, 2014) ..................................... 30, 39

*DiVittorio v. Equidyne Extractive Indus., Inc.*,
  822 F.2d 1242 (2d Cir. 1987) ......................................................................... 14

*Energy Capital Co. v. Caribbean Trading & Fid. Corp.*,
  No. 93-CV-8100, 1996 WL 157498  (S.D.N.Y. Apr. 4, 1996) ......................................... 15

*Faulkner v. Beer*,
  463 F.3d 130 (2d Cir. 2006) ........................................................................... 29

*Fierro v. Gallucci*,
  No. 06-CV-5189, 2008 WL 2039545 (E.D.N.Y. May 12, 2008) ................................... 12, 13

*Ginett v. Computer Task Grp., Inc.*,
  962 F.2d 1085 (2d Cir. 1992) .......................................................................... 30

*Gizzi v. Hall*,
  754 N.Y.S.2d 373 (N.Y. App. Div. 2002) ........................................................ 12, 17

*Golden v. Guar. Acceptance Capital Corp.*,
  807 F. Supp. 1161, 1164 (S.D.N.Y. 1992) ....................................................... 12, 28

*Harris v. City of N.Y.*,
  186 F.3d 243 (2d Cir. 1999) ........................................................................... 39

*Hayden v. Cty. of Nassau*,
  180 F.3d 42 (2d Cir. 1999) ............................................................................ 45

*Hildebrand v. Allegheny Cty.*,
  757 F.3d 99 (3d Cir. 2014) ............................................................................ 39

*Icebox-Scoops v. Finanz St. Honore, B.V.*,
  676 F. Supp. 2d 100 (E.D.N.Y. 2009) ................................................................. 16

*In re Bennett Funding Group, Inc.*,
  220 B.R. 743 (N.D.N.Y. Bankr. 1997) ................................................................. 36

*In re DDAVP Direct Purchaser Antitrust Litig.*,
   585 F.3d 677 (2d Cir. 2009) ............................................................................... 16

*In re Vivendi Universal, S.A.*,
   No. 02-CV-5571, 2004 WL 876050 (S.D.N.Y. Apr. 22, 2004) ............................ 13

*Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC*,
   No. 01-CV-6600, 2005 WL 3370542 (S.D.N.Y. Dec. 12, 2005) .......................... 13

*Israel v. Alexander*,
   50 F. Supp. 1007 (S.D.N.Y. 1942) ..................................................................... 28

*Kidder Peabody & Co. v. Unigestion Int'l, Ltd.*,
   903 F. Supp. 479 (S.D.N.Y. 1995) ...................................................................... 30

*Kirschner v. KPMG LLP*,
   590 F.3d 186 (2d Cir. 2009) ............................................................................... 10

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*,
   424 F.3d 195 (2d Cir. 2005) ............................................................................... 34

*Lefkowitz v. Reissman*,
   No. 12-CV-8703, 2014 WL 925410 (S.D.N.Y. Mar. 7, 2014) ............................. 45

*Legend Autorama, Ltd. v. Audi of Am., Inc.*,
   100 A.D.3d 714 (N.Y. App. Div. 2012) .............................................................. 23

*Leser v. U.S. Bank Nat'l Ass'n*,
   No. 09-CV-2362 KAM, 2014 WL 2154993 (E.D.N.Y. May 22, 2014) ................. 32

*Levitt v. Bear Stearns & Co.*,
   340 F.3d 94 (2d Cir. 2003) ................................................................................. 19

*Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*,
   784 F.3d 78 (2d Cir. 2015) ................................................................................. 35

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ............................................................................................. 11

*Mendez v. Bank of Am. Home Loans Servicing*, LP,
   840 F. Supp. 2d 639 (E.D.N.Y. 2012) ............................................................... 39

*Merck & Co., Inc. v. Reynolds*,
   559 U.S. 633 (2010) ........................................................................................... 19

*MRW Constr. Co. v. City of N.Y.*,
   223 A.D.2d 473 (N.Y. App. Div. 1996) .............................................................. 32

*Myers v. Cent. Fla. Invs., Inc.*,
   592 F.3d 1201 (11th Cir. 2010) .......................................................................... 39

*New Beginnings Healthcare for Women, LLC v. EVO Payments Int'l, LLC*,
   No. 17-cv-3650-JFB-SIL (E.D.N.Y. Aug. 31, 2017) ........................................... 20

*R.B. Ventures, Ltd. v. Shane*,
   112 F.3d 54 (2d Cir. 1997) ................................................................................. 28

*Revson v. Cinque & Cinque, P.C.*,
  221 F.3d 59 (2d Cir. 2000) ................................................................................ 31

*Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*,
  309 A.D.2d 288 (N.Y. App. Div. 2003) .............................................................. 27

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) .............................................................................. 15

*Schwartzco Enters. LLC v. TMH Mgmt., LLC*,
  60 F. Supp. 3d 331 (E.D.N.Y. 2014) ................................................................. 15

*Shaw Group, Inc. v. Triplefine Int'l Corp.*,
  322 F.3d 115 (2d Cir. 2003) .............................................................................. 35

*Shaw v. Mfrs. Hanover Trust Co.*,
  68 N.Y.2d 172 (N.Y. 1986) ............................................................................... 31

*Smith v. Fitzsimmons*,
  180 A.D.2d 177 (N.Y. App. Div. 1992) .............................................................. 12

*Sorenson v. Bridge Capital Corp.*,
  52 A.D.3d 265 (N.Y. App. Div. 2008) ................................................................ 22

*Superior Tech. Res., Inc. v. Lawson Software, Inc.*,
  No. 2003-10104, 2007 WL 4291575 (N.Y. Sup. Ct. Dec. 7, 2007) ..................... 14

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*,
  487 F.3d 89 (2d Cir. 2007) ............................................................................... 27

*Travelers Cas. & Sur. Co. v. Dormitory Auth.-State of N.Y.*,
  735 F. Supp. 2d 42 (S.D.N.Y. 2010) ................................................................. 31

*Travellers Int'l, A.G. v. Trans World Airlines, Inc.*,
  41 F.3d 1570 (2d Cir. 1994) .............................................................................. 22

*Tropical Sails Corp. v. Yext, Inc.*,
  No. 14-CV-7582, 2015 WL 2359098 (S.D.N.Y. May 18, 2015) ......................... 45

*Udell v. Berkshire Life Ins. Co. of Am.*,
  No. CV032721SJFKAM, 2005 WL 1243497 (E.D.N.Y. May 25, 2005) ............... 32

*United Artists Theatre Circuit, Inc. v. Sun Plaza Enter. Corp.*,
  352 F. Supp. 2d 342 (E.D.N.Y. 2005) ............................................................... 13

*Uribe v. Merchants Bank of N.Y.*,
  693 N.E.2d 740 (N.Y. 1998) ............................................................................. 31

*Van Wagner Adver. Corp. v. S&M Enters.*,
  492 N.E.2d 756 (N.Y. 1986) ............................................................................. 35

*Vornado Realty Trust v. Marubeni Sustainable Energy, Inc.*,
  987 F. Supp. 2d 267 (E.D.N.Y. 2013) ............................................................... 31

*Wall v. CSX Transp., Inc.*,
  471 F.3d 410 (2d Cir. 2006) .............................................................................. 12

*Wells Fargo Bank, N.A. v. Bank of Am., N.A.*,
    No. 11 CIV. 4062 JPO, 2013 WL 372149 (S.D.N.Y. Jan. 31, 2013) ..................................... 31

*Woods v. Maytag Co.*,
    807 F. Supp. 2d 112 (E.D.N.Y. 2011) ................................................................................. 16

*Yurish v. Sportini*,
    123 A.D.2d 760 (N.Y. App. Div. 1986) .............................................................................. 13

**Rules**

Fed. R. Civ. P. 9(c) ......................................................................................................................... 39

I.      **INTRODUCTION**

This case challenges Wells Fargo Merchant Services, LLC's ("Wells Fargo") systematic, deliberate model of luring in customers through up-front promises of reasonable fees and rates, only to hammer those customers, after they sign up, with fees and charges that far exceed what Wells Fargo promised and that otherwise violate the terms of their contracts.  Chief among these overcharges are something called "non-qualified" fees and surcharges.  Pursuant to a deliberate scheme, Wells Fargo: (a) induces customers to sign up for its services under the guise of low, fixed per-transaction card processing rates; (b) actually charges customers much higher, undisclosed "non-qualified" rates and surcharges for the vast majority (90% or more) of transactions (resulting in total rates that are often more than double the promised rates); and (c) carefully conceals these upcharges through a billing statement scheme that ensures customers cannot discover what Wells Fargo has done.  Additionally, Wells Fargo has repeatedly increased fees and rates without proper notice, has charged card rates and levied a host of monthly fees in direct violation of the customers' contract terms, and has separately abused its contractual discretion by charging and increasing certain fees in bad faith and arbitrarily.

Plaintiffs are six of the hundreds of thousands of victims of Wells Fargo's deceptive and unlawful practices.  They properly allege claims for fraudulent inducement, breach of contract, breach of the implied covenant of good faith and fair dealing and, in the alternative, unjust enrichment.  Wells Fargo's arguments for dismissing these claims lack merit.

With respect to the fraudulent inducement claim, Plaintiffs allege in substantial detail how Wells Fargo fraudulently lured them in and then broke its promises.  Wells Fargo's argument that the allegations fail to satisfy Rule 9(b) is belied by the detailed allegations themselves, and its attempt to invoke a general, cookie-cutter integration clause to avoid liability for its misconduct fails under well-established law.

With respect to the contract claims, Plaintiffs validly plead multiple direct breaches. Wells Fargo's arguments to the contrary lack merit and, at most, raise factual issues that cannot be resolved in Defendant's favor on a motion to dismiss.  Moreover, contrary to Wells Fargo's suggestion, Plaintiffs' good faith claims are not duplicative of their direct breach claims, but rather are based on distinct facts and theories, and are well pled.

Wells Fargo's misguided attempts to invoke the contractual notice (Section 5.2 and 5.11) and statute of limitations clauses (5.24) fail for multiple reasons including because Plaintiffs have sufficiently pled compliance with these clauses even if they are determined to be applicable, enforceable, and conditions precedent to bringing suit (all of which Plaintiffs dispute).  More fundamentally, at this stage the record does not yet show whether these clauses were even in each of the Plaintiffs' contracts.

Finally, Plaintiffs validly plead unjust enrichment in the alternative to their contract claims.  This alternative pleading is proper here where Plaintiffs' fraudulent inducement claim, if successful, could result in the invalidation, in whole or in part, of the contracts, leaving a void properly filled through equitable principles.

Wells Fargo's motion should be denied in its entirety.

## II.   FACTUAL BACKGROUND

The payment card processing system is highly complex and involves many entities. Second Am. Compl. ("SAC") ¶¶ 6-7 (DE 18).  Merchants like Plaintiffs must hire a company to handle card processing services.  SAC ¶¶ 4-5.  The fees that such companies charge are substantial—often a merchant's third largest expense, behind labor and product costs.  SAC ¶ 5. Wells Fargo handles card processing for hundreds of thousands of merchants.  SAC ¶¶ 70, 276.

A. **Wells Fargo Lures in Customers Through Fraudulent Promises and Omissions Regarding Pricing and Rates.**

Wells Fargo lures in customers through a standardized, deceptive marketing and enrollment process. Before enrollment, Wells Fargo provides all prospective customers with a written proposal—called a "processing proposal" or "pricing terms"—that sets forth the fees and rates the merchant will be charged if it enrolls. SAC ¶ 35. If these terms are acceptable to the merchant, Wells Fargo provides them a second form document called the Merchant Processing Application ("Application"), which the merchant must sign in order to process transactions. SAC ¶ 36, Ex. A. The Application prominently features a "Pricing Terms" section, which again sets forth the fees and rates that will supposedly apply and closely mirrors the format of proposed terms the merchant was previously shown. SAC ¶¶ 37-42, Ex. A, at 4-5.

The Pricing Terms cover two general categories of fees and charges: (1) "card processing fees" that will be charged, on a per-transaction basis, for each credit and debit card transaction processed for the merchant; and (b) "other processing fees" consisting of certain other fees and charges that may apply to that particular merchant, some but not all of which are flat monthly fees. SAC ¶¶ 38-41, Ex. A. The Application incorporates another form document called the "Program Guide," which consists of over 50 pages of dense text. SAC ¶ 36, Ex. B.

B. **Wells Fargo Crams Customers with Fees and Rates that Exceed What Was Promised to Lure Them in and that Otherwise Violate Their Contracts.**

Having lured customers in, Wells Fargo immediately begins increasing charges and cramming merchants with fees that are inconsistent with the agreed-upon rates, utilizing a series of schemes to impose and conceal these overcharges. Several of the most prominent of Wells Fargo's schemes are described in great detail in the SAC and summarized below.

3

1.   **Wells Fargo's "Non-Qualified" Card Processing Fee Upcharge/Billback Scheme.**

All six Plaintiffs were subjected to this scheme. After prominently promising customers attractive "fixed" per-transaction card processing rates in the pre-enrollment pricing proposals and in the Application, Wells Fargo in reality charges those rates for just a small fraction (less than 10%) of transactions. For the ***vast majority*** of transactions (more than 90%) Wells Fargo charges all customers ***much higher rates***, which include a higher "non-qualified" base rate and a "non-qualified surcharge," which taken together can double or even triple the promised rates. SAC ¶¶ 46-49, 69-70, 141-45, 168-73, 186-91, 205-10, 228-33, 247-52. Even though Wells Fargo knows for a fact this will occur, its pricing proposals and Pricing Terms represent the lower rates as the applicable "fixed" rates. SAC ¶¶ 46-48, 59; Parkes Decl. ¶¶ 16, 26. Notably, while the Pricing Terms include 14 explanatory footnotes regarding various ***other*** fees and charges, there is no footnote indicating any limitations or caveats for the card processing fee rates. SAC ¶ 50, Ex. A, at 4-6.

Wells Fargo goes to great lengths to conceal this "non-qualified" upcharge scheme and the higher card processing rates it charges for most transactions, including through a "billback" scheme. Rather than clearly disclose the higher per-transaction rates on each monthly statement sent to merchants, each statement falsely indicates that the agreed, lower rates have been charged. In the *following* month's statement, a mislabeled, undecipherable entry sneaks in, on an aggregated basis, the upcharges from the prior month, precluding merchants from figuring out they have been charged the higher rates, let alone whether the charges comport with the contract. SAC ¶¶ 68, 71-76, 80-86, Exs. C-D; Parkes Decl. ¶¶ 28-30.

Rather than be forthright about this critical information, Wells Fargo buries anything even remotely resembling an "explanation" deep in fine print, far removed from the Pricing

Terms.  That language, even if read, fails to accurately disclose the scheme and cannot be reasonably understood.  Worse, the language only furthers the deception, indicating the "fixed" card processing rates specified in the Pricing Terms will, at the very least, be charged for most card transactions, referring to these as the "anticipated" rates even though Wells Fargo knows the vast majority of transactions will be subject to the much higher rates.  SAC ¶¶ 53-67, 77-86; Parkes Decl. ¶¶ 13-16, 25-26.

### 2.    Wells Fargo's Improper Rate and Surcharge Increases.

Separate from the "non-qualified" upcharge scheme, Wells Fargo also has repeatedly raised card transaction rates in violation of the spirit and letter of its contracts.  After a customer enrolls, Wells Fargo will typically charge them the "fixed" rates specified in the Pricing Terms for "qualified" transactions (and inflated rates for most transactions pursuant to its upcharge scheme) for approximately one year but then periodically, and without adequate notice, unilaterally increase both rates, as well as the "non-qualified" surcharge.  Any notice Wells Fargo provided regarding the repeated rate hikes were craftily designed to go unnoticed.  These rate hikes are arbitrary, have no basis in what it costs Wells Fargo to process transactions, and are intended solely to generate additional profit at customer expense.  SAC ¶¶ 90-102.

### 3.    Wells Fargo's Other Improper Fee Practices.

The SAC details other improper fee practices that Wells Fargo has carried out with respect to Plaintiffs and other customers, such as (a) charging PCI fees on merchants which do not meet the qualifications for such fees (SAC ¶¶ 107(c), 156, 179); (b) charging paper Statement Fees even when merchants elect to and do receive online statements (SAC ¶¶ 107(b), 155); (c) imposing monthly "service" fees even when no services have been provided (SAC ¶¶ 107(a), 151, 154); and (d) imposing other fees not disclosed and charges that exceed the rates provided in the contracts (SAC ¶¶ 107(d), 242, 285(g)).

C.      **Plaintiff-Specific Allegations.**

1.      **Queen City.**

Queen City is a North Carolina-based tour operator that provides African-American themed tours of Charlotte.  SAC ¶ 22.  To induce it to sign up, Wells Fargo, through its representative Nayeli Bacon, promised Queen City in writing it would pay a 1.85% "fixed" rate on *all* card transactions.  SAC ¶¶ 139-42, Ex. E, at 1.  Queen City was never told that the rate was really variable and the *vast majority* of card transactions would incur a much higher rate pursuant to Wells Fargo's "non-qualified" upcharge scheme.  SAC ¶ 143.  Had Queen City been advised of this critical fact, it never would have signed up.  SAC ¶ 146, 166.  After Queen City signed an Application specifying the agreed "fixed" rate in October 2015, it was hammered each month with exponentially higher card processing rates until, with the assistance of federal authorities, it was able to terminate its contract in April 2017.  SAC ¶¶ 22, 145, 164.  During its time as a customer, Queen City did not realize it was being charged more than the promised "fixed" rate because of Wells Fargo's "billback" scheme.  SAC ¶¶ 147-50.

Wells Fargo's rapacious overbilling of Queen City also included the assessment of "Other Processing Fees" that contradicted its contract.  SAC ¶¶ 151-57.  For example, Wells Fargo assessed "monthly service fees" even in months when it provided no services.  SAC ¶¶ 151-54.  It also charged a monthly paper "statement billing fee" even though Queen City promptly signed up to receive (and did receive) online statements.  SAC ¶ 155.  Wells Fargo also charged PCI fees even though the contract explicitly conditioned such fees on using "a gateway or value added reseller," which Queen City did not.  SAC ¶ 156.  To the extent Queen City was required to provide timely written notice that it had been victimized by the overbilling (which Wells Fargo already knew), it did so.  SAC ¶¶ 137, 158-65.

6

### 2.     Patti's Pitas.

Patti's Pitas operated a restaurant in Pennsylvania from January to May 2017.  SAC ¶ 21.

To induce it to sign up, Wells Fargo gave Patti's Pitas a written proposal specifying it would pay

a 1.74% "fixed" rate on *all* card transactions.  SAC ¶¶ 168-69.  Patti's Pitas was never advised

that the rate was really variable and the *vast majority* of transactions would incur a much higher

rate pursuant to the "non-qualified" upcharge scheme; had Patti's Pitas been advised of this

critical fact, it never would have agreed.  SAC ¶ 170, 174, 184.  After Patti's Pitas agreed to do

business at the promised "fixed" rate, it was assessed exponentially higher card processing rates.

SAC ¶¶ 172-73.  Patti's Pitas did not realize it was being overbilled due to Wells Fargo's

"billback" scheme.  SAC ¶¶ 175-78.  Wells Fargo overbilled Patti's Pitas in this manner monthly

until July 2017, two months after the restaurant closed.  SAC ¶ 182.  Wells Fargo also charged

Patti's Pitas a PCI fee even though it did not use "a gateway or value added reseller (VAR)."

SAC ¶ 179.  To the extent Patti's Pitas was required to provide timely written notice that it had

been victimized by the overbilling (which Wells Fargo already knew), it did so.  SAC ¶¶ 182-83.

### 3.     Dr. Babbitt.

Dr. Babbitt runs a California dental office that processed payments through Wells Fargo

from 2012 to 2014.  SAC ¶ 23.  To induce him to sign up, Wells Fargo, through its representative

Manuel Santiago, promised him in writing a 1.86% "fixed" rate on credit card transactions and a

1.41% "fixed" rate on debit card transactions.  SAC ¶¶ 186-87.  He was never advised that the

rates were really variable and the *vast majority* of card transactions would incur substantially

higher rates pursuant to Wells Fargo's "non-qualified" upcharge scheme; had he been advised of

this critical fact, he never would have agreed.  SAC ¶¶ 188, 192, 203.  After he agreed to the

promised "fixed" rates, Wells Fargo charged higher rates.  SAC ¶¶ 190-191.  Dr. Babbitt did not

realize he was being overbilled because of Wells Fargo's "billback" scheme.  SAC ¶¶ 193-96.

On two occasions, Wells Fargo also unilaterally raised the "fixed" rates specified in the contract; these increases also inflated the "non-qualified" upcharges Wells Fargo was already hiding via its "billback" scheme.  SAC ¶¶ 197-98.   Wells Fargo also raised the card authorization fee from $0.25 to $0.30 per transaction.  SAC ¶ 199.  All of these increases were imposed without notice or proper justification, and were arbitrary.  SAC ¶¶ 197-201.

### 4.    Ideal Sales.

Ideal Sales, a California company that manufacturers circuit boards, was a customer from 2012 through mid-2017.   To induce it to sign up, Wells Fargo, through its representative Greg MacIsaac, promised Ideal Sales in writing it would pay a "fixed" rate of 3.25% for *all* card transactions.  SAC ¶¶ 205-06.  Ideal Sales was never advised that the rate was really variable and the *vast majority* of transactions would incur a substantially higher rate, nor would it have done business with Wells Fargo had it been so advised.  SAC ¶¶ 207, 226.  Wells Fargo repeatedly charged Ideal Sales much higher rates.  SAC ¶¶ 209-210.  Based on the "billback" scheme, Ideal Sales did not realize it was being overbilled.  SAC ¶¶ 211-14.

On four occasions, Wells Fargo also unilaterally raised the "fixed" rates specified in the contract by 0.3% (ultimately increasing it from 3.25% to 4.45%).  SAC ¶ 215-16.  These increases also inflated the "non-qualified" upcharges Wells Fargo was already hiding via its "billback" scheme.  SAC ¶ 215-220.  Wells Fargo also increased the "non-qualified surcharge" from 0.99% to 1.5% and again to 1.99%.  SAC ¶ 217.  Given the increases, Ideal Sales' rate for card processing was often *in excess of 10% per transaction*, more than *triple* the industry average.  SAC ¶ 218.  All of these increases were imposed by Wells Fargo without proper justification, and were arbitrary.  SAC ¶¶ 215, 219-220.  To the extent Ideal Sales was required to provide timely written notice that it was overcharged (which Wells Fargo already knew), it did so.  SAC ¶¶ 222-25.

5. **Lytle Café.**

Lytle Café is a Tex-Mex restaurant that has been a customer of Wells Fargo since July 2016. SAC ¶ 25. Lytle Café had no desire to continue doing business with Wells Fargo but was refused termination without a costly early termination fee, which Lytle Café could not afford. SAC ¶ 239. To induce it to sign up, Wells Fargo, through its representative Aurelio Palos, promised Lytle Café in writing it would pay a "fixed" rate of 1.659% on credit card transactions and 1.309% on debit card transactions. SAC ¶¶ 227-29. Lytle Café was never advised that the rates were really variable and the *vast majority* of card transactions would incur a substantially higher rate pursuant to Wells Fargo's "non-qualified" upcharge scheme, nor would it have done business with Wells Fargo had it been so advised. SAC ¶¶ 230, 245. After Lytle Café signed up, Wells Fargo repeatedly hammered it with much higher rates on the vast majority of transactions. SAC ¶¶ 232-33. Lytle Café did not understand how or why it was being overbilled because of Wells Fargo's "billback" scheme. SAC ¶¶ 234-36. Thinking its bills were too high, Lytle Café inquired with Wells Fargo and was advised that its fees would be reduced if the Café stopped accepting rewards credit cards. SAC ¶¶ 237-39. Until this point, Lytle Café had no idea different credit card types incurred different charges and thought all cards incurred the same "fixed" rate. SAC ¶ 238. The owners and staff thereafter diligently endeavored to avoid accepting rewards credit cards; however, these efforts did not put a dent in the amount of Wells Fargo's upcharges. SAC ¶¶ 240-41.

Lytle Café was also subjected to other fees not reflected in its contract or that exceeded the charges set forth therein, including an "AUG PURCHASE MPRT TERMINAL BILLING FEE" of $35.00 and an "AUG TERMINAL PUR/RENT TAX TERMINAL PUR/RENT TAX" of $2.90 in August 2016. SAC ¶ 242. Lytle Café was also assessed an annual fee of $75.00 in November 2016, even though its Application indicates it will only be charged $45.00 for such

9

fee.  *Id.*  To the extent Lytle Café is required to provide timely written notice that it is being

overcharged (which Wells Fargo already knew), it has done so.  SAC ¶ 244.

6.   <b><u>Indian Tree Chiropractic.</u></b>

Indian Tree is a Colorado chiropractic clinic that did business with Wells Fargo through

June 2017, when it terminated its relationship with the assistance of federal agencies.  SAC ¶ 26.

To induce it to sign up, Wells Fargo promised Indian Tree a low "fixed" rate on *all* credit and

debit card transactions (1.826%); it was never advised that the rate was really variable and the

*vast majority* of transactions be at a much higher rate pursuant to Wells Fargo's "non-qualified"

upcharge scheme.  SAC ¶¶ 246-249.  It would not have done business with Wells Fargo had it

known this.  SAC ¶ 263.

Throughout its time as a customer, Wells Fargo charged Indian Tree much higher rates

than promised in the Pricing Terms.  SAC ¶¶ 251-52.  Indian Tree did not realize it was being

overbilled because of Wells Fargo's "billback" scheme.  SAC ¶¶ 253-56.  Wells Fargo also

unilaterally raised its agreed "fixed" rates twice (first to 2.126% and then to 2.146%), and

increased the "non-qualified surcharges," without notice or proper justification.  SAC ¶¶ 257-60.

To the extent Indian Tree is required to provide timely written notice that it is being overcharged

(which Wells Fargo already knew), it has done so.  SAC ¶¶ 261-62.

## III.   <u>LEGAL STANDARD</u>

To survive a motion to dismiss, a plaintiff need only plead enough facts "to state a claim

to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The

allegations in the complaint are "assumed to be true for purposes of adjudicating" the motion,

*Kirschner v. KPMG LLP*, 590 F.3d 186, 188 (2d Cir. 2009), and the motion must be denied

unless there is no "reasonable expectation that discovery will reveal evidence" that would enable

the trier of fact, after weighing contested evidence and making allowable inferences, to decide

10

the case for the plaintiff.  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

## IV.   ARGUMENT

### A.   Plaintiffs' Fraudulent Inducement Claim Is Well Pled.

Plaintiffs sufficiently plead that Wells Fargo fraudulently induced them to enter into

contracts through material misrepresentations and concealment about the processing rates that

would apply—including in the written processing proposals and in the Pricing Terms section of

their Applications.  As alleged, Wells Fargo:

> (a) prominently promised Plaintiffs and the Class members, as an inducement to
> enter into business with Defendant, card processing fee rates and other fees and
> charges that were lower and different than what Defendant knew would be
> charged, (b) failed to properly disclose its card processing fee upcharge scheme,
> or the true applicable card processing rates, in the Pricing Terms or elsewhere, (c)
> buried highly misleading, false disclosures related to this scheme in the fine print
> of its lengthy form contracts, (d) failed to inform prospective merchants of the
> known impact of this scheme (i.e., that the merchant will, for the majority of
> transactions, pay significantly higher card transaction fee rates than the 'fixed'
> rates specified without condition in the merchant's Pricing Terms), and (e)
> disclosed 'Pricing Terms' that do not reflect, omit, conceal, and affirmatively
> misrepresent the true pricing model that Defendant knew it would use in
> processing payments.

SAC ¶ 296.[1]

Wells Fargo does not dispute that the card processing fee rates are highly material terms

or that reasonable merchants would rely on the alleged statements and omissions.  Rather, it

advances two arguments for dismissing this claim, neither of which has merit.

*First*, Wells Fargo argues the general integration clause in the Program Guide renders this

claim not viable.  Mot. at 32-33.  Not so.  "Fraud in the preliminary negotiations for a written

contract cannot, by its nature, be merged into the contract since it is such deception, not

---

[1] *See also* SAC ¶¶ 35-43, 46-89; SAC ¶¶ 141-44, 146-47, 166, 169-71, 174-75, 184, 186-89, 192-93, 203, 205-08, 211, 226, 228-31, 234, 238, 245, 247-50, 253, 263 (representations and omissions to Plaintiffs); Parkes Decl. ¶¶ 13-16, 25-26.

disclosed in the terms of the agreement, that is the essence of the cause of action." *B & F Prod. Dev., Inc. v. Fasst Prods. LLC*, No. 13303/08, 2009 WL 81145, at *6 (N.Y. Sup. Ct. Jan. 13, 2009) (citing *Gizzi v. Hall*, 754 N.Y.S.2d 373, 377 (N.Y. App. Div. 2002)); *Golden v. Guar. Acceptance Capital Corp.*, 807 F. Supp. 1161, 1164 (S.D.N.Y. 1992) ("The merger clause offers no protection, because a contract procured by fraudulent inducement cannot be saved by its own terms.").

"It is well-settled [in New York law] that a ***general*** merger clause is generally insufficient to exclude parol evidence to show fraud in the inducement." *Fierro v. Gallucci*, No. 06-CV-5189, 2008 WL 2039545, at *13 (E.D.N.Y. May 12, 2008) (emphasis added); *accord Smith v. Fitzsimmons*, 180 A.D.2d 177, 181 (N.Y. App. Div. 1992) (citing cases) *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006) ("New York also permits the use of parol evidence to prove a claim of fraud in the inducement, even where the written contract contains an integration, or merger, clause.").

On the other hand, an integration clause ***may*** bar a fraudulent inducement claim where the clause contains an explicit disclaimer regarding "the very matter as to which" the plaintiff "claims it was defrauded." *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 320 (N.Y. 1959) (explaining distinction between general and specific integration clauses, and the "fundamental principle that a general merger clause is ineffective to exclude parol evidence to show fraud in inducing the contract"); *Fierro*, 2008 WL 2039545, at *13 (denying motion to dismiss fraudulent inducement claim where "merger clause contains the standard boilerplate that typifies a general merger clause, and does not contain any language specific to the representations at issue here").

Here, the clause in the sample Program Guide (SAC, Ex. B, at 29 § 25.6) is a general, cookie-cutter clause that does not address the card transaction rates that are the subject of the

alleged representations and omissions, and it plainly does not bar a fraudulent inducement claim under New York law. *Fierro*, 2008 WL 2039545, at *13; *Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC*, No. 01-CV-6600, 2005 WL 3370542, *4 (S.D.N.Y. Dec. 12, 2005) ("This is, by nature, a general disclaimer; it lacks the specificity to meet the standard the Second Circuit has applied under New York law.").

Even if Wells Fargo's integration clause were not a general clause (it is) and instead addressed the subject matter of the alleged misrepresentations (it does not), dismissal of the fraudulent inducement claim would ***still*** be inappropriate because Plaintiffs properly allege that the truth about the rates was exclusively within Wells Fargo's knowledge and not within Plaintiffs' knowledge. *Yurish v. Sportini*, 123 A.D.2d 760, 761-62 (N.Y. App. Div. 1986) (even a specific disclaimer will not bar a fraudulent inducement claim where the facts misrepresented are "peculiarly within the [representer's] knowledge"); SAC ¶¶ 82-83, 297, 300.

The two cases Wells Fargo cites are readily distinguishable and do not support its argument. In *In re Vivendi Universal, S.A.*, No. 02-CV-5571, 2004 WL 876050 (S.D.N.Y. Apr. 22, 2004), the court declined to dismiss the fraud claims, *id.* at *11-12, and to the extent it found the integration clause there barred certain aspects of plaintiffs' Section 10(b) securities claims, the court specifically relied on the fact that the agreement in question was a heavily negotiated merger agreement between two multi-million dollar corporations, finding plaintiff "should have insisted on including [the representations at issue] in the agreement." *Id*. at *3.[2]  Similarly, in *United Artists Theatre Circuit, Inc. v. Sun Plaza Enter. Corp.*, 352 F. Supp. 2d 342, 351 (E.D.N.Y. 2005), the court relied on the fact the contract there involved a multi-million dollar

---

[2] Notably, the *Vivendi* court found that, even with a heavily negotiated document between large corporations, the integration clause did not bar claims based on misrepresentations in the contract itself, as Plaintiffs have alleged here. *Id*. at *4-6; SAC ¶¶ 37, 42-43, 46-50, 55, 57-68.

transaction and was negotiated between two large corporations.  Here, by contrast, the Program

Guide is a form contract of adhesion drafted by Wells Fargo, was not subject to any negotiation,

and on one side of the bargain were small businesses and individuals.  *See Fierro*, 2008 WL

2039545, at *14 (distinguishing another case involving a negotiated contract between two large

corporations); *Superior Tech. Res., Inc. v. Lawson Software, Inc.*, No. 2003-10104, 2007 WL

4291575, at *11 (N.Y. Sup. Ct. Dec. 7, 2007) ("In order to bar [the] fraudulent inducement

claim, based solely on the integration clause, the controlling case law requires that the clause be

a negotiated one as opposed to generic boilerplate, and it must address the specific subject matter

about which the fraud is claimed;" "[t]he clause here meets neither requirement" but rather "has

all the earmarks of a pre-printed form containing a standard and general integration clause[.]").

Nor would Plaintiffs here have had any reason to try to further memorialize the pricing

representations at issue (even if the contracts were negotiated), since the contracts themselves

included and reinforced these very representations.  SAC ¶¶ 37, 46-47.

  *Second*, Wells Fargo incorrectly argues that Plaintiffs' fraudulent inducement allegations

fail to satisfy Federal Rule 9(b).  Rule 9(b) requires that allegations of fraud be pled with

sufficient particularity that the defendant has "fair notice of plaintiff's claim, to enable

preparation of defense."  *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d

Cir. 1987) (allegations of fraud should state "the time, place, speaker, and content of the alleged

misrepresentations").  Plaintiffs' allegations satisfy this standard.

  With respect to ***affirmative misrepresentations***, Plaintiffs allege in substantial detail:

**when and where** (in the pricing proposals and in the Pricing Terms in their Applications, at the

time those documents were presented to Plaintiffs in connection with their enrollment); **who**

(Wells Fargo, including via its named sales agents); and **what** (the supposedly applicable "fixed"

card transaction rates).  Plaintiffs even include the specific timing these materials were provided

to them and, to the extent they can reasonably recall, the name of the representative who

presented these form materials to them on Wells Fargo's behalf (though, respectfully, neither

precise detail is necessary here given the materials in question were form documents prepared by

Wells Fargo).[3]  Plaintiffs further allege in substantial detail why the representations were false

and misleading, and how Wells Fargo took further steps to perpetuate the deception even after

Plaintiffs enrolled.  SAC ¶¶ 48-89.  These allegations are absolutely sufficient to put Wells Fargo

on notice of the claim here so that it can prepare its defense.

Plaintiffs also allege that Wells Fargo actively ***concealed*** the truth regarding the rates,

and that it had a duty to disclose the truth under these circumstances.  SAC ¶¶ 50, 143, 147, 170,

175, 188, 193, 207, 211, 230, 234, 249, 253, 295-97; *Energy Capital Co. v. Caribbean Trading*

*& Fid. Corp.*, No. 93-CV-8100, 1996 WL 157498, at *8 (S.D.N.Y. Apr. 4, 1996) (fraudulent

inducement claim can be based on omissions; party has duty to disclose "where [it] possesses

superior knowledge not readily available to the other, and knows that the other is acting on the

basis of mistaken knowledge").  "[W]here a claim is premised on fraudulent omission . . . the

plaintiff cannot specify the time and place of the alleged fraudulent statements because no

affirmative act occurred."  *Burkett v. Smith & Nephew Gmbh*, No. 12-CV-4895, 2014 WL

1315315, at *7 (E.D.N.Y. Mar. 31, 2014).  Omission-based claims will satisfy Rule 9(b) if they

---

[3] SAC ¶¶ 35-43, 46-47, 141-44, 168-71, 186-89, 205-08, 228-31, 246-50.  Further details are, of course,
within Wells Fargo's knowledge, some exclusively so.  *See, e.g.*, SAC ¶¶ 82-85.  When fraud claims
"involve facts solely within the defendant's knowledge . . . at the early stages of litigation, the plaintiff
need not plead . . . to the same degree of specificity . . . ."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493
F.3d 87, 102 (2d Cir. 2007) (citing *Rombach v. Chang*, 355 F.3d 164, 175 n.10 (2d Cir. 2004)) (relaxing
fraud pleading standard when information was likely to be in the exclusive control of the defendants); *cf.*
*Schwartzco Enters. LLC v. TMH Mgmt., LLC*, 60 F. Supp. 3d 331, 346 (E.D.N.Y. 2014) ("The Court also
acknowledges that those allegations of fraud based on 'information or belief' may be sufficient under
Rule 9(b) if they are based on matters 'peculiarly within the opposing party's knowledge.'").

allege: "(1) what the omissions were (2) the person responsible for the failure to disclose; (3) the context of the omissions and the manner in which they misled the plaintiff; and (4) what the defendant obtained through the fraud." *Id*. Plaintiffs here allege all four elements: **what** (the truth about the card transaction rates); **who was responsible** (Wells Fargo); **context** (Wells Fargo concealed the truth at the same time it was misleading Plaintiffs to believe the "fixed" rates would apply); and **what defendant obtained** (extra profit). SAC ¶¶ 42-50, 52-73, 80-89.

With respect to scienter, courts are "lenient in allowing scienter issues to withstand [motions to dismiss] based on fairly tenuous inferences, because such issues are appropriate for resolution by the trier of fact." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 693 (2d Cir. 2009); *see also Icebox-Scoops v. Finanz St. Honore, B.V.*, 676 F. Supp. 2d 100, 111 (E.D.N.Y. 2009) (finding "conclusory" allegations adequate to plead scienter for fraudulent inducement). Wells Fargo acknowledges that scienter can be pled generally, but casually tries to redirect attention away from itself to the *sales representatives* who delivered its form documents. The claim here is not that some rogue representatives made off the cuff statements, but rather that *Wells Fargo's form pricing proposal and Application documents*, provided to *every* merchant that does business with Wells Fargo, include material representations that are false and misleading, and that Wells Fargo as a matter of company policy misrepresents and conceals the truth from merchants. To allege scienter here, it is sufficient to allege either: (a) facts showing Wells Fargo "had both motive and opportunity to commit fraud;" or (b) facts constituting "strong circumstantial evidence of conscious misbehavior or recklessness." *Woods v. Maytag Co.*, 807 F. Supp. 2d 112, 120 (E.D.N.Y. 2011). Plaintiffs here allege both. SAC ¶¶ 9-11, 33, 37, 42-50,

16

52-53, 57-59. 63, 66-68, 70-71, 73, 77, 80-87, 90, 100, 103, 106-108.[4]

To the extent Wells Fargo seeks dismissal on the ground that the appendices buried deep in the contract supposedly "clarified" the rates that applied, such argument lacks merit. Plaintiffs allege in substantial detail why these buried "disclosures" were not only extremely unclear and unhelpful, but they also were themselves grossly misleading and only furthered the deception caused by the up-front, prominently disclosed false pricing terms. SAC ¶¶ 53-68; *compare id.*, Ex. A, at 4 (Pricing Terms), *with id.*, Ex. A, at 17-18 (supposed clarifying language that Wells Fargo is relying upon); Parkes Decl. ¶¶ 13-16, 25-26. Even if this buried language were not itself misleading (which it is), at most that would give rise to a question of fact as to whether it was "so conspicuous and apparent that [merchants] are not likely to be deceived." *Chapman v. Skype Inc.*, 220 Cal. App. 4th 217, 227-28 (2013) ("the fact that Skype ultimately discloses the limits in its 'Fair Usage Policy' does not excuse its practice of labeling the plan 'Unlimited' in its initial dealings with potential customers"). Under New York law, "whether a party could have ascertained the facts with reasonable diligence is a factual question for resolution by the jury." *Gizzi*, 754 N.Y.S.2d at 377 (quoting *Bethka v. Jensen*, 672 N.Y.S.2d 494, 495 (N.Y. App. Div. 1998)). Wells Fargo will have an opportunity to try to convince a fact finder that it did not misrepresent and conceal from merchants the card transaction fee rates that would apply. However, the SAC's allegations are absolutely sufficient and Plaintiffs should be permitted to pursue this well-pled claim.

### B.   Plaintiffs' Contract Claims Are Well Pled.

Plaintiffs assert two varieties of contract claims. SAC ¶¶ 283-93. First, Plaintiffs allege that Wells Fargo imposed fees that are in direct breach of their contracts. SAC ¶ 285(a)-(g).

---

[4] Even if the scienter of the representatives were pertinent (which Plaintiffs dispute), Plaintiffs plausibly allege they were motivated (and they certainly had the opportunity) to help carry out the fraud. SAC ¶ 42.

Second, Plaintiffs allege that Wells Fargo has exercised contractual discretion in a manner that deprives Plaintiffs of the benefits of their contracts in breach of the implied covenant of good faith and fair dealing.  SAC ¶¶ 286-89.  Each claim is supported by factually distinct allegations and theories.  Wells Fargo's arguments for dismissing these claims lack merit.

          1.      **Plaintiffs Validly Plead Direct Breach Claims.**

Wells Fargo argues that all of its challenged fee practices were contractually authorized.  Mot. at 24-31.  Plaintiffs allege otherwise, and their allegations are supported by the contracts themselves.  Plaintiffs' allegations are sufficient to state claims for several direct breaches.

Paper Statement Billing Fees (Queen City).  Wells Fargo's form contract provides that the "Statement Billing Fee (Paper Statement)" can be waived if the merchant "elects to access the monthly statement online instead of receiving a paper copy by mail."  SAC, Ex. E, at 2 & n.7.  Queen City did so elect and began receiving its statements online instead of by mail; however, Wells Fargo continued to charge the $10.00 paper Statement Fee each month.  SAC ¶ 155.  Wells Fargo maintains that, to avoid dismissal, Queen City was required to specifically allege it activated and maintained activity on "Business Track" (Wells Fargo's system for online statements)  Mot. at 28-29.  But Queen City alleges it "promptly requested online statement access and did receive its statements electronically."  SAC ¶ 155.  That Queen City's allegation may not have included the "buzzword" Wells Fargo desires does not change the fact that Queen City's allegations are sufficient to state a claim for breach of contract.[5]

PCI Fees (Queen City and Patti's Pitas).  The contract explicitly conditions the imposition of Non-Validation PCI Compliance fees on a merchant being "a Level 4 Client[] who utilize[s] a gateway or value added reseller (VAR)."  SAC, Ex. E, at 3 n.8 (Queen City Pricing

---

[5] Queen City could readily amend the complaint to include any "buzzword" or formal service name used by Wells Fargo, which would not alter the material substance of Queen City's claims.

Terms); Shaw Decl., Ex. 5, at 3 n.8 (Patti's Pitas Pricing Terms).  Wells Fargo charged Queen

City and Patti's Pitas this fee in multiple months.  SAC ¶¶ 156, 179.  Even if these Plaintiffs

were "Level 4 Clients" (not defined in the contract), both specifically allege they "did not use

any gateway or VAR."  SAC ¶¶ 156, 179.  Wells Fargo argues that their pricing terms show they

were "*set up*" to utilize internet gateways.  Mot. at 29.  Whether the fee can be charged,

however, does not depend on what merchants are *set up* to do.  Both of these Plaintiffs allege

they did not utilize a gateway or VAR and yet were charged this fee, and thus properly state

claims for breach of contract.[6]  To the extent the parties dispute these facts, the Court must

accept the SAC's allegations as true; resolution of disputed issues of fact would be inappropriate

on a motion to dismiss.  *See Levitt v. Bear Stearns & Co.*, 340 F.3d 94, 101 (2d Cir. 2003),

*abrogated on other grounds by Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 653 (2010).

Monthly Service Fees (Queen City).  Queen City wanted a contract with no monthly

minimum fees because its business is seasonal and it does not process transactions year round.

SAC ¶ 151.  Queen City agreed to pay a Monthly Service Fee of $35.00 per month, but by its

plain terms such fee would only apply during months when Wells Fargo actually provided Queen

City with services.  SAC ¶ 153; Shaw Decl., Ex. 5.  Still, Wells Fargo assessed Monthly Service

Fees during months when Queen City's business was not operating and Wells Fargo thus

provided no service.  SAC ¶¶ 151-54, 285(a); Shaw Decl., Ex. 7 (statements for Oct. 2015–Mar.

2017).  Queen City repeatedly complained about this fee being charged those months but Wells

Fargo refused to cease charging it (it did, at one point, reduce it to $20 per month).  SAC ¶ 154.

---

[6] Wells Fargo argues that Patti's Pitas agreed to utilize the "internet gateway" "FreedomPay FreeWay
GW Ret, MOTO – v.1."  Mot. at 29-30.  That device is a terminal, not an "internet gateway," and nothing
in the pricing terms suggests otherwise.  Indeed, the "Internet Gateway" line on Patti's Pitas' pricing
terms is blank.  Shaw Decl., Ex. 5, at 1.  What qualifies as a "gateway" or "VAR" is at least unclear, and
should be resolved only after it is explored through discovery.

Wells Fargo argues that the contract did not expressly prevent it from charging the Monthly Service Fee during months when it provided no services, but that is inconsistent with the plain meaning of the word "service."  If the fee did not depend on Wells Fargo's provision of services, it could have been called simply "Monthly Fee," and Queen City would not have agreed to it.[7]

Miscellaneous "Other Processing Fees" (Lytle Café).  Lytle Café alleges it was charged several miscellaneous fees not provided for in its contract.  SAC ¶ 242 (citing "AUG PURCHASE MPRT TERMINAL BILLING FEE" and "AUG TERMINAL PUR/RENT TAX TERMINAL PUR/RENT TAX").  Wells Fargo cites no contractual provision allowing these fees, but instead argues that Lytle Café has not shown how these fees were in breach of contract.  Mot. at 30.  At the pleading stage, however, it is sufficient to allege the fees were not authorized by the contract.  *See New Beginnings Healthcare for Women, LLC v. EVO Payments Int'l, LLC*, No. 17-cv-3650-JFB-SIL, p. 12 (E.D.N.Y. Aug. 31, 2017) (rejecting payment processor's argument that complaint failed to sufficiently plead a claim for breach when it cited fees that were not allowed by the contract) (Ex. A to Decl. of E. Adam Webb ("Webb Decl.")).

Lytle Café also alleges that it was assessed an Annual Fee of $75.00 even though its Application limited such fee to $45.00.  SAC ¶ 242.  Wells Fargo responds by producing what it contends is the operative contract that lists a $75.00 Annual Fee.  Mot. at 30.  But that version differs from the Lytle Café's actual contract, which clearly shows the $75.00 amount is replaced by $45.00.  *See* Lytle Café Pricing Terms, at 1 (Ex. B to Webb Decl.).[8]

Raising Fees/Rates Without Providing Proper Advance Notice (Dr. Babbitt and Indian

---

[7] Wells Fargo also argues that Queen City waived the right to challenge this fee because it continued to pay the reduced $20 rate (Mot. at 28 n.13), but the reduction did not resolve the issue as Queen City should not have been paying anything for this fee in months without service.  Queen City continued to complain even after the reduction to $20.  SAC ¶¶ 163-64.

[8] The hand-written revisions were made by Wells Fargo representative, Aurelio Palos.

Tree).  Even assuming *arguendo* the sample Program Guide (SAC, Ex. B) applied to all
Plaintiffs, it provides that Wells Fargo may "increase [] fees . . . by notifying you thirty (30) days
prior to the effective date of any such change or addition."  SAC, Ex. B, at 10 § 5.6.  Both Dr.
Babbitt and Indian Tree allege that Wells Fargo increased their fees *without* providing the
required notice.  SAC ¶¶ 90-102, 197, 201, 257, 260.  Wells Fargo attempts to rebut these
allegations by having one of its outside attorneys submit copies of notices these Plaintiffs were
supposedly provided.  Shaw Decl., ¶ 6;*id.*, Ex. 6.  However, there is no indication outside
counsel is qualified to attest that the purported notices are "true and correct," nor is there any
proof whether, how, and when they were sent.  Moreover, even assuming they were timely sent,
Plaintiffs have challenged the legitimacy of Wells Fargo's general notice practices.  SAC ¶¶ 94-
98.  Finally, the supposed notice documents are not "integral to the complaint" such that they can
be properly considered on motion to dismiss, in any event, because they were not relied upon by
Plaintiffs in drafting the complaint.  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.
2002) ("a plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a
necessary prerequisite to the court's consideration of that document on a dismissal motion").
The untested, unproven supposed notices cannot trump Plaintiffs' allegations.

  Excessive Non-Qualified Interchange Fees and Surcharges (All Plaintiffs).  Plaintiffs
allege in detail that Wells Fargo systematically imposes "non-qualified" upcharges and
surcharges that exceed the rates set forth in the parties' contracts, but through its "billback"
scheme fails to provide Plaintiffs with the information they need (e.g., which specific
transactions are deemed non-qualified and the amounts of such transactions) to discover exactly
for which transactions and how much they are being overcharged.  SAC ¶¶ 80-88, 147-50, 175-

78, 193-96, 211-14, 234-36, 253-56, 285(g).[9]  Once Plaintiffs receive this information in discovery, they will clarify which specific fees and surcharges have been inflated by Wells Fargo pursuant to this upcharge scheme.  Wells Fargo does **not** argue these upcharges—which exceeded the lower "fixed" rates set forth in Plaintiffs' Pricing Terms—were assessed as an exercise of its contractual discretion to increase rates with notice; in fact, as alleged, these upcharges were imposed without any notice immediately following merchants' enrollment.  SAC ¶¶ 145, 172-73, 190-91, 209-10, 232-33, 251-52.

## 2.    Plaintiffs Validly Plead Good Faith and Fair Dealing Claims.

"Implicit in every contract is a promise of good faith and fair dealing that is breached when a party acts in a manner that—although not expressly forbidden by any contractual provision—would deprive the other party of receiving the benefits under their agreement." *Sorenson v. Bridge Capital Corp.*, 52 A.D.3d 265, 267 (N.Y. App. Div. 2008).  "Even when a contract confers decision-making power on a single party, the resulting discretion is nevertheless subject to an obligation that it be exercised in good faith." *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1575 (2d Cir. 1994) (citing *Carvel Corp. v. Diversified Mgmt. Grp., Inc.*, 930 F.2d 228, 231 (2d Cir. 1991), and *Cross & Cross Props., Ltd. v. Everett Allied Co.*, 886 F.2d 497, 502 (2d Cir. 1989)); *see also, e.g., Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (N.Y. 1995) ("Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion.").  The obligation to operate in good faith is particularly important for the more powerful party in a contractual relationship in which the parties "do not deal as equals either in terms of access to information or

---

[9] The supposed terms under which Wells Fargo argues each Plaintiff purportedly agreed to pay Non-Qualified Interchange Fees and Surcharges are in an "Interchange Pricing Summary."  *See, e.g.*, Dr. Babbitt Application, pp. 10-18 (Ex. A to SAC).  The only "Interchange Pricing Summary" in the record is for Dr. Babbitt.  *Id.*; *see also* Shaw Decl. (failing to attach such documents for any of the other Plaintiffs).

business acumen and thus . . . often lack equal bargaining power." *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (N.Y. 2002) (citation omitted).

The propriety of a contract claim founded on the implied covenant was recently considered in *Ahmed Elkoulily, M.D., P.C. v. N.Y. State Catholic Healthplan, Inc.*, 153 A.D.3d 768 (N.Y. App. Div. 2017).  In *Elkoulily*, a medical clinic sued an insurer for breach of contract, claiming that the insurer terminated the parties' contract without justification and in bad faith. *Id.* at 769.  The insurer moved to dismiss, claiming that the contract empowered it to terminate if "in its sole discretion" it believed the clinic's services created an imminent harm to its employees.  *Id.*  The trial court granted the motion but the appellate court reversed, holding that "[e]ven an explicitly discretionary contract right may not be exercised in bad faith so as to frustrate the other party's right to the benefit under the agreement."  *Id.* at 770 (quoting *Legend Autorama, Ltd. v. Audi of Am., Inc.*, 100 A.D.3d 714, 716 (N.Y. App. Div. 2012)).  The court found the clinic's allegations that (a) the insurer had no real justification to believe its employees were in imminent harm and (b) the true motivation underlying the termination was cost-based "were sufficient to state a cause of action to recover damages for breach of contract based upon the alleged breach of the implied covenant of good faith and fair dealing."  *Id.* at 770-71. Plaintiffs' allegations are at least as sufficient as those in *Elkoulily*.

Abusing Discretion to Raise Card Processing Rates and Surcharges (Dr. Babbitt, Ideal Sales, and Indian Tree).  The sample Program Guide gives Wells Fargo certain discretion to increase fees with advance notice.  SAC, Ex. B, at 10, § 5.6.  As alleged, Wells Fargo apparently exercised this discretion to impose substantial increases on three of the Plaintiffs' "fixed" card processing rates (which also raised the higher "non-qualified" rates charged for most transactions), "non-qualified surcharges," and per transaction fees.  SAC ¶¶ 197-99, 215-18, 257-

23

58.  Even *if* Wells Fargo provided timely, proper notice of such increases such that it was not in direct breach (Indian Tree and Dr. Babbitt allege otherwise), it nevertheless breached the covenant of good faith and fair dealing because these increases were arbitrary, in bad faith, and implemented solely to pad Wells Fargo's own bottom line and not in response to external factors (such as increased costs).  SAC ¶¶ 100-02, 200, 219, 259, 287.  As a result of such increases, Plaintiffs were forced to pay *substantially* more for payment processing services than they had agreed to pay, thus depriving Plaintiffs of the benefit of their bargain.  For instance, Wells Fargo's unilateral increases with respect to Ideal Sales led to an effective processing rate in excess of 10% per transaction (more than *triple* the industry average).  SAC ¶¶ 218-22.

> Adopting So-Called "Anticipated Interchange Levels" It Knew the Vast Majority of Card Transactions Would Not Meet (All Plaintiffs).  Wells Fargo baits merchants with promises of "fixed" card processing rates.  SAC ¶¶ 46-53.  After hooking merchants, Wells Fargo then has them sign a contract that consists of several documents collectively exceeding 50 pages of fine print legalese.  SAC ¶ 36.  Wells Fargo knows full well that merchants will rely on the up-front promises of low "fixed" rates that are reiterated in the prominently featured part of the contract, and not spend hours pouring through the dense boilerplate contracts to ensure they have not been lied to.  So Wells Fargo buries provisions deep in these documents that it now claims allow it to charge, for the vast majority of card transactions (i.e., all transactions which do not qualify at "Anticipated Interchange Levels"), rates that greatly exceed the promised low "fixed" rates.  SAC ¶¶ 52-53.  Even this buried language deceptively indicates the agreed-upon low, fixed rates will be charged for *most* transactions, which Wells Fargo knows is decidedly not true.

> For instance, the "Interchange Pricing Summary" states that Wells Fargo "anticipates" the merchant will process transactions at specified "interchange levels."  SAC, Ex. A, at 17; SAC

¶ 55.  These "Anticipated Interchange Levels" are described via payment processing industry jargon that is incomprehensible except to industry experts.  SAC, Ex. A, at 17; SAC ¶ 58; Parkes Decl. ¶¶ 13-16, 19-22, 25-26.  Thus, no merchant could understand what this language meant or its significance.  However, because Wells Fargo indicated that it "anticipates" the merchant will process transactions at these levels, it falsely indicates that most transactions will qualify.  SAC ¶ 58.

The next paragraph of the "Interchange Pricing Summary" then sets forth various criteria which merchants must meet to process transactions at the "Anticipated Interchange Levels," such as signatures being obtained for swiped cards and transactions being authorized and settled within one day.  SAC, Ex. A, at 17; SAC ¶ 61.  This disclosure suggests that if merchants follow these rules their transactions will qualify and the promised "fixed" rates will apply.

Wells Fargo has thus worded its contract to create the impression that most card transactions will process at "Anticipated Interchange Levels."  SAC ¶¶ 54-64.  Yet Wells Fargo has intentionally set "Anticipated Interchange Levels" that it knows the vast majority of card transactions will not (and cannot) possibly meet.  SAC ¶¶ 58-59.  By doing so, Wells Fargo has deprived Plaintiffs of the benefit of their bargain even under the contract reading most favorable to Wells Fargo (i.e., that the negotiated "fixed" rate would apply to at least most transactions) in violation of the covenant of good faith and fair dealing.  SAC ¶ 289.

## a.     The Good Faith Claims Are Not Duplicative.

Wells Fargo argues that New York law bars a plaintiff from pleading a good faith claim when a direct breach claim "based on the same facts" is also pled.  Mot. at 16.  Not only is that

an inaccurate, oversimplification of the law,[10] but here the direct breach and good faith claims are ***not*** based on the same sets of facts.  The direct breach claims are premised on Wells Fargo's (a) imposition of various fees in direct violation of the Application, (b) increasing "fixed" rates, surcharges, and per transaction fees *without notice* in violation of Section 5.6 of the Program Guide, and (c) imposition of Non-Qualified Interchange Fees and Non-Qualified Surcharges in amounts that exceed the amounts set forth in the Application.  *See supra* Parts II.B.1, IV.B.1. These claims are based on a limited set of facts—primarily, the charges and the contracts.  The good faith claims, on the other hand, allege the contract provided Wells Fargo with discretion to take certain fee actions and, under the ***additional factual circumstances*** here, Wells Fargo's exercises of such discretion were in bad faith and prevented Plaintiffs from receiving the benefit of their bargain.  *See supra* Part IV.B.2, pp. 23-25.

For example, Plaintiffs allege that even if Wells Fargo provided compliant notice of its unilateral periodic rate increases (and thus did not directly breach Section 5.6), its exercises of this discretionary power were in bad faith and arbitrary and violated the implied covenant, because of the ***additional facts*** that the increases lacked any justification besides padding Wells Fargo's profits and led to effective rates that dwarfed the initial rates agreed to.  The direct breach and good faith claims are distinct and not duplicative.

---

[10] Although an implied covenant claim may be dismissed as redundant of a *live* breach of contract claim, when "the Court dismisses Plaintiff's claim for breach of contract, . . . there is no need to dismiss this [implied covenant] claim as redundant."  *Wiseman v. ING Groep, N.V.*, No. 16-cv-07587, 2017 WL 4712417, at *8 (S.D.N.Y. Sept. 28, 2017).  In other words, claims for direct breach and breach of the implied covenant can be properly pled in the alternative, such that if one is dismissed, the other may still be considered on its merits.  *See id.* ("In some cases a party may be in breach of its implied duty of good faith and fair dealing even if it is not in breach of its express contractual obligations." (internal brackets and quotation marks omitted)); *see also Orange Cty. Choppers, Inc. v. Olaes Enters., Inc.*, 497 F. Supp. 2d 541, 560 (S.D.N.Y. 2007) (dismissing breach of contract claim while denying motion to dismiss good faith claim based on same set of facts); *DiFolco v. MSNBC Cable LLC*, No. 06 Civ. 4728, 2007 WL 959085, *4 (S.D.N.Y. Mar. 30, 2007) (concluding that dismissal of direct breach claim mooted argument that good faith claim was duplicative), *vacated in part on other grounds*, 622 F.3d 104 (2d Cir. 2010).

That **_some_** of the **_charges_** at issue may be challenged via both claims, does not make the claims impermissibly duplicative or change that there are distinct sets of **_other_** facts (i.e., besides the charges themselves) underlying the two claims; rather, even for the same charges, Plaintiffs may properly plead overcharges were not permitted by the contract's express terms and, in the alternative, they were an abuse of contractual discretion and violated the implied covenant under the additional specific factual circumstances here.  *See e.g.*, *Wiseman*, 2017 WL 4712417, at *8.

### b.   Plaintiffs' Good Faith Claims Do Not Negate Wells Fargo's Explicit Rights.

Wells Fargo next argues that Plaintiffs are attempting to use the implied covenant to create a new duty that negates Wells Fargo's contractual rights.  Mot. at 16-17.  Not so.  New York courts have recognized:

> . . . that there is clearly some tension between, on the one hand, the imposition of a good faith limitation on the exercise of a contract right and, on the other, the avoidance of using the implied covenant of good faith to create new duties that negate explicit rights under a contract. However, the allegations here clearly go beyond claiming only that [the defendant] should be precluded from exercising a contractual right; they support a claim that [the defendant] exercised a right malevolently, for its own gain as part of a purposeful scheme designed to deprive plaintiffs of the benefits of the [bargain]. These allegations do not create new duties that negate [the defendant's] explicit rights under a contract, but rather, seek imposition of an entirely proper duty to eschew this type of bad-faith targeted malevolence in the guise of business dealings.

*Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 302 (N.Y. App. Div. 2003). Whether Wells Fargo exercised its contractual discretion in good faith and in accordance with the parties' reasonable expectations is a question of fact.  *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007) ("whether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case, and is ordinarily a question of fact to be determined by the jury or other finder of fact" (citation omitted)).  Plaintiffs' good faith and fair dealing claims are validly pled.

27

3.   **Sections 5.2 and 5.11 Provide No Basis for Dismissing Plaintiffs' Contract Claims.**

Wells Fargo argues that Plaintiffs cannot pursue their contract claims because Plaintiffs supposedly did not comply with Sections 5.2 and 5.11 of the Program Guide—which Wells Fargo calls the "contractual notification requirements."  Plaintiffs note that Wells Fargo does ***not*** argue that either section would bar Plaintiffs' fraudulent inducement or unjust enrichment claims (Mot. at 15-24), which it could not argue because fraudulent inducement and unjust enrichment are non-contractual claims.  *See Israel v. Alexander*, 50 F. Supp. 1007, 1009 (S.D.N.Y. 1942) (under "New York substantive law," a fraudulent inducement "action is not based on the contract but on the fraud"); *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 60 (2d Cir. 1997) (unjust enrichment is a "non-contractual, equitable" remedy); *cf. Golden*, 807 F. Supp. at 1164 ("contract procured by fraudulent inducement cannot be saved by its own terms").  Moreover, even with respect to the contract claims, these provisions do not support dismissal for multiple reasons, including because Plaintiffs allege compliance.

a.   **Discovery Is Needed to Determine Whether Plaintiffs' Program Guides Include These Sections and What They Say.**

It is undisputed that each Plaintiff's contract includes a lengthy form Program Guide. However, Plaintiffs are not all subject to the *same version* of the Program Guide.  SAC ¶ 36 & n.2.  Queen City, Patti's Pitas, and Lytle Café are subject to "Version WFB1707," Dr. Babbitt and Ideal Sales to "Version WFB1405," and Indian Tree to "Version WFB1601."  *See* Shaw Decl., Ex. 3.  No Plaintiff's *actual* Program Guide was attached to the SAC.  Wells Fargo suggests this is some calculated maneuver by Plaintiffs to avoid providing the Court the terms. In fact, the Program Guides were not attached because Plaintiffs do not have copies of them. The sample version attached as Ex. B to the SAC (Version "WFB1707 REV00 (7/14)") was found by counsel on the internet.  It is believed to be *similar* to the versions applicable to each

Plaintiff, but discovery is needed to confirm the existence and materiality of any differences.[11]

SAC ¶¶ 36, 120.  Discovery may reveal that the versions actually applicable to some (or all)

Plaintiffs do not have the same Sections 5.2 and 5.11 found in the sample version.

Wells Fargo wants the Court to ignore this possibility and assume the sample Program

Guide is identical to those versions applicable to each Plaintiff, but it provides no basis to make

this assumption.  Until it is established what the versions of the Program Guide applicable to

Plaintiffs actually say, it is premature to consider any argument based on sections 5.2 and 5.11 of

the sample Program Guide.  *See Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

### b.      Neither Section Imposes a Condition Precedent to Suit.

Wells Fargo argues that Sections 5.2 and 5.11 of the sample Program Guide impose a

condition precedent to bringing claims for breach of contract, but that notion is entirely absent

from a plain reading of either section's text.  Neither section addresses the right to sue at all.

Section 5.11 provides that if a customer does not notify Wells Fargo of a concern regarding card

transaction activity within 60 days, Wells Fargo "shall have no obligation to investigate or effect

any adjustments."  SAC, Ex. B, at 9 § 5.11.  Section 5.2 provides that if a merchant raises certain

questions after 90 days, the issue "***may*** not be considered for refund review" by Wells Fargo.

SAC, Ex. B, at 9, § 5.2 (emphasis added).  By their terms, these sections describe a procedure for

raising certain concerns, and set forth specific, limited consequences of what happens if concerns

are raised later than the time period specified—consequences that do ***not*** include losing the right

to sue.  The consequences are expressly limited to whether Wells Fargo must or may engage in

an internal investigation or review.  Neither section makes any mention of losing one's right to

---

[11] At this point, it is unknown if all Program Guides containing a specified code (e.g., "WFB1707") are identical.  The fact that the sample Program Guide in the record contains additional code markings (i.e., "REV00 (7/14)") suggests there may be subversions.  Again, discovery will provide clarity.

bring suit, which would be easy if that were truly the intent.  Whether Wells Fargo must conduct

an internal review or investigation is entirely distinct from Plaintiffs' access to the courts.

New York courts require an especially high standard of clarity to enforce purported

conditions precedent in contracts.  "Conditions are not favored under New York law, and in the

absence of ***unambiguous*** language, a condition will not be read into the agreement."  *Ginett v.*

*Computer Task Grp., Inc.*, 962 F.2d 1085, 1099-100 (2d Cir. 1992) (emphasis added); *see also*

*Bank of N.Y. Mellon Trust Co. v. Morgan Stanley Mortg. Capital, Inc.*, 821 F.3d 297, 305 (2d

Cir. 2016) ("Conditions precedent are not readily assumed . . . . [The law] demands that

conditions precedent be expressed in ***unmistakable*** language") (emphasis added); *Kidder*

*Peabody & Co. v. Unigestion Int'l, Ltd.*, 903 F. Supp. 479, 501 (S.D.N.Y. 1995) ("a contractual

duty is not to be construed as a condition precedent unless the language of the contract ***clearly***

imposes such a condition") (emphasis added).

Here, Sections 5.2 and 5.11 do ***not*** unambiguously, clearly, and unmistakably create a

condition precedent to bringing suit; in fact, they make ***no mention whatsoever*** of merchants'

rights to bring suit, any impact the timing of raising concerns with Wells Fargo would have on

the right to bring suit, immunity from liability, or any other such language.  *Cf. DiCroce v. Wells*

*Fargo Bank, N.A.*, No. 13-CV-1768, 2014 WL 4904458, at *6 (E.D.N.Y. Sept. 30, 2014)

(rejecting Wells Fargo entity's argument that a contractual provision permitting the bank to

"hold any insurance proceeds until after it has had an opportunity to inspect" hazard claims

constituted a condition precedent when there was "nothing that *specifies* that such a hazard claim

must be established before Insurance Proceeds are released") (emphasis added); *ACE Capital Re*

*Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 31 (2d Cir. 2002) (enforcing plainly

written condition precedent: "As a condition precedent to any right of action hereunder . . . .");

*Travelers Cas. & Sur. Co. v. Dormitory Auth.-State of N.Y.*, 735 F. Supp. 2d 42, 75 (S.D.N.Y. 2010) ("The language of §11.01(B)(2) clearly mandates that a contractor's failure to follow the process set forth in §11.01(A) will result in 'a waiver by the Contractor of all claims for additional compensation or damages'").

Wells Fargo cannot now conjure a requirement that it failed to draft into the text of these sections. *See Vornado Realty Trust v. Marubeni Sustainable Energy, Inc.*, 987 F. Supp. 2d 267, 277 (E.D.N.Y. 2013) ("[W]hen the meaning of a contract is plain and clear, it is entitled to be enforced according to its terms and not to be subverted by straining to find an ambiguity which otherwise might not be thought to exist.") (quoting *Uribe v. Merchants Bank of N.Y.*, 693 N.E.2d 740, 743 (N.Y. 1998)); *accord Wells Fargo Bank, N.A. v. Bank of Am., N.A.*, No. 11 CIV. 4062 JPO, 2013 WL 372149, at *8 (S.D.N.Y. Jan. 31, 2013).

Even under the most generous reading of these sections for Wells Fargo, the language of S 5.2 and 5.11 is at best ambiguous.  By definition, ambiguous language cannot be clear and unmistakable, and under well-established law, any such ambiguity must be resolved in Plaintiffs' favor, since Wells Fargo drafted the form Program Guides.  *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 67 (2d Cir. 2000) ("Under New York law, equivocal contract provisions are generally to be construed against the drafter.") (citing *Shaw v. Mfrs. Hanover Trust Co.*, 68 N.Y.2d 172, 176 (N.Y. 1986)).  Wells Fargo, as the drafter of these sections, ***could*** have made clear that they created a condition precedent to bringing suit, if that was truly the intent.  Instead it chose to include nothing at all about the subject in either section.

Wells Fargo cites to the district court decisions in *Benex* and *Zam & Zam*.  Respectfully, the district courts in those cases misapplied applicable law on this issue and failed to adequately consider the language of the sections at issue there.  Of course, neither of those decisions is

31

binding on this Court.  *Leser v. U.S. Bank Nat'l Ass'n*, No. 09-CV-2362 KAM, 2014 WL 2154993, at *3 (E.D.N.Y. May 22, 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 547 F.3d 109, 112 (2d Cir. 2008)).  In *Benex*, the enforceability of the notice provision was not addressed by the Second Circuit on appeal.  *Benex LC v. First Data Merch. Servs. Corp.*, 695 F. App'x 12, 15 (2d Cir. 2017) (summary order resolving case on contract terms unique to that contract and not addressing notice issue).  An appeal of the district court's decision in *Zam & Zam* is currently pending.  *Zam & Zam*, Notice of Appeal, Dkt. No. 53 in Case No. 2:16-cv-06370 (Second Circuit Appeal No. 17-3571).

*Udell v. Berkshire Life Ins. Co. of Am.*, cited by Wells Fargo, actually ***undermines*** Wells Fargo's argument here by further illustrating of the type of language Wells Fargo ***could have*** drafted into its form agreement if it had intended to create conditions precedent to suit.  In *Udell*, the contract stated that if a condition were not met, defendant's "liability will be limited to a refund of premium," and that if a further condition were not met, "the policy will be voided."  No. CV032721SJFKAM, 2005 WL 1243497, at *5 (E.D.N.Y. May 25, 2005).[12]

### c.  Sections 5.2 and 5.11 Are Inapplicable to the Charges Here.

Whether and when Plaintiffs gave notice of improper fees is inconsequential for the additional reason that §§ 5.2 and 5.11, by their own terms, do not apply to Plaintiffs' claims.

Section 5.2.  This provision establishes a permissive process for merchants to submit "questions regarding any Non-Qualified fee."  *If* a merchant has a question, it is directed to "submit a Non-Qualified Fee Inquiry (NFI) request in writing . . . within 90 days from the mail date (post mark) of the monthly statement in question."  NFI requests received after 90 days

---

[12] The other case Wells Fargo cites merely states, in conclusory fashion, that the plaintiff failed to meet one or more conditions precedent, and includes no analysis or even the text of the pertinent provision. *MRW Constr. Co. v. City of N.Y.*, 223 A.D.2d 473, 474 (N.Y. App. Div. 1996).

"may not be considered for refund review."  Section 5.2 does ***not*** compel Plaintiffs to investigate

Non-Qualified Fees or notify Wells Fargo of any discrepancies in such fees.[13]  Plaintiffs here do

not have "questions" regarding Non-Qualified Fees; rather, now that they have been informed by

counsel what occurred to them, they allege Wells Fargo's entire deliberate, systemic scheme of

imposing and then concealing such upcharges is unlawful.  SAC ¶¶ 122-24.  Wells Fargo's

attempt to expand Section 5.2 to affirmatively require merchants to investigate and submit

questions about upcharges Wells Fargo has hidden but itself knows full well about, lacks merit.

Section 5.11.  This provision tasks merchants with reviewing statements and other

documents "reflecting Card transaction activity, including, activity in your Settlement Account."

Thus, merchants must compare "Card transaction activity" as reflected in their statements from

Wells Fargo with their own records and raise any discrepancies promptly.

This requirement makes practical sense because: (a) merchants like Plaintiffs are

uniquely positioned to confirm the transactions that occurred in their stores, and to note any

discrepancies; and (b) adjustments may affect parties beyond the merchant and Wells Fargo (e.g.,

the customer who made the purchase and the credit card company that is getting paid), making

prompt resolution important.  The same is ***not*** true for charges like "non-qualified" upcharges,

surcharges, and flat monthly service fees, which are levied directly by Wells Fargo and not split

with any third party.  Wells Fargo is in the best position to know if and when it is levying these

fees, and such fees have no potential impact on any third parties.  Therefore, there is neither any

need for merchants to alert Wells Fargo that these charges have been assessed—since it already

knows full well it has programmed its systems to assess these fees—nor any reason why these

---

[13] That Section 5.2 establishes a permissive (not mandatory) process is echoed by the form Application,
which states, "if you have a question regarding a particular additional fee that was assessed to you for a
Non-Qualified Transaction, you ***may*** also write to us at . . ."  SAC, Ex. C at 18 (emphasis added).

issues would need to be raised within the truncated 60-day window.

Interpreting Section 5.11 to require merchants to timely investigate and report discrepancies in "Card transactions" comports with the plain language of the provision as well as the intent behind it.  SAC ¶¶ 126-29 (noting industry experts who have dealt with Wells Fargo have stated that reporting of card transaction errors is the reason for the provision).  This is also confirmed by Wells Fargo's actions, as it often refunds fees that are disputed outside the 60-day window which it would not, of course, do if the provision applied to fees.  SAC ¶¶ 130-31, 164.

Wells Fargo argues that since Section 5.11 requires merchants to provide timely notice as to adjustments to the merchant's "Settlement Account" and such term is defined to include "fees," the provision requires merchants to promptly investigate and provide timely notice of any wrongfully assessed fees.  Mot. at 23-24.  The sample Program Guide does define "Settlement Account" as: "An account or account(s) at a financial institution designated by Client as the account to be debited and credit by Processor or Bank for Card transactions, fees, chargebacks and other amounts due under the Agreement or in connection with the Agreement."  However, this definition merely confirms the obvious: the merchant's (i.e., "Client's") linked bank account is where all credits and debits of every kind will be posted.  This definition does nothing to alter the plain language of Section 5.11, which identifies "your Settlement Account" as simply one example of a place where "Card transaction activity" is reflected.

Thus, the reference to "activity in your Settlement Account" does not expand the merchant's investigation requirement to activity that is unrelated to "Card transactions," such as wrongfully assessed service fees.  Such an interpretation would render the provision's explicit reference to "Card transaction activity" meaningless and without effect.  *See LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) ("In interpreting a

contract under New York law . . . the contract 'should be construed so as to give full meaning and effect to all of its provisions'" and "'an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.'" (quoting *Shaw Group, Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121, 124 (2d Cir. 2003))).  The first sentence of Section 5.11 advises merchants to carefully review documents "reflecting *Card transaction activity*, including activity in your Settlement Account." SAC, Ex. B, at 10 § 5,11 (emphasis added).  Thus, merchants must promptly look at all documents reflecting "Card transaction activity," regardless of whether such documents relate to activity reflected in the Settlement Account, and seek adjustments promptly.  Wells Fargo's proposed interpretation would effectively write the term "Card transaction activity" out of Section 5.11.[14]

At the very least, the provision is ambiguous as to whether it applies to fees such as those at issue here.  *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir. 2005) ("An ambiguous term is one that is reasonably susceptible to more than one reading, or one as to which reasonable minds could differ." (citing *Van Wagner Adver. Corp. v. S&M Enters.*, 492 N.E.2d 756, 758-59 (N.Y. 1986))).  Dismissal based on an ambiguous contract term would be improper.  *E.g.*, *Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 784 F.3d 78, 86 (2d Cir. 2015) ("On a motion to dismiss a breach of contract claim, we should resolve any contractual ambiguities in favor of the plaintiff." (internal quotation marks omitted)); *Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 53 (2d Cir. 2012) ("a claim predicated on a materially ambiguous contract term is not dismissible on the pleadings" (citation omitted)).

**d.** **Sections 5.2 and 5.11 Would Be Unenforceable Here Even If**

---

[14] Plaintiffs are aware that Judge Feuerstein adopted Wells Fargo's proposed interpretation in the unpublished *Zam & Zam* decision (currently on appeal).  In that case, however, the plaintiff did not allege that industry experts had confirmed the intent of the notice requirement was to uncover errors in card transactions, or that the defendant repeatedly refunded fees not disputed within the time period provided.

**They Did Apply.**

Even if Sections 5.2 and 5.11 are deemed to be applicable conditions precedent that Plaintiffs have not fulfilled (all of which Plaintiffs dispute), they would be unenforceable.  First, Plaintiffs have alleged that Wells Fargo fraudulently induced them to enter the contract.  SAC ¶¶ 294-304.  If this claim succeeds, any contractual notification requirements (along with the remainder of the contract) are voidable at Plaintiffs' option.  *Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co.*, 263 F.3d 26, 31 (2d Cir. 2001).  It would be inappropriate to dismiss Plaintiffs' claims by enforcing provisions in the very contract that was allegedly fraudulently procured. *E.g.*, *Centronics Fin. Corp. v. El Conquistador Hotel Corp.*, 573 F.2d 779, 782 (2d Cir. 1978); *In re Bennett Funding Group, Inc.*, 220 B.R. 743, 754 (N.D.N.Y. Bankr. 1997) ("A claim of fraud in the inducement may be a defense to the enforceability of a contract which, if supported by sufficient evidence, will preclude entry of summary judgment in a suit to enforce the contract"). Wells Fargo's reliance on *Zam & Zam* to try to refute this argument (Mot. at 22), is misplaced because *Zam & Zam* did not involve a fraudulent inducement claim at all.

Second, Sections 5.2 and 5.11 would be unenforceable, under well-settled law, to the extent Defendant's conduct prevented or delayed Plaintiffs from discovering the overcharges at issue.  *Cross & Cross*, 886 F.2d at 501; *A.H.A. Gen. Constr. v. N.Y.C. Hous. Auth.*, 92 N.Y.2d 20, 31 (N.Y. 1998) ("[It] is a well-settled and salutary rule that a party cannot insist upon a condition precedent, when its non-performance has been caused by himself" (internal quotation marks omitted)).  "Put another way, a party to a contract cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition."  *A.H.A.*, 92 .N.Y.2d at 31 (internal quotation marks omitted).

Here, Plaintiffs allege in detail that Wells Fargo systematically concealed from Plaintiffs and the other customers the higher "non-qualified" fee rates that were being charged for the

majority of their transactions—including: (a) misrepresenting and concealing the upcharge scheme in the form materials Wells Fargo provided; and (b) implementing a "billback" scheme whereby the customers' monthly statements (the place they are supposed to be able to see what they have been charged and for what) were deliberately structured to, and did, conceal the upcharges from customers and falsely made it appear as if the promised, lower rates were being applied universally.  SAC ¶¶ 46-88, Exs. C-D; Shaw Decl., Ex. 7.

Wells Fargo's "billback" scheme (implemented for the purpose of preventing customers from knowing they had been charged the higher rates) alone makes dismissal based on the notice provisions inappropriate.  The SAC lays out the pertinent facts.  In each monthly statement, all transactions are listed as being billed at the lower rate.  It is only in the following monthly statement that Wells Fargo imposes additional "billback" charges which themselves are mislabeled and intentionally formatted by Wells Fargo to conceal the upcharges.  SAC ¶¶ 71-76.  Thus, merchants have no reasonable way to discover these upcharges.  SAC ¶¶ 84-86, 147, 175, 193, 211, 234, 253; Parkes Decl. ¶¶ 28-30.

Wells Fargo's systemic concealment prevented Plaintiffs from earlier discovering the upcharges, infecting not only their ability to know about and raise issues about this scheme (SAC ¶ 136), but also about the other periodic improper increases in rates and surcharge increases, which affected qualified and non-qualified rates and surcharges alike (SAC ¶¶ 91-92).  The monthly statements masked the true rates that were being charged for all of these rates and fees.  Customers simply had no way of reasonably knowing what Wells Fargo was doing to them or that they had been charged rates that were higher than promised, which is exactly how Wells Fargo wanted it and set things up.  Wells Fargo cannot now rely on Plaintiffs' inability to earlier identify the basis of their complaints, when Wells Fargo itself is responsible for that inability.

*Cross & Cross*, 886 F.2d at 501; *A.H.A.*, 292 N.Y.2d at 31.

Citing *Benex*, Wells Fargo argues that: (a) the fact that Plaintiffs ultimately learned something was amiss and cite examples of improper charges demonstrates that the monthly statements were not deceptive; and (b) the statements themselves bely any argument that Plaintiffs could not reasonably discover the upcharges.  Mot. at 23.  Both arguments lack merit.

First, Plaintiffs' counsel discovered the upcharge scheme and corresponding improper charges after a long investigation that included consulting with experts in the payments industry. The individual Plaintiffs each plead they were unaware of this scheme after reading their statements (SAC ¶¶ 149, 177, 193, 213, 236, 255), which is eminently plausible given the complex and deliberately misleading nature of the "billback" scheme and statements.[15]

Second, unlike the deliberately concealed "non-qualified" upcharge/billback scheme in this case, the charges at issue in *Benex* were readily discernable from the monthly statements there.  Plaintiff in *Benex* alleged defendant improperly retained fees associated with a refunded transaction of a specific amount, but the monthly statement there showed a credit reversal for that exact amount.  2016 WL 1069657 at *4.  In other words, in *Benex* the monthly statement did not obscure the transaction(s) resulting in overcharges, allowing the district court to find that those monthly statements put the plaintiff on notice of the alleged overcharges.  Here, by contrast Wells Fargo cannot point to, and does not even try to point to, anything in Plaintiffs' monthly statements that clearly (or even unclearly) show it was charging higher rates on virtually all card transactions.  Nor did *Benex* involve a situation where, as here, the monthly statements actually affirmatively **misstate** the rates that Plaintiffs were charged.  SAC ¶¶ 68, 74-76.  Here, Wells Fargo's statements told Plaintiffs they were being charged a lower rate than they were actually

---

[15] While Plaintiffs believed something was amiss before talking to their attorneys, none of them reasonably could have, or did, figure out the upcharge/billback scheme independently.

charged, and then Wells Fargo snuck the upcharges in the next month's statement in a way that by its own design mislabeled and concealed these upcharges.

### e.  In All Events, Plaintiffs Properly Allege Compliance.

Even assuming Sections 5.2 and/or 5.11 are applicable, enforceable, and conditions precedent to suit—all of which Plaintiffs dispute (*supra* Parts IV.3.a–d)— dismissal is inappropriate because Plaintiffs allege compliance.  "In pleading conditions precedent, it suffices to allege generally that all conditions precedent have occurred or been performed."  Fed. R. Civ. P. 9(c).[16]  Here, Plaintiffs allege "have performed all, or substantially all, of the obligations imposed on them under the contract."  SAC ¶ 291.  Wells Fargo's argument that more specifics are needed directly conflicts with the plain language of Rule 9(c) and case law applying it.  *E.g.*, *Harris v. City of N.Y.*, 186 F.3d 243, 251 (2d Cir. 1999); *Hildebrand v. Allegheny Cty.*, 757 F.3d 99, 112 (3d Cir. 2014) ("the pleading of conditions precedent falls outside the strictures of *Iqbal* and *Twombly*"); *Myers v. Cent. Fla. Invs., Inc.*, 592 F.3d 1201, 1224 (11th Cir. 2010) (post-*Twombly/Iqbal* decision concluding "general statement" that plaintiff had "fulfilled all conditions precedent to institution of this action" was "sufficient to discharge her duty under Rule 9").

Even if the general allegations of compliance in the SAC were not in-and-of-themselves sufficient, Queen City, Patti's Pitas, Ideal Sales, and Lytle Café each provide more specific allegations of timely written notice.[17]  SAC ¶ 137.  For example:

---

[16] In fact, some courts have held that Rule 9(c) "does not expressly require that the performance or occurrence of conditions precedent be pleaded by a claimant" at all.  *Mendez v. Bank of Am. Home Loans Servicing*, LP, 840 F. Supp. 2d 639, 647 (E.D.N.Y. 2012); *see also DiCroce*, 2014 WL 4904458, at *6 (discussing caselaw).

[17] Sections 5.2 and 5.11 do not make it clear when the 60- and 90-day clocks commence.  Section 5.2 starts the 90-day clock on the "mail date (post mark) of the monthly statement in question" but is silent as to statements sent electronically (as many Plaintiffs' statements were).  *E.g.*, SAC ¶ 155.  Section 5.11 starts the 60-day clock on the date "the debit or credit is, or should have been effected."  But the Program Guide Confirmation Page says the 60-day clock starts on "the date of *the statement* where the charge or

- <u>Queen City</u> notified Wells Fargo via email in February 2016, March 2016, and December 2016 that it had recently been charged several improper fees. SAC ¶¶ 158-61. These emails were sent within 60 days of Wells Fargo debiting the improper fees from Queen City's account.[18] SAC ¶¶ 145 ("non-qualified" upcharges imposed throughout), 157 (improper fees charged each month from October 2015 to October 2016); *compare also, e.g.,* SAC ¶¶ 153-56, 158-60 (February and March 2016 emails complaining of improper fees), *with* Shaw Decl. Ex. 7 (December 2015, January 2016, and February 2016 statements imposing disputed Statement, PCI, and Monthly Service Fees); *compare* SAC ¶ 156, 161 (December 2016 email complaining of PCI fees), *with* Shaw Decl., Ex. 7 (October – December 2016 statements imposing disputed PCI fees).

- <u>Patti's Pitas</u> summarized its grievances in the original complaint, which was filed on August 4, 2017, and served on Wells Fargo on August 14, 2017. SAC ¶ 183; Dkt. 1 (Complaint), ¶¶ 61-63. Wells Fargo thus received written notice within 60 days of seizing complained of PCI fees and within 90 days of seizing "non-qualified" upcharges fees from Patti's Pita's account. *See, e.g.,* SAC ¶¶ 173 ("non-qualified" upcharges imposed throughout), 179 (disputed PCI fees imposed on May 2017 statement, received in June 2017), 178, 182 ("billback" fees on virtually every monthly statement, including the June 2017 statement, received in July 2017).

- <u>Ideal Sales</u> sent a letter to Wells Fargo on August 30, 2017, complaining about what turned out to be "billback" charges that were assessed on its June 2017 statement (received in July 2017). SAC ¶ 224; *see also* SAC ¶ 210 ("non-qualified" upcharges imposed throughout). Ideal Sales provided further written notice of its dispute in the Amended Complaint, filed on October 6, 2017. SAC ¶ 225; Dkt. 11, ¶¶ 147-54.

- <u>Lytle Café</u> was a current customer at the time the Amended Complaint and SAC were filed, and was being subjected to improper fees on an ongoing basis. SAC ¶¶ 25, 233, 237, 241. It initially provided written notice of its grievances via the October 6, 2017 Amended Complaint. SAC ¶¶ 244, 155-64. Such notice was provided well within 90 days of Wells Fargo's imposition of disputed "billback" fees, which in fact continue to be assessed monthly. SAC ¶¶ 233, 241.

Wells Fargo argues that Plaintiffs fail to allege that any notices "were submitted pursuant to the NFI request procedure explained in Section 5.2." Mot. at 19. Wells Fargo suggests that unless notice was provided pursuant to the exact content and formatting procedure set forth in Section 5.2, it is ineffective. First, Section 5.2 ostensibly applies only to non-qualified fees, and

---

[18] funding appears for Card Processing." Shaw Decl., Ex. 3 at #4 (emphasis added). Statements, however, are not dated. *E.g.,* Shaw Decl., Ex. 7. The contracts are ambiguous as to when the clocks began, so any "close calls" as to whether notice is timely must await discovery.

[18] It is Plaintiffs' understanding that Wells Fargo typically debits fees from merchants' account in the middle of the month following the month when such fees were assessed. *See, e.g.,* SAC ¶ 159 (January 2016 fees debited from Queen City account on February 10, 2016).

not to other fees at issue.  Second, Section 5.2 is clear that the *only* ramification of submitting timely written notice in another manner is that Wells Fargo has a longer time to respond.  SAC, Ex. B, § 5.2 ("NFI requests not received in accordance with the foregoing shall not be subject to the response times set forth in this Section").  Section 5.2 certainly does not state (or even imply) that timely written notices are entirely ineffective just because they do not precisely follow the NFI format and content, and any such consequence would be unsupported and grossly harsh.

Section 5.11 does not impose any content or formatting requirements, requiring only that notice be in writing and given within 60 days.  SAC, Ex. B, § 5.11.  Plaintiffs' notices comply with both elements.  *Contrast Zam & Zam*, pp. 35-36 (plaintiff did not plead compliance); *Benex*, 2016 WL 1069657, at *4 (E.D.N.Y. Mar. 16, 2016) (plaintiff admittedly failed to comply).

### 4.   The Shortened Statute of Limitations Clause (Section 24.4) Does Not Bar Plaintiffs' Claims.

Wells Fargo also argues that Section 24.4 of the sample Program Guide—which purports to impose a shortened, one-year statute of limitations period—bars ***certain*** of the Plaintiffs' contract claims.  Wells Fargo concedes that some of the Plaintiffs' claims could not be barred even under Wells Fargo's reading of that clause.  Mot. at 32 ("With the possible exception of a few examples . . .").[19]  And Wells Fargo does not attempt to invoke Section 24.4 to challenge Plaintiffs' fraudulent inducement or unjust enrichment claims.  *See supra* Part IV.3, p. 28.  Even so limited, Wells Fargo's invocation of this clause fails for multiple reasons.

First, it would be premature to dismiss any of Plaintiffs' claims based on a contractual provision when there is no clear evidence that such a provision actually appears in each Plaintiff's Program Guide, none of which are in the record.  *See supra* Part IV.3.a.

Second, even assuming *arguendo* this provision is in all of the Plaintiffs' Program Guides

---

[19] For example, Wells Fargo does not raise any statute of limitations challenge as to Patti's Pitas.

and is enforceable, most of the Plaintiffs unquestionably brought their contract claims within one-year of incurring challenged charges.  The initial complaint in this case was filed by Patti's Pitas, LLC and Queen City Tours on August 4, 2017, and the First Amended Complaint, which added the remaining four Plaintiffs was filed on October 6, 2017.  All Plaintiffs except Dr. Babbitt were assessed improper fees within the calendar year preceding the filing of their respective allegations.  *See* Shaw Decl., Ex. 7 (Queen City statements showing numerous challenged fees within the year prior to filing suit in August 2017); SAC ¶¶ 22, 145, 148, 157, 161, 163 (alleging overcharges to Queen City in October and December 2016 and "non-qualified" upcharges "throughout the time" it was using Wells Fargo's services through 2017); SAC ¶¶ 21, 173, 176-79 (alleging improper fees to Patti's Pitas in 2017, including "non-qualified" upcharges "throughout the time" it was using Wells Fargo's services); SAC ¶¶ 24, 210, 212-21, 224 (same for Ideal Sales); SAC ¶¶ 26, 252, 254-255, 260-61 (same for Indian Tree); SAC ¶¶ 25, 233, 235, 241-42 (Lytle Café charged improper fees in late 2016 and 2017 including "non-qualified" upcharges "throughout the time" it has been using Wells Fargo's services);.  Thus, even if the truncated limitations period were enforceable, five of the six Plaintiffs allege facts supporting that they filed well within that period.

Wells Fargo's argument that the SAC lacks sufficient detail regarding the dates the charges were incurred lacks merit.  The SAC alleges explicit date ranges and months when the charges were being ***continually*** assessed in each monthly statement.  *E.g.,* SAC ¶¶ 48 ("***All remaining transactions***" receive the higher rate) (emphasis in original), 71 ("Defendant craftily formats *all* of its monthly statements to confuse merchants") (emphasis added), 44, 74, 87, 145 ("These higher rates and surcharges were charged for transactions *throughout* the time [Plaintiff] was using Defendant's processing services" (emphasis added), 173, 196, 210, 233, 252 (same).

Alleging ranges rather than listing each individual month within those ranges is absolutely appropriate given the charges were systematically assessed each month.  Wells Fargo's insistence on more detail rings particularly hollow given that it has full access to all of the billing records regarding Plaintiffs, and thus can verify the accuracy of Plaintiffs' allegations.  The five Plaintiffs' specific allegations of compliance with Section 24.4 are undoubtedly sufficient at the pleading stage.  Wells Fargo will have its opportunity to try to disprove them.[20]

Moreover, Section 24.4 would be unenforceable here in any event—either as a basis for dismissing any Plaintiff's contract claims altogether or as a basis for reducing their entitlement to damages—for many of the same reasons discussed above regarding the notice provisions.  *See supra* Part IV.3.d.  Under New York law, provisions in a form contract of adhesion that purport to reduce the otherwise applicable time period in which the non-drafting party may bring a claim will not be enforced where that would "unreasonably deprive the plaintiff of a course of action." *Certified Fence Corp. v. Felix Indus., Inc.*, 260 A.D.2d 338, 339 (N.Y. App. Div. 1999).  Such a provision can be unenforceable even if "freely agreed to by the parties" if its application is particularly unreasonable under the circumstances.  *Id.*  Here, Wells Fargo deliberately concealed its "non-qualified" upcharge scheme, including through its "billback" process which misrepresented and concealed the actual rates being charged in the statements, so that Plaintiffs and other customers would not be able to discover the overcharges.  SAC ¶¶ 46-88.  Only once Plaintiffs consulted counsel (and counsel consulted experts) could it be determined why and how they had been charged so much.  To permit Wells Fargo to exploit its deceptive conduct to escape or limit its liability based on Section 24.4 would unreasonably deprive Plaintiffs of justice under the circumstances.  Just as the limitations period freely agreed to in *Certified Fence* was

---

[20] Plaintiffs could easily amend to add more details once they are provided detailed transaction and billing data, but Plaintiffs submit that their current allegations are absolutely sufficient at this stage.

unenforceable when combined with another clause that effectively deprived the plaintiff of

redress, Section 24.4 applied in combination with the billback scheme and Wells Fargo's other

efforts to conceal the overcharges would be unenforceable.  260 A.D.2d at 339.  Moreover, as

with the notice provisions, to the extent Wells Fargo is found to have fraudulently induced

Plaintiffs' agreement to their contracts, Defendant cannot properly rely on a provision in that

same contract to escape liability.  *Golden*, 807 F. Supp. at 1164.

### C.     Plaintiffs' Unjust Enrichment Claim Is Well Pled in the Alternative.

Plaintiffs properly allege all of the elements of an unjust enrichment claim, namely that:

"(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience

militate against permitting defendant to retain what plaintiff is seeking to recover."  *Briarpatch*

*Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004); SAC ¶¶ 305-10.

Wells Fargo does not appear to dispute this, but instead argues that Plaintiffs cannot raise

unjust enrichment because the parties' relationship is governed by contract.  However, the SAC

makes clear that this claim was "brought in the alternative and is contingent on Defendant's

contracts with Plaintiffs and the Class members being deemed ineffective, inapplicable, void, or

unenforceable.  In such scenario, unjust enrichment will dictate that Defendant disgorge all fees

unjustly received."  SAC ¶ 306.

Such alternative pleading is appropriate here, because Plaintiffs allege their agreement to

the contract was fraudulently induced; if Plaintiffs prevail on that claim, one potential remedy is

rescission.[21]  *See Burton v. Iyogi, Inc.*, No. 13-CV-6296, 2015 WL 4385665, at *11 (S.D.N.Y.

---

[21] "Under New York law, rescission is available as a remedy if a party can show that it was fraudulently
induced to enter into the contract."  *Merhej v. I.C.S. Int'l Custody Sys., Inc.*, 2014 WL 104908, at *4
(S.D.N.Y. Jan. 9, 2014), *report and recommendation adopted*, 2014 WL 948108 (S.D.N.Y. Mar. 11,
2014); SAC, ¶¶ 303-04, Prayer for Relief, ¶ 5.  Wells Fargo argues that Plaintiffs cannot obtain
rescission even if the fraudulent inducement claim was proven because it has provided Plaintiffs with

Mar. 16, 2015) ("[W]here, as here, there are allegations of fraud in the inducement and a dispute as to whether a valid contract exists, parties can and routinely do plead in the alternative fraud, unjust enrichment, and breach of contract."); *Lefkowitz v. Reissman*, No. 12-CV-8703, 2014 WL 925410, at *12 (S.D.N.Y. Mar. 7, 2014) (plaintiff permitted to plead unjust enrichment and breach of contract in the alternative where "although express agreements governed the transactions through which Reissman allegedly unjustly enriched himself," plaintiff alleged the contract was fraudulently induced which would render the contract potentially voidable); *Tropical Sails Corp. v. Yext, Inc.*, No. 14-CV-7582, 2015 WL 2359098, at *7 (S.D.N.Y. May 18, 2015) (same).  The cases cited by Wells Fargo (Mot. at 34-35) either did not involve or did not consider allegations that the contract at issue was fraudulently induced.

> ### D.  **Plaintiffs Should Be Given Leave to Cure Any Deficiencies.**

Should the Court determine that any of Plaintiffs' claims are subject to dismissal, Plaintiffs respectfully request leave to amend.  *Hayden v. Cty. of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999) ("When a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint.").  The Court has not previously ruled on the sufficiency of Plaintiffs' allegations. While Plaintiffs believe their allegations in the SAC are absolutely sufficient, additional details (e.g., additional dates charges were imposed; the precise dates Plaintiffs were provided with the processing proposals) can be added, though respectfully discovery will allow Plaintiffs to provide these dates with even further precision based on Wells Fargo's data and records.

## V.  **CONCLUSION**

For the foregoing reasons, Wells Fargo's motion should be denied in its entirety.

---

services that "cannot be undone."  Mot. at 22 n.10.   It is premature to resolve this issue, but even assuming *arguendo* full rescission were ultimately not appropriate here (which Plaintiffs do not concede), that still would not categorically preclude applying equitable principles to fashion a remedy.  For example, gaps in the parties' contracts created by voided provisions could be filled using equitable considerations.

Dated: February 7, 2018

**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**

*/s/  David S. Stellings*
David S. Stellings
New York Bar No. 2635282
dstellings@lchb.com
Avery S. Halfon
New York Bar No. 5418017
ahalfon@lchb.com
250 Hudson Street, 8th Floor
New York, NY 10013
Tel: (212) 355-9500

Roger N. Heller (Admitted *Pro Hac Vice*)
California Bar No. 215348
rheller@lchb.com
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111
Tel:  (415) 956-1000

**WEBB, KLASE & LEMOND, LLC**

*/s/  E. Adam Webb*
E. Adam Webb (Admitted *Pro Hac Vice*)
Georgia Bar No. 743910
Adam@WebbLLC.com
1900 The Exchange, S.E., Suite 480
Atlanta, GA 30339
Tel: (770) 444-0773

*Attorneys for Plaintiffs*