**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PATTI'S PITAS, LLC, QUEEN CITY TOURS, MARK A. BABBITT, DDS, INC., IDEAL SALES, INC., LYTLE CAFÉ, and INDIAN TREE CHIROPRACTIC, P.C., individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>v.<br><br>WELLS FARGO MERCHANT SERVICES, LLC,<br><br>                    Defendant. | CIVIL ACTION NO.<br><br>1:17-cv-04583 (AKT) |

## <u>MEMORANDUM OF LAW IN SUPPORT OF UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT</u>

E. Adam Webb
Georgia Bar No. 743910
Adam@WebbLLC.com
Matthew C. Klase
Georgia Bar No. 141903
Matt@WebbLLC.com
WEBB, KLASE & LEMOND, LLC
1900 The Exchange, S.E.
Suite 480
Atlanta, GA 30339
Tel: (770) 444-0773

Roger N. Heller
California Bar No. 215348
rheller@lchb.com
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Tel: (415) 956-1000

David S. Stellings
New York Bar No. 2635282
dstellings@lchb.com
Avery S. Halfon
New York Bar No. 5418017
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Tel: (212) 355-9500

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

I.     Factual Background ................................................................................................. 3

II.    Procedural History ................................................................................................. 3

      A.    Pre-Filing Investigation and Initiation of Litigation. ............................. 3

      B.    Motion to Dismiss Briefing and Decision. ............................................ 4

      C.    Extensive Discovery Process. ................................................................. 4

      D.    Settlement Negotiations. ......................................................................... 6

      E.    Preliminary Settlement Approval. .......................................................... 7

III.   The Settlement Terms .......................................................................................... 7

      A.    The Settlement Class................................................................................ 7

      B.    The Relief. ............................................................................................... 8

            1.    Settlement Fund. ......................................................................... 8

            2.    Practice Changes. ..................................................................... 10

      C.    Attorneys' Fees and Expenses and Service Awards. ........................... 11

      D.    Release. .................................................................................................. 11

IV.  The Notice Program Directed by the Court Is Being Implemented and Satisfies All Applicable Standards. ................................................................... 12

V.    The Response from the Settlement Class Has Been Very Positive. ................. 14

ARGUMENT ................................................................................................................... 14

I.     Overview of the Class Settlement Approval Process. ...................................... 14

II.    Rule 23(e)(2) and the *Grinnell* Factors. ........................................................... 15

III.   The Settlement Is Fair, Reasonable, and Adequate and Should Be Approved. ............... 16

      A.    The Settlement Is the Product of Arm's-Length Negotiations by Experienced Counsel and Is Informed by Extensive Discovery and Litigation (Fed. R. Civ. P. 23(e)(2)(B); *Grinnell* Factor 3). ................. 16

      B.    Plaintiffs and Class Counsel Have Zealously Represented the Class (Fed. R. Civ. P. 23(e)(2)(A)). ............................................................... 18

## TABLE OF CONTENTS
### (continued)

Page

C.  The Settlement Represents a Strong Result for the Settlement Class, Particularly Given the Substantial Risk and Challenges They Face (Fed. R. Civ. P. 23(e)(2)(C); *Grinnell* Factors 1 & 4-9). ..................................... 18

D.  The Settlement Treats Settlement Class Members Equitably (Fed. R. Civ. P. 23(e)(2)(D)). ........................................................................................... 20

E.  The Reaction of the Class to the Settlement to Date Has Been Very Positive (*Grinnell* Factor 2). ........................................................................ 21

F.  The Additional Rule 23(e) Factors Support Granting Preliminary Approval. ............................................................................................................ 21

IV.  The Court Should Reaffirm Certification of the Settlement Class. ............................... 22

A.  The Requirements of Rule 23(a) Are Satisfied. ........................................... 22

1.  Numerosity (Rule 23(a)(1)) ................................................................ 22

2.  Commonality (Rule 23(a)(2)) ............................................................. 23

3.  Typicality (Rule 23(a)(3)) ................................................................... 23

4.  Adequacy of Representation (Rule 23(a)(4)) ................................... 23

B.  The Requirements of Rule 23(b)(3) Are Satisfied. ...................................... 24

1.  Predominance. ....................................................................................... 24

2.  Superiority. ............................................................................................. 25

CONCLUSION ........................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)......................................................................................... 25

*Butler v. Sears, Roebuck & Co.*,
702 F.3d 359 (7th Cir. 2012) ........................................................................... 25

*Denney v. Jenkens & Gilchrist*,
230 F.R.D. 317 (S.D.N.Y. 2005), *aff'd in relevant part sub nom. Denney v. Deutsche Bank
AG*, 443 F.3d 253 (2d Cir. 2006) ...................................................................... 25

*Ft. Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*,
301 F.R.D. 116 (S.D.N.Y. 2014) ................................................................ 22, 23

*Gutierrez v. Wells Fargo Bank, N.A.*,
730 F. Supp. 2d 1080 (N.D. Cal. 2010) .............................................................. 6

*In re Checking Account Overdraft Litig.*,
286 F.R.D. 645 (S.D. Fla. 2012)......................................................................... 6

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009) .............................................................................. 23

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
279 F.R.D. 151 (S.D.N.Y. 2011) ...................................................................... 17

*In re Namenda Direct Purchaser Antitrust Litig.*,
462 F. Supp. 3d 307 (S.D.N.Y. 2020) ............................................................... 16

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
No. 05MD1720MKBJO, 2019 WL 6875472 (E.D.N.Y. Dec. 16, 2019) .................... 15, 16, 21

*In re U.S. Foodservice Inc. Pricing Litig.*,
729 F.3d 108 (2d Cir. 2013) ............................................................................ 24

*Marisol A. v. Giuliani*,
126 F.3d 372 (2d Cir. 1997) ............................................................................ 23

*Passafiume v. NRA Grp., LLC*,
274 F.R.D. 424 (E.D.N.Y. 2010).......................................................................... 23

*Roach v. T.L. Cannon Corp.*,
778 F.3d 401 (2d Cir. 2015) ............................................................................ 25

*Tyson Foods, Inc. v. Bouaphakeo*,
136 S. Ct. 1036 (2016)..................................................................................... 24

*Velez v. Majik Cleaning Serv., Inc.*,
No. 03 Civ. 8698(SAS)(KNF), 2007 WL 7232783 (S.D.N.Y. June 25, 2007) ................. 20

**TABLE OF AUTHORITIES**
(continued)

Page

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005) ................................................................................... 15

**Statutes**

28 U.S.C. § 1715 ................................................................................................... 13

**Other Authorities**

Fed. R. Civ. P.
   23(a) ..................................................................................................... 22, 24

Fed. R. Civ. P.
   23(a)(1) ......................................................................................................... 22

Fed. R. Civ. P.
   23(a)(2) ......................................................................................................... 23

Fed. R. Civ. P.
   23(a)(3) ......................................................................................................... 23

Fed. R. Civ. P.
   23(a)(4) ......................................................................................................... 23

Fed. R. Civ. P.
   23(b)(3) ............................................................................................ 22, 24, 25

Fed. R. Civ. P.
   23(c)(2)(B) .................................................................................................... 14

Fed. R. Civ. P.
   23(e) .............................................................................................................. 14

Fed. R. Civ. P.
   23(e)(1) ..................................................................................................... 7, 14

Fed. R. Civ. P.
   23(e)(1)(B) .................................................................................................... 15

Fed. R. Civ. P.
   23(e)(2)(A) .................................................................................................... 18

Fed. R. Civ. P.
   23(e)(2)(B) .................................................................................................... 16

Fed. R. Civ. P.
   23(e)(2)(C) .................................................................................................... 18

Fed. R. Civ. P.
   23(e)(2)(C)(ii) ............................................................................................... 21

Fed. R. Civ. P.
   23(e)(2)(C)(iii) .............................................................................................. 22

## TABLE OF AUTHORITIES
### (continued)

**Page**

Fed. R. Civ. P.
  23(e)(2)(c)(iv) ................................................................................................. 7

Fed. R. Civ. P.
  23(e)(2)(D) ...................................................................................................... 20

Fed. R. Civ. P.
  23(e)(3) ............................................................................................................. 7

Fed. R. Civ. P.
  23(h) ................................................................................................................ 22

## INTRODUCTION

The Court previously granted preliminary approval of the Settlement reached by the parties in this action, and approved the proposed notice program.  *See* Dkt. 61.  Notice has been, and is being, disseminated to the Settlement Class as directed by the Court.  By this motion, Plaintiffs respectfully request that the Court conduct a final review of the Settlement, and approve the Settlement as fair, reasonable, and adequate.

As previously reported, the Settlement here is the product of more than three years of hard-fought litigation and arms-length negotiations involving complex and challenging factual and legal issues.  It follows extensive discovery conducted by the parties.  And, most importantly, it will provide valuable monetary and non-monetary benefits to customers of Defendant Wells Fargo Merchant Services, LLC ("WFMS" or "Defendant") that were allegedly overcharged for payment processing services.[1]

Pursuant to the Settlement, WFMS has agreed to pay up to **$40 million** to cover cash payments to the Settlement Class Members as well as to cover notice and administration costs, attorneys' fees and expenses, and service awards.  Settlement Class Members that are Current Customers will receive checks *automatically*, without the need to submit a claim or take any other action.  Former Customers are eligible to receive cash payments by submitting a very simple claim form, without any documents to substantiate their claim.  In addition, WFMS has also agreed to important practice changes, including:  (a) continuing to allow customers to switch, penalty-free, from WFMS's "fixed" pricing plan to its "standard" pricing plan for more than 18 months; and (b) modifying its contract terms so customers will not have to pay early termination fees to leave WFMS within 45 days of being assessed new non-pass-through fees or

---

[1] All capitalized terms have the meanings afforded them in the Settlement, which is on file at Dkt. 58-2, Ex. A.

any increase to such fees.  These are critical benefits for class members that remain customers of WFMS.  Indeed, it is estimated that if all class members eligible to switch pricing plans take advantage of this benefit, they would collectively save in excess of **$50 million annually** in processing costs.

By any objective measure, the Settlement presented for the Court's consideration is fair, reasonable, and adequate.  Moreover, the Settlement provides for a robust notice program (previously approved by this Court), including individual notice to Settlement Class Members, which has been, and is being, implemented by the Settlement Administrator in accordance with this Court's Preliminary Approval Order.

The reaction of the Settlement Class thus far has been very positive, further supporting the conclusion that the Settlement is fair, reasonable and adequate.  Direct notice has been sent to the Settlement Class via mail and email.  The deadline to opt-out or object is June 8, 2021.  As of May 5, 2021, only three Settlement Class Member have opted-out and zero objections have been submitted.  By contrast, as of May 5, 2021, 16,633 claims by Former Customers have already been submitted (in addition to the 85,756 Current Customer accounts that will be issued payments without the need to submit a claim), with two rounds of reminder emails still to come in advance of the claims deadline.

For the foregoing reasons and the others detailed below, the Settlement meets the standards for final settlement approval and should be approved.[2]

---

[2] Plaintiffs are authorized to state that WFMS does not oppose the relief requested in this motion. The arguments and contentions contained herein, however, are attributable solely to Plaintiffs.

# BACKGROUND

## I.      Factual Background

Plaintiffs are six small business merchants that retained WFMS to process credit and debit card payments made by their customers.  Plaintiffs allege that WFMS fraudulently induced them to enter into contracts by failing to properly disclose the true payment processing rates and charges that would apply, and then breached their contracts and the implied covenant of good faith and fair dealing by increasing rates and fees and by imposing certain fees and charges that were improper and/or not adequately disclosed.  *See generally* Dkt. 18 (Second Amended Complaint).  Plaintiffs filed this case on behalf of themselves and a nationwide class of merchants that are current and former WFMS customers.  WFMS vehemently denies Plaintiffs' allegations.

## II.      Procedural History

### A.      Pre-Filing Investigation and Initiation of Litigation.

Following an extensive investigation by counsel that included a thorough review of WFMS sales materials and customer billing statements, this case was originally filed by Plaintiffs Patti's Pitas, LLC and Queen City Tours on August 4, 2017.  *See* Dkt. 58-2 (Joint Declaration of Class Counsel ("Joint Decl.")) ¶¶ 11-13; *see also generally* Dkt. 1.  The case received attention in the media and many additional WFMS merchants contacted counsel.  After further investigation by counsel, which included discussions with industry experts, Plaintiffs filed their First Amended Complaint on October 6, 2017, adding several additional allegations and four additional named plaintiffs, Mark A. Babbitt, DDS, Ideal Sales, Inc., Lytle Café, and Indian Tree Chiropractic, P.C.  Joint Decl. ¶¶ 17-18; Dkt. 11.   After WFMS requested Court permission to move to dismiss the First Amended Complaint (Dkt. 15), Plaintiffs filed their operative Second Amended Complaint on November 28, 2017.  Dkt. 18.

B.      **Motion to Dismiss Briefing and Decision.**

On February 21, 2018, WFMS moved to dismiss Plaintiffs' Second Amended Complaint, and included with its motion more than 400 pages of supporting exhibits.  Dkt. 23.  WFMS argued that Plaintiffs' claims should be dismissed because, *inter alia*:  the express terms of the contract permitted WFMS's conduct; Plaintiffs' claims were barred by the contractual statute of limitations; applicable state law barred implied covenant claims that are duplicative of contract claims; Plaintiffs failed to meet the heightened pleading standard for fraudulent inducement claims; and applicable law barred unjust enrichment claims in the presence of a contract.  *See id.* Plaintiffs opposed WFMS's motion with thorough briefing and their own exhibits.  Dkt. 25. WFMS replied, including with its reply approximately 200 pages of additional exhibits.  Dkt. 26. Extensive legal research and investigation were required for this briefing, given the number and complexity of the issues raised.  Joint Decl. ¶¶ 20-25.

On July 24, 2018, the Hon. Gary R. Brown held a hearing on WFMS's motion to dismiss. Following a lengthy discussion of the issues at the hearing, on July 25, 2018, Judge Brown entered an order denying WFMS's motion to dismiss without prejudice to WFMS renewing its arguments at a later stage.  *See* Electronic Order (dated July 25, 2018).  On January 17, 2020, this case was reassigned to the Hon. A. Kathleen Tomlinson.

C.      **Extensive Discovery Process.**

Following the Court's ruling on the motion to dismiss, WFMS filed an Answer and Affirmative Defenses to Plaintiffs' Second Amended Complaint on August 21, 2018 (Dkt. 34), and the parties began to conduct discovery.  Plaintiffs propounded 84 requests for production of documents as well as written interrogatories on WFMS.  WFMS, in turn, propounded dozens of requests for production and interrogatories on Plaintiffs.  The parties thereafter served responses to the discovery and counsel met and conferred on many occasions about the requests and the

objections thereto.  Through those efforts, the parties were successfully able to resolve numerous discovery disputes without the need for Court intervention.  These efforts resulted in multiple sets of supplemental responses and additional productions.  Joint Decl. ¶¶ 29-34.

Counsel for the parties also negotiated a detailed protocol for the collection and production of electronically stored information ("ESI"), a confidentiality order, and negotiated extensively regarding the scope and nature of the customer data that WFMS would produce, including substantial back-and-forth concerning the ESI terms Defendant would run and the custodians and databases on which such terms would be run.  Joint Decl. ¶ 35.

The ESI and document productions in this case have been enormous.  In all, WFMS has produced more than 460,000 pages of internal emails and other documents, as well as extremely voluminous customer data.  Class Counsel spent more than two thousand hours reviewing and analyzing these documents and data.  Supplemental Joint Declaration of E. Adam Webb and Roger N. Heller ("Supp. Joint Decl.") ¶ 32 (filed herewith).  Class Counsel also took the deposition of WFMS's Senior Vice President of Marketing and Customer Communications, Tracey Fanelli, in California, and WFMS deposed two of the named Plaintiffs, Queen City Tours and Indian Tree Chiropractic, P.C., in Colorado and North Carolina, respectively.  Joint Decl. ¶ 42.  Further, while the parties were able to resolve almost all of their discovery disputes without the need for Court intervention, on September 27, 2019, Plaintiffs moved to compel WFMS to provide substantive responses and productions for seven requests for production and one interrogatory to which WFMS had objected.  Dkt. 43.  The Court denied Plaintiffs' motion to compel without prejudice and ordered the parties to continue to meet and confer.  *See* Electronic Order, Oct. 8, 2019.  Through further meet and confer efforts, the parties were able to resolve their outstanding discovery disputes.  Joint Decl. ¶ 49.

D.      **Settlement Negotiations.**

The parties engaged in two formal mediation sessions in this case, both with widely-

respected and experienced mediator Hunter R. Hughes.  *See* Dkt. 58-3 (Declaration of Hunter

Hughes ("Hughes Decl.")); Joint Decl. ¶¶ 39-59.  The two sessions occurred on September 12,

2019, and July 20, 2020.  In preparation for both of these sessions, Plaintiffs engaged expert

Arthur Olsen of Cassis Technology, LLC to help them analyze the voluminous customer data

produced by WFMS for the purpose of estimating class damages.[3]  The parties also exchanged

multiple rounds of voluminous mediation statements that addressed the most significant merits

and class certification issues at issue in the litigation.  Joint Decl. ¶¶ 39-59.

Both sessions were entirely arms-length, adversarial, and extremely hard-fought.  Hughes

Decl. ¶¶ 8-10; Joint Decl. ¶ 59.  The first session did not result in a resolution.  During the

second session—which followed extensive additional discovery, a substantial effort by Plaintiffs

to marshal the evidence identified from WFMS's voluminous document productions, and the

production by WFMS of updated customer data (i.e., for the time period since the first session)—

Mr. Hughes presented a mediator's proposal on the class monetary terms which both parties

accepted.  Hughes Decl. ¶¶ 10-12; Joint Decl. ¶¶ 57-58.  After reaching agreement on the class

monetary terms, the parties worked hard over several months negotiating the non-monetary relief

(i.e., practice changes) included in the Settlement, drafting the written agreement and the various

exhibits thereto, working on the Notice Program, and identifying the proposed Settlement

Administrator through a competitive bid process.  The parties negotiated and reached agreement

---

[3] Mr. Olsen is a well-respected expert renowned for his ability to isolate class-wide damages
from large data sets.  *E.g.*, *In re Checking Account Overdraft Litig.*, 286 F.R.D. 645, 650 n.4
(S.D. Fla. 2012)` (concluding Mr. Olsen has the "ability to calculate damages on an account-by-
account basis using the bank's own computerized records, a method upon which Mr. Olsen
previously relied, with court approval"); *Gutierrez v. Wells Fargo Bank, N.A.*, 730 F. Supp. 2d
1080, 1138-39 (N.D. Cal. 2010) (finding Olsen's methods to be "professional" and "careful").

regarding attorneys' fees and expenses and service awards only after reaching agreement on all other material terms of the Settlement.  Settlement ¶ 89; Joint Decl. ¶¶ 61-63; Hughes Decl. ¶ 13.

The Settlement averted several additional years of complex, contentious litigation.  Had the parties not accepted the mediator's proposal, they would have immediately proceeded to take an additional 10 depositions (many of which had already been scheduled), engage in expert discovery, and brief class certification and summary judgment.  Joint Decl. ¶ 65.  Instead, the Settlement provides much needed, immediate relief to small businesses, many of which are struggling with the impact of the COVID-19 pandemic.

### E.    Preliminary Settlement Approval.

On February 8, 2021, the Court entered an Order granting preliminary approval of the proposed Settlement, certifying the Settlement Class for settlement purposes, and directing that, under Fed. R. Civ. P. 23(e)(1), class notice be disseminated pursuant to the parties' proposed notice program.  Dkt. 61.

### III.   The Settlement Terms

The full Settlement terms are set forth in the Settlement Agreement, which is filed at Dkt. 58-2, Ex. A.[4]  The following is a summary of the Settlement terms.

### A.    The Settlement Class.

The Settlement Class, as certified by the Court, is defined as:

All merchants in the United States that contracted to receive payment processing services from Defendant and, from August 4, 2011 through the date of Preliminary Approval: (a) processed sales through a fixed pricing plan, (b) paid a statement billing fee, non-validation PCI compliance fee, and/or monthly minimum processing fee, or (c) processed sales through a pricing plan other than standard pricing (also known as "volume tier" or "simplified" pricing) and as of

---

[4] Pursuant to Fed. R. Civ. P. 23(e)(3) and 23(e)(2)(c)(iv), the only agreement made in connection with the proposed class action settlement in this case is the Settlement Agreement and Release itself.  Joint Decl. ¶ 83.

Preliminary Approval are not account-managed (which includes the premier services team).

Settlement ¶ 41.  Entities or persons affiliated with the Defendant or the Court are excluded.  *Id.*

**B.     The Relief.**

Both monetary relief and non-monetary relief (i.e., practice changes) will be provided to Settlement Class Members if the Court finally approves the Settlement.

1.     Settlement Fund.

Pursuant to the Settlement, WFMS will pay up to $40 million to establish a settlement fund which will provide cash benefits to the Settlement Class Members via mailed checks and also cover attorneys' fees and expenses, service awards, and notice and administration costs. Settlement ¶¶ 42, 71.  All of the 487,527 Settlement Class Members are eligible to receive a cash payment under the Settlement.  The 85,756 Current Customer accounts will automatically be issued payments without the need to submit a claim.  The 401,771 Settlement Class Members that are Former Customers are eligible to receive cash payments by submitting a simple claim form, without the need to submit any substantiating documentation.  Settlement ¶¶ 72-78, Ex. 1, Ex. 2C (claim form).  The notices sent to Former Customers inform them that they need to submit claims to receive payments.  Settlement Ex. 2, 4.  Former Customers may submit claims online, via the Settlement Website, or may alternatively submit claims by mail via the postage-prepaid claim form attached to their notice.  The deadline for Former Customers to submit claims ("Claims Deadline") is July 23, 2021.  Settlement ¶¶ 38, 58; Dkt. 61, ¶¶ 23, 41.  As discussed further below, two rounds of reminder emails will be sent in advance of the Claims Deadline. The precise amount of the settlement fund (up to $40 million) will depend on the number of valid claims submitted by Former Customers but, no matter how many claims are submitted, WFMS will under no circumstances pay less than $27 million.  Settlement ¶¶ 72-78.

There is good reason to pay Current Customers automatically while requiring Former Customers to file a claim.  Current Customers are active merchants (i.e., active business entities) for which WFMS maintains current address information.  Thus, a high percentage of the checks sent to such customers are likely to be cashed.  Former Customers, meanwhile, may not be active entities (e.g., the merchant may have gone out of business sometime during the past several years, including during this past year in connection with the pandemic) and the address information from WFMS may be outdated.  Thus, if checks were automatically sent to all of the Former Customers, the cash rate would likely be very low.  Joint Decl. ¶ 69.  The claim process thus allows Former Customers to provide updated address and payee information so as to ensure checks are routed to the correct location and recipients.  *Id.*

The cash payments will be calculated as described in the Allocation Formula attached as Exhibit 1 to the Settlement.  Settlement ¶ 73, Ex. 1.  To summarize:

- <u>Step One</u>:  The funds will first be allocated among three "Groups."  Of the "Net Settlement Amount" (i.e., the amount remaining in the settlement fund after payment of legal fees and expenses, service awards, and notice and administrative costs), 60% of that amount will be allocated to class members that processed sales through a "fixed" pricing plan during the Class Period ("Group 1"), 10% to members that paid a statement billing fee, non-validation PCI compliance fee, and/or monthly minimum processing fee during the Class Period ("Group 2"), and 30% to members not a part of Group 1 that processed sales through a pricing plan other than WFMS's Standard Plan during the Class Period ("Group 3").

- <u>Step Two</u>:  Next, within each of these Groups, the dedicated funds for that Group will be split among the members of that Group: 30% of the funds will be equally allocated on a *per capita* basis to each class member; 10% will be allocated *pro rata* based on the total number of calendar months each class member was a WFMS customer (or enrolled in fixed pricing, for Group 1) during the Class Period; and the remaining 60% will be allocated on a *pro rata* basis based on each class member's net sales processed through the fixed pricing plan (for Group 1) or through any WFMS non-Standard Plan (for Group 3), or the total At-Issue Fees paid (for Group 2), during the Class Period.

- Class members who receive a payment from the allocations to Group 1 or Group 3 may also receive payments from the allocation to Group 2.

This Allocation Formula was chosen by the parties to ensure that Settlement Class Members are fairly compensated relative to each other.  The applicable percentages under Step One are based on approximate percentage shares of total alleged class damages associated with the corresponding types of processing activity/charges for each of the three groups.  The allocation percentages under Step Two were chosen so that customers within each group that were exposed to more of the allegedly improper charges receive higher payments.  Joint Decl. ¶ 70.

        2.   <u>Practice Changes.</u>

The Settlement also provides significant non-monetary relief to the Settlement Class. Settlement ¶¶ 42-46.   WFMS instituted a new "standard" pricing plan in 2018, which for many merchants results in lower monthly processing costs than WFMS's "fixed" pricing plan. Pursuant to the Settlement, WFMS has agreed that, for at least 18 months after the Settlement's Effective Date, WFMS will continue to allow fixed plan customers to switch, without penalty, to the WFMS standard plan.  Settlement ¶¶ 42-44.  Based on WFMS's estimates of the potential average annual savings for eligible fixed pricing merchants that convert to standard pricing, the savings provided by this relief could exceed $50 million annually (or $150 million over the next three years).[5]  Supp. Joint Decl. ¶ 25.  Settlement Class Members that remain current fixed plan customers have been notified of their right to switch plans, penalty-free, on the class notices disseminated pursuant to this Settlement, and will also be notified of such right on each monthly statement they receive from WFMS for 18 months after the Settlement's Effective Date. Settlement ¶¶ 42-43.  WFMS will also make available customer service representatives who are well versed in the differences between the two pricing plans and are able to analyze whether the

---

[5] The savings, if any, for any individual merchant will vary depending on a number of factors, such as the type of business, the size and amount of future transactions, the duration of the merchant relationship, and other considerations.  Joint Decl. ¶ 68.

switch may be beneficial to a current customer based on an analysis of the merchant's prior card processing activity and expected future activity.  Settlement ¶ 44.

In addition, WFMS has agreed to amend the terms and conditions governing its merchant agreement so that current Settlement Class Members that are not account-managed or on the standard plan will now have 45 days after receiving notice of a WFMS-initiated fee increase or a WFMS-initiated new fee (i.e., non-pass-through fees) to terminate their accounts without payment of an early termination fee.  Settlement ¶¶ 45-46.  This is a significant achievement for merchants that would rather take their business elsewhere than be subjected to a new or increased WFMS fee.  Supp. Joint Decl. ¶ 26.

### C.  Attorneys' Fees and Expenses and Service Awards.

Under the Settlement, Class Counsel is permitted to seek attorneys' fees and reimbursement of litigation expenses in a total amount of one-third of the $40 million Settlement Amount (i.e., approximately $13.33 million).  Settlement ¶¶ 84-85.   However, Class Counsel is seeking less than that amount.  Class Counsel are filing herewith their fee application, requesting attorneys' fees equal to 30% of the $40 million (i.e., $12 million) plus reimbursement of $51,098.89 in litigation expenses.  Class Counsel are also requesting service awards of $15,000 for the two Plaintiffs who were deposed and $10,000 for the four Plaintiffs who were not deposed, to compensate them for the substantial efforts and commitment on behalf of the Settlement Class.  Any attorneys' fees, expenses, and service awards granted will be paid from the common Settlement Fund.  Settlement ¶ 71.

### D.  Release.

In exchange for the benefits afforded by the Settlement, Settlement Class Members will release WFMS from claims relating to the issues raised in this case or related to payment card

processing services through the date of preliminary approval of this Settlement.  The release is set forth in more detail in paragraphs 79-83 of the Settlement.

**IV.   The Notice Program Directed by the Court Is Being Implemented and Satisfies All Applicable Standards.**

The Notice program set forth in Section VI of the Settlement (Settlement ¶¶ 53-64) and approved by the Court in the Preliminary Approval Order (Dkt. 61, ¶¶ 15-22) has been, and is being, implemented.  *See generally* Declaration of Jason Rabe ("Rabe Decl.") (filed herewith). Such Notice program includes the following:

*Direct Notice to Settlement Class Members:*  Direct notice was sent to the entire Settlement Class.  Pursuant to the Court-approved Notice program, WFMS provided the Settlement Administrator a listing of the current or last known mail and email addresses of all Settlement Class Members, identifying those who are Current Customers and those who are Former Customers.  Rabe Decl. ¶¶ 7, 14.

By April 9, 2021 (the "Notice Deadline" set by the Court, *see* Dkt. 61, ¶ 19), the Settlement Administrator timely sent direct notice to Settlement Class Members.  Specifically, for all Settlement Class Members for which an email address was reasonably available in WFMS's records, the Settlement Administrator timely sent direct email notice to their last known email address.  Rabe Decl. ¶¶ 9, 16.  For Settlement Class Members for which an email address was not reasonably available in WFMS's records, or for which email notice was attempted but was not successful, the Settlement Administrator timely sent notice via a postcard notice mailed to their last known mailing address in WFMS's records or, as applicable, a more current address available through the United States Postal Service National Change of Address database.  Rabe Decl. ¶¶ 8, 10, 15, 17.  The Settlement Administrator has and is attempting to locate updated address information for mailed postcard notices returned as undeliverable,

resending postcards to any such located addresses.  Rabe Decl. ¶¶ 11, 18-19.  As of the filing of

this motion, individual notice has been successfully delivered to 100% of Settlement Class

Members that are Current Customers and 95.4% of Former Customers.  Rabe Decl. ¶¶ 13, 21.

> *Settlement Website and Toll-Free Number*:   The Settlement Administrator timely

established the Settlement Website (https://MerchantServicesSettlement.com), which includes a

detailed long-form notice, key case documents, and additional information.  Former Customers

can electronically submit claims for payments via the Settlement Website.  *See*

https://MerchantServicesSettlement.com/Claim-Form.  The Settlement Administrator also timely

established a toll-free telephone line that Settlement Class Members can call with questions.  As

of the filing of this motion, the Settlement Website has received 46,683 unique visitors and the

toll-free telephone line has received 1,530 calls.  Rabe Decl. ¶¶ 22-23.

> *Reminder Emails to Former Customers:*   Pursuant to the Settlement and this Court's

Preliminary Approval Order, the Settlement Administrator will send two reminder emails to

Former Customers, reminding them to submit a claim.  The first reminder email will be sent by

May 24, 2021 (15 days prior to the opt-out/objection deadline).  *See* Dkt. 61 ¶¶ 21, 41;

Settlement ¶ 62, Ex. 4.  The second reminder email will be sent by July 3, 2021 (20 days before

the Claims Deadline).  Former Customers have until July 23, 2021 (the Claims Deadline) to file

claims.  *See* Dkt. 61 ¶¶ 24, 41; Settlement ¶ 7.  Class Counsel proposed these additional reminder

notices be sent to ensure Former Customers that wish to claim their part of the Settlement are

reminded to do so on a timely basis.  Joint Decl. ¶ 61.

> *CAFA Notice:*   Notice was sent to the appropriate government entities in compliance with

the Class Action Fairness Act, 28 U.S.C. § 1715.  Rabe Decl. ¶ 4.

The Court-approved Notice program satisfies all applicable standards, including Fed. R. Civ. P. 23(e)(1) and 23(c)(2)(B).  The fees and costs of the Settlement Administrator, in implementing the notice and claims programs, mailing the settlement checks, and performing the other administrative tasks described in the Settlement, will be paid from the common settlement fund.  Settlement ¶ 71.  The Settlement Administrator's current estimate for notice and administration costs is $280,708.  Rabe Decl. ¶ 28.

## V.   The Response from the Settlement Class Has Been Very Positive.

The response from the Settlement Class to date has been very positive.  The deadline to opt-out or object is June 8, 2021.  As of May 5, 2021, only three Settlement Class Members have opted-out and zero objections have been submitted.  Rabe Decl. ¶¶ 26-27.[6]  By contrast, as of May 5, 2021, 16,633 claims by Former Customers have already been submitted (in addition to the 85,756 Current Customer accounts that will be issued payments without the need to submit a claim), with two rounds of reminder emails still to come in advance of the July 23, 2021 Claims Deadline.  Rabe Decl. ¶¶ 7, 25.

## ARGUMENT

## I.   Overview of the Class Settlement Approval Process.

Pursuant to Rule 23(e), a class action settlement must be approved by the court before it can become effective.  The process for court approval is comprised of two principal steps:

(1)   Preliminary approval of the proposed settlement and direction of notice to the class; and

(2)   A final approval hearing, at which argument concerning the fairness, adequacy, and reasonableness of the settlement is presented.

---

[6] The final numbers of opt-outs and objections will be provided to the Court in advance of the July 22, 2021 Final Approval Hearing.  Pursuant to the procedure established by the Court in the Preliminary Approval Order, the parties will address in their reply papers any objections that may be submitted before the June 8, 2021 objection deadline.  *See* Dkt. 61, ¶ 31.

In granting preliminary approval of the Settlement and directing that notice be disseminated to the Settlement Class, the Court took the first step in the process. Moreover, as summarized above, the Settlement Administrator has been and is implementing the Notice program as directed by the Court. Dkt. 61; *see also generally* Rabe Decl. By this motion, Plaintiffs respectfully request that the Court take the final step by granting final approval of the Settlement. Preliminary approval required the Court to determine that it would "likely be able to … approve the proposal under Rule 23(e)(2)." Fed. R. Civ. P. 23(e)(1)(B). Nothing has since undermined this Court's initial findings that final approval would be likely; in fact, the positive reaction of the Settlement Class to the Settlement has further substantiated the Court's initial conclusions and further support final approval.

## II.      Rule 23(e)(2) and the *Grinnell* Factors.

The Second Circuit has a "strong judicial policy in favor of settlements, particularly in the class action context." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005). The ultimate touchstone for final approval of a class action settlement is whether the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). To make that assessment, courts in this Circuit consider the standards set forth in Rule 23(e) and the "*Grinnell* factors." *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05MD1720MKBJO, 2019 WL 6875472, at *14 (E.D.N.Y. Dec. 16, 2019) (granting final approval to class settlement about merchant fees, and citing *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974)).

Rule 23(e)(2) requires courts to consider whether:

(A) the class representatives and class counsel have adequately represented the class;
(B) the proposal was negotiated at arm's length;
(C) the relief provided for the class is adequate, taking into account:
    (i)  the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).  Courts in the Second Circuit Courts have also traditionally considered the nine *Grinnell* factors:

(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*In re Payment Card*, 2019 WL 6875472, at \*14 (citing *Grinnell*, 495 F.2d at 463).

"There is significant overlap between the Rule 23(e)(2) and *Grinnell* factors, which complement, rather than displace each other."  *Id.*  "The factors set forth in Rule 23(e)(2) have been applied in tandem with the Second Circuit's *Grinnell* factors and focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal."  *In re Namenda Direct Purchaser Antitrust Litig.*, 462 F. Supp. 3d 307, 311 (S.D.N.Y. 2020) (granting final approval).

III.    **The Settlement Is Fair, Reasonable, and Adequate and Should Be Approved.**

A.      **The Settlement Is the Product of Arm's-Length Negotiations by Experienced Counsel and Is Informed by Extensive Discovery and Litigation (Fed. R. Civ. P. 23(e)(2)(B); *Grinnell* Factor 3).**

"A strong initial presumption of fairness attaches to a proposed settlement if it is reached by experienced counsel after arm's-length negotiations, and great weight is accorded to counsel's recommendation."  *In re Namenda*, 462 F.Supp.3d. at 311; *accord Wal-Mart*, 396 F.3d at 116. The Settlement here is the product of arms' length negotiations by the Parties through multiple

sessions with an experienced mediator, Hunter R. Hughes.  Dkt. 61, ¶ 5.  After the second

session, Mr. Hughes presented a mediator's proposal regarding monetary terms, which the

parties accepted.  Hughes Decl. ¶¶ 10-12.  The parties thereafter worked hard to negotiate the

non-monetary relief terms, draft the written Settlement Agreement and exhibits, and select the

proposed Settlement Administrator.  Joint Decl. ¶¶ 61-62.

Throughout the negotiations, the parties were represented by experienced and well-

qualified counsel on both sides.  Class Counsel here have extensive experience prosecuting and

resolving class actions and other complex cases, including cases against payment processing

companies and other financial institutions.  Joint Decl. ¶¶ 3-8, 79, Ex. B; *see also* Supp. Joint

Decl. ¶¶ 17-19.   Indeed, Class Counsel were uniquely situated to analyze the strengths and

weaknesses of this case, given their particular experience pursuing class action litigation against

payment processing companies for alleged overbilling and improper charges.  *Ibid*.

Moreover, as the Court previously recognized, the Settlement here comes after significant

litigation—including a litigated motion to dismiss—and substantial investigation, discovery, and

expert damages analysis.  Dkt. 61, ¶ 5.  These discovery efforts included consultation with

industry and damages experts, reviewing and analyzing more than 460,000 pages of documents

and ESI and voluminous raw data produced by WFMS, deposing WFMS's marketing executive,

and written discovery requests.  *See generally* Joint Decl, Supp. Joint Decl.; *see also supra*

Background § II.C.  Thus, in negotiating the Settlement, Class Counsel were well informed about

the facts and law specific to this case, and well situated to evaluate the relative strengths and

weaknesses of the parties' positions, and to negotiate a fair, reasonable, and adequate settlement.

*See In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 160 (S.D.N.Y. 2011)

(presumption of fairness where parties were represented by experienced counsel and the case

"proceeded well into…discovery before settlement was reached.").

### B.     Plaintiffs and Class Counsel Have Zealously Represented the Class (Fed. R. Civ. P. 23(e)(2)(A)).

Plaintiffs and Class Counsel have prosecuted this action on behalf of the Settlement Class

with vigor and dedication for more than three years.  *See* Dkt. 61, ¶ 5.  As detailed above, Class

Counsel have thoroughly investigated the factual and legal issues involved, conducted extensive

discovery, and engaged in substantial litigation of the legal issues in furtherance of prosecuting

the claims here.  Likewise, Plaintiffs were actively engaged—each produced pertinent

documents, responded to written discovery requests, and have communicated with Class Counsel

up to and including evaluating and approving the proposed Settlement.  Further, two of the

Plaintiffs were deposed by WFMS's counsel.

### C.     The Settlement Represents a Strong Result for the Settlement Class, Particularly Given the Substantial Risk and Challenges They Face (Fed. R. Civ. P. 23(e)(2)(C); *Grinnell* Factors 1 & 4-9).

The Settlement provides substantial monetary and non-monetary relief for the Settlement

Class.  *See* Dkt. 61, ¶ 6.  Pursuant to the Settlement, WFMS will pay up to $40 million (and in no

event less than $27 million) to create a settlement fund.  All Settlement Class Members that are

Current Customers of WFMS will automatically receive settlement payments, and all Settlement

Class Members that are Former Customers and that file a simple claim form will receive

settlement payments, with no substantiating documentation required.  Settlement ¶¶ 72-78.  In

addition to the monetary relief, WFMS has also agreed to important, valuable practice changes,

including: (a) committing, for at least 18 months after the Settlement's Effective Date, to

continue to allow existing "fixed" pricing plan customers to switch, penalty-free, to WFMS's

"standard" pricing plan, which is estimated to provide potential savings of more than $50 million

annually for these customers (or more than $150 million over three years); and (b) allowing existing customers in the Settlement Class to leave WFMS without paying an early termination fee within 45 days after the introduction of any new non-pass-through fee or any increase to any non-pass-through fee by WFMS.  Settlement ¶¶ 42-46.

Plaintiffs estimate that the $40 million monetary Settlement Amount, plus the approximately $150 million in potential savings from the first aspect of the non-monetary relief for three years, alone, represents approximately 28% of the class damages under the reasonable best case, proverbial "home run" scenario—i.e., if Plaintiffs and the Settlement Class were to overcome every affirmative defense, successfully obtain certification of a litigation class, prevail at trial on every claim, and hold on to that result through appeals.  Joint Decl. ¶ 78; Supp. Joint Decl. ¶ 25.

The result achieved for the Settlement Class here is particularly strong given the significant risks, challenges, and substantial complexities of continued litigation.  For example, while Judge Brown denied WFMS's motion to dismiss, that ruling was without prejudice and did not dispose of any of WFMS's arguments for dismissal.  Electronic Order, July 25, 2018 (stating that "many of the arguments raised by defendant could still prevail" at a later stage of the case). *Id.*  Even if they are able to overcome WFMS's numerous arguments for dismissal, Plaintiffs would face significant additional risks in establishing liability and damages.  Among the other arguments WFMS has advanced and/or indicated it would advance if the case proceeded are: (a) WFMS discloses the rates and charges in question in materials presented to customers at sign up; (b) WFMS discloses the charges in question in its monthly billing statements; (c) WFMS's rates are reasonably tied to its processing costs and other charges from third parties; and

(d) customers can avoid the charges through their own choices.  WFMS also has made clear that it would vigorously oppose certification of a litigation class.

While Plaintiffs believe that these obstacles are definitely surmountable, they are indicative of the substantial risks that Plaintiffs and the Settlement Class would face if the litigation were to continue.  The proposed Settlement provides considerable, appropriately tailored relief while allowing Settlement Class Members to avoid the risks of unfavorable, and in some cases dispositive, rulings on these and other issues.  The Settlement also provides another significant benefit that would not be available if the litigation were to continue—prompt relief. Proceeding to trial could add years to the resolution of this litigation, given the legal and factual issues raised and likelihood of appeals.  *See Velez v. Majik Cleaning Serv., Inc.*, No. 03 Civ. 8698(SAS)(KNF), 2007 WL 7232783, at *6 (S.D.N.Y. June 25, 2007) (proposed settlement "benefits each plaintiff in that he or she will recover a monetary award immediately, without having to risk that an outcome unfavorable to the plaintiffs will emerge from a trial").

### D.   The Settlement Treats Settlement Class Members Equitably (Fed. R. Civ. P. 23(e)(2)(D)).

Pursuant to the Settlement, all Settlement Class Members have the opportunity to receive a payment from the settlement fund pursuant to an Allocation Formula that is well-designed to ensure they will be fairly compensated relative to one another.  Settlement Ex. 1; Joint Decl. ¶ 70; *see also supra* Background § III.B.1; Dkt. 61, ¶ 7.  Moreover, the merchant-friendly practice changes that WFMS has agreed to—i.e., continuing to allow customers to switch from the "fixed" pricing plan to the "standard" plan, and  to allow more opportunity to terminate without penalty—will also provide significant benefits to Current Customers.  Settlement ¶¶ 42-46.   And while Former Customers are required to submit claims to receive payments, the claim process and claim form are simple and user-friendly (including the ability to submit claims online via the

Settlement Website), and having a claim process for Former Customers is reasonable and appropriate under the circumstances here given that many of them may no longer be in business and given the related practical unavailability of reliable contact and payee information.

   **E.    The Reaction of the Class to the Settlement to Date Has Been Very Positive (*Grinnell* Factor 2).**

   The deadline to opt-out or object is June 8, 2021.  As of May 5, 2021, only three Settlement Class Members have opted-out and zero objections have been submitted.  Rabe Decl. ¶¶ 26-27.  Settlement Class Members that are Current Customers will receive the benefits of the Settlement, including a mailed check, without taking any action so long as they do not opt out. The deadline for Settlement Class Members that are Former Customers to file claims is July 23, 2021.  As of May 5, 2021, 16,633 claims have already been filed, with two rounds of reminder emails still to be sent in advance of the Claims Deadline.  Rabe Decl. ¶¶ 25; Dkt. 61 ¶¶ 21, 41; Settlement ¶¶ 54, 62.  The positive reaction from the Settlement Class thus far further supports the conclusion that the Settlement is fair, reasonable, and adequate.  *See In re Payment Card*, 2019 WL 6875472, at *16 (granting final approval to settlement with 675 exclusion requests— accounting for 28% of transaction volume among the merchants in the class there—and 46 objections (plus 130 additional boilerplate objections), and citing cases concluding that low percentages of class members requesting exclusion or objecting strongly supported approval). Plaintiffs will provide updated claims, opt-out, and objection numbers, and the parties will submit a proposed final approval order, in advance of the July 22, 2021 Final Approval Hearing.

   **F.    The Additional Rule 23(e) Factors Support Granting Preliminary Approval.**

   The proposed method of distributing relief is simple and straightforward.  *See* Fed. R. Civ. P. 23(e)(2)(C)(ii) (court must consider "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims").

Settlement Class Members that are Current Customers will be automatically mailed checks, while Settlement Class Members that are Former Customers need only submit a short, simple claim form with an updated address to get their checks.  Claim forms can be returned via mail or filled out electronically via the Settlement Website, and the email notices and two reminder emails have a hyperlink to the appropriate page on the Settlement Website for submitting claims. Settlement ¶¶ 58-62, 72-78, Ex. 2, 4.

Rule 23(e)(2)(C)(iii) requires the Court to consider "the terms of any proposed award of attorney's fees, including timing of payment."  Here, Class Counsel are seeking attorneys' fees and expenses in a concurrently filed motion.  That motion (and this motion) will be available on the Settlement Website after filing, and Settlement Class Members will have the opportunity to comment on or object under Fed. R. Civ. P. 23(h) prior to the Final Approval Hearing.  As with the payments to Settlement Class Members, any attorneys' fees and expenses awarded by the Court will be paid from the settlement fund following the Effective Date of the Settlement.

**IV.   The Court Should Reaffirm Certification of the Settlement Class.**

The Court previously provisionally certified the Settlement Class as part of the Preliminary Approval Order.  Dkt. 61, ¶¶ 10-11.  The Court should reaffirm certification of the Settlement Class, for settlement purposes, in conjunction with final approval of the Settlement, because the standards of Rule 23(a) and Rule 23(b)(3) are satisfied.

**A.   The Requirements of Rule 23(a) Are Satisfied.**

1.   Numerosity (Rule 23(a)(1))

Rule 23(a)(1) requires that a proposed settlement class be "so numerous that joinder of all members is impracticable."  The Settlement Class here includes more than 400,000 merchants, making joinder impracticable. *See Ft. Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 131 (S.D.N.Y. 2014) (numerosity satisfied if 40 or more members).

2.      Commonality (Rule 23(a)(2))

Commonality under Rule 23(a)(2) is satisfied if there is at least one question of law or

fact that is common to the class.  *J.P. Morgan*, 301 F.R.D. at 131; *Passafiume v. NRA Grp., LLC*,

274 F.R.D. 424, 429 (E.D.N.Y. 2010) (commonality inquiry is "qualitative rather than

quantitative").  Even if there are some variations in the individual circumstances of the class

members, commonality will be generally be satisfied where, as here, the class' injuries "derive

from a unitary course of conduct."  *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997).  In

this case, Plaintiffs and the Settlement Class Members' claims all stem from alleged

programmatic billing practices by WFMS that are common to the class.  These claims involve

several common questions, including whether the charges in question are permitted by WFMS's

contracts and whether WFMS adequately disclosed the charges in question in form materials and

billing statements.  Commonality is satisfied.

3.      Typicality (Rule 23(a)(3))

Typicality under Rule 23(a)(3) requires that "each class member's claim arises from the

same course of events and each class member makes similar legal arguments to prove the

defendant's liability."  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir.

2009).  Typicality is satisfied here.  Plaintiffs' claims and those of the Settlement Class arise

from the same alleged programmatic billing charges and are based on the same legal theories.

4.      Adequacy of Representation (Rule 23(a)(4))

Adequacy under Rule 23(a)(4) turns on "whether (1) plaintiff's interests are antagonistic

to the interest of other members of the class and (2) plaintiff's attorneys are qualified,

experienced and able to conduct the litigation."  *Flag Telecom*, 574 F.3d at 35.  The adequacy

inquiry serves to uncover any "conflicts of interest between named parties and the class they

seek to represent."  *Id*.  There are no such conflicts here.  Moreover, Plaintiffs do not have any

interests antagonistic to other Settlement Class Members.  Further, Plaintiffs have retained counsel who are well-qualified and have extensive experience prosecuting and successfully resolving class action cases, including cases against payment processing companies and other financial institutions.  Joint Decl. ¶¶ 3-8, 79, Ex. B; Supp. Joint Decl. ¶¶ 17-19.  Class Counsel have vigorously litigated this action on behalf of the Settlement Class, conducted extensive investigation and discovery, negotiated the proposed Settlement, and have and will continue to fairly and adequately protect the interests of the Settlement Class.  Likewise, Plaintiffs have demonstrated their commitment to the Settlement Class, including by participating in discovery, communicating with Class Counsel, and reviewing and approving the proposed Settlement.

**B.     The Requirements of Rule 23(b)(3) Are Satisfied.**

In addition to the requirements of Rule 23(a), at least one of the prongs of Rule 23(b) must be satisfied.  Here, Plaintiffs seek certification of the Settlement Class, for settlement purposes, under Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

**1.     Predominance.**

"The predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'"  *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016).  Predominance "is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."  *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 118 (2d Cir. 2013).  At its core,

"[p]redominance is a question of efficiency." *Butler v. Sears, Roebuck & Co.*, 702 F.3d 359, 362 (7th Cir. 2012). Predominance is satisfied. The common issues—including whether the programmatic charges at issue are authorized by WFMS's contracts, and whether WFMS's sales materials adequately disclose the charges in question—predominate over any individualized questions. The only individual issues relate to damages, which can be systematically calculated. *See Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 409 (2d Cir. 2015) (individualized damages determinations "alone cannot preclude certification under Rule 23(b)(3)").

        2.     <u>Superiority.</u>

Class treatment is superior to other methods for the resolution of this case. Given the size of each Settlement Class Member's damages—which would be dwarfed by the expense of prosecuting a separate individual case—pursuit of individual claims is unlikely. In all events, Settlement Class Members remain free to exclude themselves from the Settlement Class if they wish to do so. It would be far more efficient for the Court and the parties to have a single resolution (as with the proposed Settlement here), rather than multiple separate cases about the same issues. Moreover, under the proposed Settlement, there will not need to be a class trial, meaning there are no potential concerns about any individual issues, if any, creating trial inefficiencies. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems … for the proposal is that there will be no trial."); *Denney v. Jenkens & Gilchrist*, 230 F.R.D. 317, 335 (S.D.N.Y. 2005), *aff'd in relevant part sub nom. Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant final approval of the proposed Settlement.

DATED this 7th day of May, 2021          Respectfully submitted,

WEBB, KLASE & LEMOND, LLC

BY: /s/ E. Adam Webb
E. Adam Webb*
Georgia Bar No. 743910
Adam@WebbLLC.com
Matthew C. Klase*
Georgia Bar No. 141903
Matt@WebbLLC.com
1900 The Exchange, S.E.
Suite 480
Atlanta, GA 30339
Tel: (770) 444-0773

LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP

BY: /s/ Roger N. Heller
Roger N. Heller*
California Bar No. 215348
rheller@lchb.com
275 Battery Street, 29th Floor
San Francisco, CA 94111
Tel: (415) 956-1000

David S. Stellings
New York Bar No. 2635282
dstellings@lchb.com
Avery S. Halfon
New York Bar No. 5418017
250 Hudson Street, 8th Floor
New York, NY 10013
Tel: (212) 355-9500

Attorneys for Plaintiffs

* Admitted *Pro Hac Vice*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 7th day of May, 2021, I caused the foregoing document to be

electronically filed with the Clerk of Court using the CM/ECF system which automatically sends

email notification of such filing to all attorneys of record.

<u>*/s/ E. Adam Webb*</u>
E. Adam Webb