**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PATTI'S PITAS, LLC, QUEEN CITY TOURS, MARK A. BABBITT, DDS, INC., IDEAL SALES, INC., LYTLE CAFÉ, and INDIAN TREE CHIROPRACTIC, P.C., individually and on behalf of all others similarly situated, | CIVIL ACTION NO. |
| Plaintiffs, | 1:17-cv-04583 (AKT) |
| v. | **SUPPLEMENTAL JOINT DECLARATION OF E. ADAM WEBB AND ROGER N. HELLER** |
| WELLS FARGO MERCHANT SERVICES, LLC, | |
| Defendant. | |

1. We are lead counsel for Plaintiffs in the above-referenced matter and submit this joint declaration in support of the motion for final approval of class settlement and motion for attorneys' fees, expenses, and service awards, and as a supplement to the joint declaration we previously filed with the Court (Dkt. 58-2). Unless otherwise noted, we have personal knowledge of the facts set forth in this declaration and could testify competently to them if called upon to do so.

2. The practice at both of our firms is to enter the time we spend on a matter (including contingency matters) on a daily basis. True and accurate copies of both firms' time records will be delivered to the Court. These records itemize the enormous amount of time our firms have spent on this case.

3. This work included extensive pre-suit investigation; communications with Plaintiffs and experts; preparing complaints, substantive legal briefs, and mediation briefs; attending hearings; taking substantial written discovery and reviewing, analyzing, and organizing over 460,000 pages of documents; preparing for and taking/defending lengthy depositions; exchanging extensive mediation damages discovery and analyzing voluminous billing data with

experts; preparing for and attending the first in-person mediation; mediating a second time; extensive negotiations regarding the practice change relief; negotiating and drafting the settlement agreement and exhibits thereto; preparing the settlement approval papers; working with the Settlement Administrator on the notice program and implementation efforts; and communicating with Settlement Class Members.

4. Each of the above-described efforts was essential to reaching the final approval stage of the Settlement before the Court. Indeed, our extensive knowledge, investigation, discovery, and briefing allowed us to better understand the merits of the claims and the damages of the Settlement Class, and the risks and challenges of ongoing litigation, and prepared us for the two mediation sessions. They also successfully positioned us to engage in vigorous, arms-length negotiations under the direction of mediator Hunter Hughes. Our work with the Settlement Administrator and communications with Settlement Class Members have confirmed that the notice program has been thorough and robust and that Settlement Class Members appreciate the litigation and the Settlement.

5. Since the Court entered its Preliminary Approval Order, we have worked extensively with Rust Consulting – the appointed Settlement Administrator – to ensure that the notice was disseminated to the Settlement Class in accordance with the notice program provided in the Settlement and directed by the Court's Preliminary Approval Order.

6. To that end, among other things, we have (a) reviewed and edited the email, postcard, and long form notices, the claim form, and the content of the settlement website and telephone IVR scripts; (b) ensured that notice was timely sent; (c) answered direct, individual inquiries from many Settlement Class Members via telephone and/or email; and (d) monitored those notices that could not be successfully delivered and the claims response, working

2

collaboratively with Defendant Wells Fargo Merchant Services, LLC's ("WFMS") counsel and the Settlement Administrator to accomplish these important implementation tasks.

7. We also have prepared (and will file) a motion for final approval and will appear at the final approval hearing.

8. If the Settlement is granted final approval, our work will continue well past the final approval hearing and not conclude until all claims are paid and the Settlement is fully implemented and consummated. Based on the planned timeline and our experience on class settlement implementation, this process will take several more months of additional work, including time answering questions from Settlement Class Members, overseeing cash distributions, ensuring that Defendant follows through on making the agreed-upon practice changes, and other important implementation tasks.

9. This case involved difficult factual issues. For instance, it was extremely challenging to determine the nature of many of the alleged overcharges because of WFMS's intricate contract (which exceeds 50 fine print pages) and monthly statements, as well as the complex manner in which payment processing fees are calculated and billed.

10. Indeed, certain fees are imposed by the processor (WFMS), while others are passed through from the card networks (Visa, MasterCard, Discover, etc.). The latter, often called "interchange" charges, are set by the card networks and supposed to be passed through at cost, yet many of the fees imposed on our clients that were labeled "IC" for interchange charges appeared to be non-pass through fees added by WFMS. Moreover, many such charges related to the prior month's activity, making it difficult to tie charges to particular transactions and determine what was contractually authorized and what was not.

11. Through interviews and reviewing thousands of pages of documentation from merchants that contacted us, several conversations with Roy Parkes, an expert specializing in investigating improper payment processor billing practices, additional investigation of publicly available information, and extensive legal research, we concluded that breach of contract and fraudulent inducement claims against WFMS were warranted.

12. Indeed, our investigation led us to conclude that WFMS's "fixed" pricing plan provided, despite its name, processing rates that regularly exceeded the supposedly "fixed" rates. Indeed, the disclosed "fixed" rates only applied to a handful of card types (out of hundreds of card types established by the card networks) and the majority of card sales actually incurred not only the "fixed" rate but also two extra rate surcharges established by WFMS, which collectively made the true processing costs for most card transactions considerably higher than the prominently disclosed "fixed" rate. Moreover, it appeared these additional rates were mis-labeled as pass through interchange charges and billed on the next month's statement (as opposed to the statement reflecting the actual card transactions).

13. The operative Second Amended Complaint filed in this case, which added nearly 100 new paragraphs of allegations, was the result of our extensive research and investigation, including numerous conversations with the Plaintiffs concerning their years' worth of interactions with WFMS.

14. The case also presented several novel legal issues. For example, the issues raised in WFMS's motion to dismiss were by no means settled and depended in large part of the Court's interpretation of the WFMS contracts and its conclusion as to whether the fine print authorized the alleged overcharges.

15. Other complex legal issues included whether the Plaintiffs had standing to assert their overbilling claims given the contractual notice requirement, whether the fraud claims could survive in light of the contract's integration clause, whether a nationwide Class of 487,527 merchants could be managed and certified – especially given Defendant's claims that the fraud and unjust enrichment claims implicated the laws of multiple states and the contracts were not uniform and had varied terms – and if so, whether damages for each Class Member could be calculated programmatically.

16. The detection of Defendant's purported overbilling and the positioning of this complex case for class certification and a victory on the merits presented challenges many law firms are simply not able to meet.

17. We have particular experience litigating class cases against payment processing companies and analyzing their complex contracts and data sets. Webb, Klase & Lemond, LLC ("WKL") has filed – and litigated to conclusion – several cases alleging payment processor overbilling. Some of these cases were successfully resolved. *See Champs Sports Bar & Grill Co. v. Mercury Payment Sys., LLC*, 275 F. Supp. 3d 1350 (N.D. Ga. 2017) (final approval of settlement); *Teh Shou Kao v. CardConnect Corp.*, No. 16-cv-5707, 2021 WL 698173 (E.D. Pa. Feb. 23, 2021) (same); *Al's Pals Pet Care v. Woodforest Nat'l Bank*, No. 4:17-CV-3852, 2019 WL 387409 (S.D. Tex. Jan. 30, 2019) (same); *Expert Auto Repair, LLC v. Payment Systems*, Los Angeles County Superior Court Case No. BC623856 (Jan. 23, 2019) (same); *Alghadeer Bakery & Market, LLC v. Worldpay US, Inc.*, N.D. Ga. Case No. 16-cv-3627-MLB (June 3, 2020) (same). Others were unsuccessful. *E.g.*, *Cobra Tactical, Inc. v. Payment Alliance Int'l, Inc.*, 315 F. Supp. 3d 1342, 1350-51 (N.D. Ga. 2018) (dismissing case).

5

18.     WKL and Lieff Cabraser Heimann & Bernstein, LLP ("LCHB") also both worked on a case against another First Data-controlled entity, Ignite Payments, which provided us with substantial experience assessing processor overbilling, but was ultimately unsuccessful. *Zam & Zam Super Market, LLC v. Ignite Payments, LLC*, 736 Fed. Appx. 274, 277-78 (2d Cir. 2018) (affirming dismissal of breach claim on grounds merchant did not provide timely notice of challenged fees in accordance with contract).

19.     This experience and expertise in this specific field of class action litigation was crucial in identifying and grappling with the numerous complex issues raised and to achieving a strong result for the Settlement Class Members.

20.     WFMS has been represented by skilled attorneys throughout this action. Indeed, Jarrod Shaw, Nellie Hestin, and Anastasia Cordova (among others) all have considerable experience defending class actions and a virtually encyclopedic knowledge of Defendant's practices and the payment processing industry. They are highly skilled adversaries and their inventive, tireless representation of Defendant makes the Settlement here all the more impressive.

21.     We also have first-hand knowledge how risky litigating against Wells Fargo can be, our firms having devoted thousands of hours and hundreds-of-thousands of dollars in out-of-pocket costs to another case alleging improper overdraft fees that has been pending (and aggressively litigated) since 2009.

22.     We knew that, in filing this case, we very well could be in for a similarly difficult, expensive fight, but took the case anyway despite the risks (and in spite of the fact that there were no other pending cases or government inquiries into the practices at issue). Indeed, it is believed that this is the first and only case brought against Defendant challenging the practices at

6

issue, despite the fact that merchant websites have for years included numerous complaints about such practices. Bringing these claims was by no means an easy or attractive undertaking.

23. The relief provided by the Settlement is substantial. In addition to the $40 million in cash being made available, the ability of current "fixed" pricing merchants to switch to the lower cost, simpler "standard" pricing plan will provide huge savings for those Settlement Class Members that take advantage of it. Indeed, rather than being subjected to a "fixed" rate that actually varies depending on whether a card transaction meets complicated, difficult to predict "qualification" criteria, transactions under the "standard" plan really are subject to fixed rates (regardless of such qualification criteria).

24. We worked hard to configure the Settlement so that it easy for "fixed" pricing merchants to make this switch, requiring that it be permitted without penalty, and that notice of this right not only be provided in the settlement notices but also on every billing statement for 18 months after the Settlement is finalized. Also, there are no complicated forms to fill out in order to make the switch; rather, all the merchant need do is call WFMS and ask to switch.

25. Based on WFMS's estimates, if every eligible "fixed" pricing customer converts to the standard pricing plan as allowed by the Settlement, the Settlement Class would see savings of in excess of $50 million annually (or $150 million over the next three years). This is meaningful relief that directly addresses the "fixed" pricing plan that we alleged to be the cause of so many of the purported overcharges.

26. In addition, as a result of this case, merchants also now have 45 days after receiving notice of a WFMS-initiated fee increase or a WFMS-initiated new fee (i.e., non-pass-through fees) to terminate their accounts without payment of an early termination fee, which is typically $500 (or $500 plus the cost of the merchant's most expensive month multiplied by six

7

for merchants who have processed over $1,000,000). This is a significant achievement for merchants who may want to switch payment processors in the face of new or increased WFMS fees.

27. As of the signing of this declaration, no objections have been filed in the case, nor have we received notice that any Settlement Class Members intend to object to the Settlement. The Settlement Class Members who have contacted us directly concerning the Settlement have given positive feedback. Moreover, as of the signing of this declaration, the Settlement Administrator reports that only three Settlement Class Members have requested exclusion (i.e., opted out).

28. At the outset of this case, our firms agreed to split all work and expenses on the case (as well as any fees, should there be a recovery) equally.

29. Our firms took this case entirely on a contingent basis, knowing that we would not be reimbursed for the substantial time and expenses the case would require unless we were successful in achieving a victory for the Class. In the case of WKL, such risk was amplified given the small size of the firm. Similarly, LCHB is far smaller than typical class action defense firms (including defense counsel here). Moreover, while the case was being litigated, both of our firms turned down additional fee-generating work because of the substantial time, attention, and costs required by this matter.

30. We request a fee of 30% of the $40 million Settlement Amount, or $12 million. We are not including, in the denominator for this percentage calculation, the substantial value of the practice changes achieved via the Settlement, even though such changes will undoubtedly save the Settlement Class Members who take advantage of these changes at least tens-of-millions of additional dollars.

31. Although the Settlement authorizes us to seek a higher fee percentage (33.33% of $40 million, or $13.33 million), and we believe such higher fee would be reasonable given the total relief (including the practice changes) and other circumstances of this case, we have decided to seek a lesser 30% fee award, which will make more cash available to the Settlement Class.

32. We have reviewed our firms' time records for this case. The time reflected in such records was necessary and reasonable to the prosecution and success of this case. Care was taken to avoid duplication of effort. For instance, after LCHB came on as co-counsel, we endeavored to split necessary tasks as equally as possible, taking advantage of each firm's particular resources and experience. Some tasks (such as reviewing and analyzing the 460,000 pages of documents produced by WFMS, which collectively took more than 2,000 hours) required more time than others.

33. The rates billed for professional services provided are our regular and customary rates for similar complex cases handled to date. These rates are in line with those that have been approved by this Court when cross-checking a percentage-of-fund fee in the context of a class action settlement. *E.g.*, *Tanski v. AvalonBay Communities, Inc.*, No. CV 15-6260(AKT), 2020 WL 2733989, *2 (E.D.N.Y. May 26, 2020) ("courts have approved, in class actions where the defendants have agreed to pay the specific attorneys' fees, a lodestar based on billable rates of between $405 and $790 for partners and $270 to $500 for associates") (Tomlinson, J.).

34. These rates are also in line with rates other courts in this District and elsewhere have approved as reasonable "for similar services by lawyers of reasonably comparable skill, expertise and reputation," *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984), including for our firms. For example, LCHB's customary rates, used for purposes of calculating the lodestar here,

9

have been approved by federal courts in this District and elsewhere in this Circuit. *See, e.g., Dover v. British Airways, PLC*, No. 12-cv-05567-RJD-CLP, Dkt. 321, 323 (E.D.N.Y. 2018) (awarding requested attorneys' fees); *Calibuso v. Bank of America Corp.*, No. 10-cv-01413-PKC-AKT, Dkt. 202 (E.D.N.Y. Dec. 27, 2013) (same); *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MC-2543 (JMF), 2020 WL 7481292, at *3 n.3 (S.D.N.Y. Dec. 18, 2020); *In Re: The Bank of New York Mellon ADR FX Litigation*, No. 16- 00212, Dkt. No. 161 (S.D.N.Y. June 17, 2019) (awarding requested attorneys' fees as "fair and reasonable and consistent with awards in similar cases"); *In Re: Bank of New York Mellon Corp. Forex Transactions Litigation*, No. 12-MD-2335, Dkt. 637 (September 24, 2015) (awarding requested attorneys' fees).

35. The following chart reflects the (a) name, (b) title, (c) current years of experience, (d) billing rate for complex cases, (e) hours worked through April of 2021, (f) estimated future hours to see this case to conclusion, and (g) lodestar, attributable to each attorney and other timekeeper who worked on this case. This summary information is supported by the daily time records that will be submitted to the Court.

| Name | Title | Experience | Rate | Hours | Future Hours | Lodestar |
|---|---|---|---|---|---|---|
| E. Adam Webb | Partner | 25 years | $695 | 863.9 | 86.4 | $660,458.50 |
| Roger Heller | Partner | 20 years | $775 | 329.1 | 32.9 | $280,550.00 |
| Matthew Klase | Partner | 19 years | $645 | 1,031.5 | 103.2 | $731,881.50 |
| G.F. Lemond | Partner | 16 years | $595 | 5.2 | 0.0 | $3,094.00 |
| Avery Halfon | Associate | 6 years | $485 | 192.6 | 19.2 | $102,723.00 |
| D. Grant Coyle | Associate | 4 years | $395 | 226.6 | 0.0 | $89,507.00 |
| Yun Swenson | Staff Atty | 3 years | $415 | 2,167.8 | 0.0 | $899,637.00 |
| Various | Paralegals | Various | $375 to $385 | 43.7 | 4.4 | $18,396.95 |

10

| Various | Litigation Support Specialists | Various | $420 | 78.4 | 0.0 | $32,928.00 |
|---------|-------------------------------|---------|------|------|-----|------------|
| **Total** | | | | **4,938.8** | **246.1** | **$2,819,175.95** |

36. We have conservatively estimated the future hours Class Counsel will devote to seeing this case to a final conclusion. These estimates, which are equivalent to ten (10%) percent of the hours expended to date for the attorneys and paralegals likely to continue working on this matter after April 30, 2021, are based on our experience overseeing and wrapping up similar class action settlements, including the similarly-configured settlements noted in Paragraph 17, *supra*. This time will include such tasks as (a) finalizing and filing the final approval motions, (b) continuing to answer direct, individual inquiries from Settlement Class Members via telephone and/or email, (c) continuing to monitor those notices that could not be successfully delivered and the claims response, (d) providing updated declarations to the Court from us and the Settlement Administrator concerning most recent notice and claim statistics, (e) responding to objections (if any), (f) preparing for, traveling to (as applicable), and participating in the final approval hearing, (g) litigating appeals (if any), (h) ensuring that WFMS complies with the Settlement and administers the required practice changes over the 18 months following the effective date of the Settlement, (i) overseeing cash distributions to Current Customers and Former Customers filing claims, (j) monitoring the administrator's invoices for services rendered and costs, and (k) to the extent funds remain after the first cash distribution, overseeing a second distribution to the Class and/or to the agreed-upon *cy pres* recipients (Settlement Agreement, ¶ 76).

37. Our firms' experience is described in Paragraphs 3 through 8 of our prior Joint Declaration (Dkt. 58-2) and the firm résumés cited therein (*e.g.*, Exh. B to Dkt. 58-2). The qualifications of the individual attorneys who worked on this case are summarized below.

38. E. Adam Webb is a member in good standing of the State Bar of Georgia and has been admitted to practice in Georgia state and federal courts, numerous federal circuit and district courts, and the Supreme Court of the United States. He received his undergraduate degree from Harvard and his law degree from the University of Georgia. He is the managing partner of WKL and has practiced law since 1996. For more than a decade, he has focused his practice on pursuing class actions on behalf of consumers and small businesses. He has been appointed lead counsel, co-lead counsel, or to plaintiffs' executive committees in more than two dozen successful class actions.

39. Roger N. Heller is a member in good standing of the California State Bar and a partner with LCHB. He graduated from Columbia University School of Law in 2001, where he was a Senior Editor for the Columbia Law Review. From 2001 through 2005, he was a litigation associate at O'Melveny & Myers LLP. From 2005 through 2008, he worked for the non-profit law firm Disability Rights Advocates, where he was a Senior Staff Attorney and worked primarily on prosecuting class actions under federal and state anti-discrimination laws. He joined LCHB in 2008 and became a partner at LCHB in 2011. During his entire time at LCHB, his practice has been focused on consumer protection class actions. He has successfully represented large classes in numerous consumer cases, including cases involving consumer banking, credit cards, payment processing services, false advertising, and insurance practices.

40. Matthew C. Klase is a partner of WKL and has practiced law for more than 18 years. He is a member in good standing of the state and federal courts in California and Georgia.

He received his undergraduate degree from Florida State University (1999) and his law degree from The Ohio State University (2002). For more than a decade, he has spent the majority of his practice representing plaintiffs in complex class action and multi-district litigation and has served as class counsel in many federal and state class actions. Mr. Klase was previously named a "Trial Lawyer of the Year Finalist" by Public Justice for his work on the *In re Checking Account Overdraft* multi-district litigation.

41. G. Franklin Lemond, Jr. is a partner of WKL and has practiced law for more than 15 years. He received his undergraduate degree from Furman University (1996), a master's degree from the University of North Carolina at Charlotte (2002), and his law degree from Georgia State University College of Law (2005). Mr. Lemond has been admitted to practice before all Georgia state courts, several Georgia federal courts, and was previously named a "Rising Star" by Georgia Super Lawyers Magazine. Mr. Lemond focuses his practice on representing plaintiffs in consumer class actions and has been appointed lead or co-lead counsel in numerous such cases.

42. Avery S. Halfon is a member in good standing of the New York State Bar and an associate at LCHB. He graduated from Harvard Law School in 2015, where he was editor-in-chief of the Harvard Law & Policy Review. During law school he served as a legal intern for the New York State Attorney General's Office and for Senator Charles E. Schumer's Judiciary Committee staff. Following law school he litigated on behalf of plaintiff classes at Cohen Milstein Sellers & Toll, PLLC and served as a Law Clerk to Judge Jane B. Stranch of the U.S. Court of Appeals for the Sixth Circuit. He joined LCHB in 2017 and his practice has focused on prosecuting consumer class actions, including successfully representing large classes in cases involving consumer banking, payment processing services, and false advertising.

43. Yun Swenson is a member in good standing of the California State Bar and a staff attorney at LCHB. Ms. Swenson earned her B.A. from the University of California, Berkeley in 1998 and earned her J.D. from Cornell Law School in 2003. Ms. Swenson became a staff attorney at LCHB in 2018. From 2010 to 2018, she was a senior paralegal at LCHB. Prior to joining LCHB, she worked for a real estate and loan brokerage company.

44. D. Grant Coyle is a member in good standing of the Georgia State Bar and a former associate at WKL. He earned his B.A. from the University of Florida in 2013, and his J.D. and Master of Public Administration from Georgia State University College of Law in 2017. While in law school, Mr. Coyle served as Vice President of Appellate Advocacy for the Moot Court Board. Mr. Coyle also argued for a team finishing in the top-10 at the Jessup International Moot Court Competition Southeastern Regional. He currently works as an associate for the law firm of Martenson, Hasbrouck & Simonson, LLP in Atlanta, Georgia.

45. Additionally, LCHB litigation support specialists worked on this matter as well. LCHB's Litigation Support group consists of an experienced team of specialists responsible primarily for: (a) preparing and conducting trial presentations and similar in-court technical productions; (b) creating, managing, and searching case-specific document and information databases (e.g., Relativity); and (c) performing certain case-specific data analyses. Because the personnel who make up LCHB's Litigation Support group have extensive training and experience performing these specific, technical tasks, it is generally more efficient and cost-effective for this type of work to be assigned to these personnel as opposed to, e.g., third parties or to paralegals with other areas of specialization and/or who normally perform less technical work. LCHB believes the fact that it has in-house personnel who specifically focus on these tasks represents a significant benefit and value to the clients and class members that LCHB

represents. In this case, LCHB Litigation Support specialists were primarily tasked with creating, managing, and conducting targeted searches of, and assisting attorneys in searching, the large database of documents produced by Defendant.

46. Dividing the $12 million fee request by our lodestar yields an implied "multiplier" of approximately 4.26. This is within the range of multipliers approved by courts in this and other Circuits during lodestar cross checks of percentage-of-fund awards.

47. Through the filing of this motion, we have incurred (and request reimbursement for) a total of $51,098.89 in litigation expenses. The requested sum corresponds to specific out-of-pocket expenses incurred while prosecuting and settling the actions and includes mediator fees ($17,100), maintenance costs associated with the secure electronic database storing WFMS's enormous document productions ($11,715), expert fees ($8,050), necessary (coach class) travel costs for depositions, court hearings, and mediations ($6,905.50), deposition transcript costs ($4,603.92), and necessary filing and administrative expenses (e.g., filing and service fees, PACER charges, copies, postage, delivery fees, etc.) ($2,724.47). All such expenses are reasonable and were necessarily incurred in furtherance of these actions.

48. We reserve the right to supplement this total with any additional costs that are incurred prior to the final approval hearing. We will not seek any expenses for the period after final approval. Sometimes there can be substantial expenses during this latter phase.

49. We enthusiastically support $15,000 service awards for each of the two named Plaintiffs/class representatives that were deposed in this action and service awards of $10,000 for each of the four Plaintiffs/class representatives that were not deposed in this action.

50. Each of the six representatives took time away from the day-to-day operation of their small businesses to devote substantial time and effort to the litigation, including by

15

contacting us, submitting to interviews regarding their billing experiences with WFMS, producing relevant documents, participating in conferences, responding to interrogatories and other written discovery, and keeping themselves abreast of the proceedings over the course of four years.  Moreover, they all exposed themselves to the risk and media attention that accompanies suing a powerful company such as WFMS.  Indeed, several were contacted by members of the media concerning the case and some submitted to interviews.

51. Queen City and Indian Tree Chiropractic, P.C. also expended substantial additional time away from their businesses preparing for, and participating in, depositions.  Both of these small businesses are owned and operated by the individuals who were deposed, so the depositions required the businesses to be shuttered for two work days, costing them income they otherwise would have earned giving tours or seeing patients, respectively.  This additional burden is the primary reason for the discrepancy between the proposed service awards to the Plaintiffs that were deposed and those that were not.

52. But for all six class representatives' courageous service, other Settlement Class Members would have received nothing.

53. We unequivocally recommend the Settlement as a fantastic result for the Settlement Class.

We declare under penalty of perjury that the foregoing is true and correct to the best of our knowledge, information, and belief.

Executed this 7th day of May, 2021, at Atlanta, Georgia and San Rafael, California, respectively.

/s/ E. Adam Webb
E. Adam Webb

/s/ Roger N. Heller
Roger N. Heller

16

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of May, 2021, I caused the foregoing document to be electronically filed with the Clerk of Court using the CM/ECF system which automatically sends email notification of such filing to all attorneys of record.

*/s/ E. Adam Webb*
E. Adam Webb
